UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DARREN MALLOY HEKKING, and :
SHAUN EGAN HEKKING, on behalf of :
himself and on behalf of C.H. and B.H., :
      Plaintiffs, :
      v. :      C.A. No. 14-295ML
CRAIG ANTONY HEKKING and :
MOLLY DURANT HEKKING, :
      Defendants. :

## REPORT AND RECOMMENDATION
## REGARDING SANCTIONS AGAINST DEFENDANT CRAIG ANTONY HEKKING

Defendant Craig Antony Hekking has blatantly and brazenly violated five orders of this Court (including one order entered after express notice that failure to comply could expose him to default), committed perjury and repeatedly engaged in deceptive tactics in responding to discovery for the purpose of delay. His recalcitrance not only constitutes willful disobedience of court orders, but also has thwarted the ability of the Court to adjudicate the merits of the suit and has inflicted prejudice, perhaps irreparable harm, on Plaintiffs. This conduct merits the imposition of the most extreme sanctions in the Court's arsenal. See Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1122 (1st Cir. 1989) ("brazen conduct merited so extreme a sanction; . . . the court, jealous of its integrity and concerned about deterrence, was entitled to send a message, loud and clear").

Plaintiffs in this inheritance dispute are two brothers, Darren Malloy Hekking and Shaun Egan Hekking. On June 27, 2014, they sued their older brother, Craig, and his wife, Molly Durant Hekking,[1] for breach of fiduciary duty, conversion and theft[2] in connection with Craig's

---

[1] To avoid the confusion inherent in a case in which every party has the same last name, I will refer to Plaintiffs as Darren and Shaun and to Defendants as Craig and Molly.

[2] Specifically, Counts I to III of the complaint allege breach of fiduciary duty against Craig for his actions as personal representative of the Parents' estates and as trustee of the Renate Revocable Trust, as well as for his actions

discharge of his obligations as personal representative of the estates of their late father, Laurie Vonderwind Hekking and their late stepmother, Renate E. Danhardt Hekking[3] (collectively, the "Parents") and related trusts.  The younger brothers charge that Craig abused his fiduciary position as personal representative and trustee by diverting the assets entrusted to him to fund a fruitless business venture and an extravagant lifestyle for himself, Molly and their family; Darren and Shaun have presented evidence of an elaborate web of forgery, lies and delay tactics to hide the assets entrusted to Craig and to cover-up the scheme.  They have established – using evidence from their pre-filing investigation and procured from third-party subpoenas since they have received no meaningful discovery from Craig – misappropriation of at least $3.8 million in inheritance property.  They have presented proof that the purloined funds continued to disappear after the filing of this action; their bank subpoenas have uncovered $195,000 withdrawn between the filing of this action in June and August 2014, including funds that were drained after the entry of the first of this Court's orders requiring disclosure.

Plaintiffs' Motion for Sanctions, ECF No. 25,[4] has been referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B); it asks the Court to sanction both Craig and Molly.  Because Molly's role in the underlying scheme and her conduct before this Court are materially different from those of her husband, I have severed the motion as to Molly from the motion against Craig.  For his part, at the final hearing on this motion, Craig represented that he will voluntarily resign as personal representative of the Parents' estates and as trustee of the

---

in draining the assets of the Cego Foundation and the Winter Group.  Count IV charges Craig with fraud for misrepresenting and hiding inheritance assets.  Counts V and VI accuse both Craig and Molly of conversion and civil theft, while Count VII charges Molly only with aiding and abetting.  ECF No. 1.

[3] Also to avoid confusion, I will refer to the decedents whose estates are in issue as Laurie and Renate.

[4] Plaintiffs' motion also sought to compel previously ordered expedited discovery.  That aspect of the motion was separately addressed by the September 25, 2014 Discovery Order, which Craig blatantly violated.  ECF No. 32.  It is discussed *infra*.

Renate Revocable Trust, which is one of the principal remedies sought by Plaintiffs in their complaint.  This offer (not yet executed as of this writing) comes a day late and is a dollar short; to the contrary, Craig's willingness to acquiesce to what would amount to a partial default "speaks volumes about [his] expectations with respect to what the unrebutted records show of the magnitude of [his] misconduct."  Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 500 (D. Md. 2010) (recommending sanctions of default, attorney's fees, costs and civil contempt, with incarceration until fees and costs timely paid, despite offer by defendant to accept default).

## I.    Factual Background[5]

Laurie and Renate died in Switzerland within eight days of each other in June 2010; each left a sophisticated estate, including an associated trust known as the Renate Revocable Trust, [6] with assets located both in the United States and in Europe.  ECF No. 11-3 ¶¶ 10, 11, 21, 27, 57. Although Darren and Shaun understood generally that they were equal one-third beneficiaries of the estates along with Craig, they did not know the particulars but relied on Craig to handle everything.  ECF No. 11-3 ¶¶ 22, 29; ECF No. 11-5 ¶¶ 22, 24.  In addition to the estates and the Renate Revocable Trust, prior to their deaths, Laurie and Renate also funded a trust for the benefit of their grandchildren called the Cego Foundation (based in Europe), which administered funds through an entity named the Winter Group.[7]  ECF No. 11-5 ¶ 86; see also ECF No. 1 ¶¶

---

[5] These facts are drawn from the evidence presented by Darren and Shaun in sworn declarations proffered in support of their motions for preliminary injunction and expedited discovery and this motion for sanctions.  ECF Nos. 11, 12, 25, 36, 42.

[6] Laurie's will left all assets (both real and personal) outright to his three sons.  ECF No. 11-5 at 28-33.  Renate's will provided that her personal property would pass to her three stepsons, but her non-personal property (including her real property) was devised to the Renate Revocable Trust for the exclusive benefit of her step grandchildren. ECF No. 11-5 at 35-42.  As of Renate's death, the only grandchildren were the children of Craig and Shaun; Darren has no children.  ECF No. 11-5 ¶ 70.  Apparently, Renate had no other grandchildren.  ECF No. 11-3 ¶ 9.

[7] The Renate Revocable Trust, Cego Foundation and Winter Group will be referred to collectively as the "related trusts."

83-85.[8]  As of the Parents' deaths, Darren and Shaun were completely unaware of the existence of the Renate Revocable Trust and the Cego Foundation, although they were aware generally that assets had been left for the grandchildren.  ECF No. 11-3 ¶¶ 57-58; ECF No. 11-5 ¶¶ 71, 86.

Initially, Darren and Shaun informally asked Craig for reports on what was going on with their Parents' estates.  ECF No. 11-3 ¶¶ 25, 28-29, 33; ECF No. 11-5 ¶¶ 23-24, 26, 33.  They became suspicious after receiving several notices (in German) from a clerk in the Hamburg Probate Court.[9]  ECF No. 11-5 ¶¶ 41-42.  In February 2014, they launched an investigation. ECF No. 11-3 ¶ 5.  When the investigation uncovered estate assets in Germany and the Renate Revocable Trust, ECF No. 11-5 ¶¶ 46, 56, both of which Craig had taken steps to conceal, they filed this complaint, seeking injunctive relief prohibiting Craig from acting as personal representative of the Parents' estates and trustee of the Renate Revocable Trust, compensatory and punitive damages for the lost inheritance and an accounting so Plaintiffs can begin to piece through the wreckage.  ECF No. 1.  The sordid history that follows begins with the convoluted tale of service of the complaint.

### A.    Chapter One – Default and Perjury

After Plaintiffs filed their complaint and affidavits of service averring that Craig and Molly had been served on July 3, 2014, nothing happened.  ECF Nos. 4, 5.  Ultimately, default against Craig and Molly entered.  ECF No. 18.  Meanwhile, on August 5, 2014, they appeared

---

[8] While Craig is not a trustee for the Cego Foundation or the Winter Group, Plaintiffs have presented evidence to establish that Craig used his position as personal representative of the estates to drain the Cego Foundation and Winter Group of all of their assets.  ECF No. 11-5 ¶¶ 73, 79, 94-96.

[9] After falsely telling his brothers that there were no assets in Germany, Craig surreptitiously initiated probate proceedings in Hamburg.  A clerk in the Hamburg Probate Court discovered that Craig had provided bogus contact information for the estate beneficiaries (Darren and Shaun); on his own initiative, the clerk found their addresses and sent them a notice.  Because it was in German, they turned it over to Craig without getting a translation.  When a second notice came from the Hamburg Probate Court, they pressed Craig for an explanation and he cut off all communication.  ECF No. 11-5 ¶¶ 36-38, 41-45; see also ECF No. 11-3 ¶¶ 38-40.  This incident triggered their engagement of counsel and the ensuing investigation.

through counsel and asked the Court to remove the default and to permit them to answer. These motions were supported by affidavits signed by Craig averring, *inter alia*, that he had never been served. ECF No. 14. Craig repeated this testimony at the hearing on the motions: he "categorically denied that the signatures on the two summonses belonged to him or that he was ever personally served."[10] ECF No. 28 at 8.

The resulting Memorandum and Order issued on September 17, 2014. In it, the Court found that Craig's testimony (and affidavit) averring that he had not been served was "a complete fabrication" that constituted perjury. ECF No. 28 at 15. Nevertheless, despite Craig's "blatant perjurious conduct," ECF No. 28 at 18, the Court vacated the default because the short delay (less than two weeks) that it caused had not resulted in demonstrable harm to Plaintiffs, beyond the attorney's fees and expenses incurred to defend the motion.[11] ECF No. 28 at 15, 18. Nevertheless, in language that resonates in light of Craig's subsequent conduct, the Court issued a stern warning: "should it become apparent in the course of discovery that the delay was used by the Defendants to gain a litigation or practical advantage, the Court may reconsider today's ruling and reinstate the default." ECF No. 28 at 17-18.

**B.      Chapter Two – Violation of the August 15, 2014 Expedited Discovery Order**

After the complaint was served, on July 31, 2014, Plaintiffs moved for a preliminary injunction to enjoin Craig from acting as personal representative and trustee and to enjoin both Craig and Molly from further misappropriating inheritance property. ECF No. 11. At the same time, Plaintiffs moved for expedited discovery so that they could quickly locate estate and trust

---

[10] The details of the default, Craig's affidavit and testimony averring that he was never served, the contrary testimony presented by Plaintiffs and this Court's finding that everything Craig said constituted perjury is laid out in the September 17, 2014, Memorandum and Order. ECF No. 28. They will not be repeated here.

[11] The Memorandum and Order sanctioned Craig for the perjury by requiring him to pay Plaintiffs their related counsel fees and other expenses. ECF No. 28 at 18. Subsequent events resulted in the October 2, 2014 Sanctions Order, which required both Craig and Molly to pay $30,777.93 by October 10, 2014 at 3 p.m. See ECF No. 34. As discussed below, neither Craig nor Molly complied with the October 2, 2014 Sanctions Order.

assets, which they believed had become intermingled with Craig and Molly's personal finances.[12] ECF No. 12. In light of Plaintiffs' allegation that Craig and Molly were continuing to spend the inheritance so that time was of the essence, the Court granted the motion by entry of the August 15, 2014 Expedited Discovery Order. See ECF No. 12-1 and Text Order of Aug. 15, 2014. This Order required Craig (and Molly) to provide sworn personal financial statements and to sign authorizations permitting access to their personal financial information; it also required Craig to furnish sworn financial statements for the estates and the related trusts and to sign authorizations sufficient to provide Plaintiffs with access to relevant third-party documents; all this was required to be accomplished within seven days of entry of the Order. ECF No. 12-1 at 8. In addition, the Order permitted Plaintiffs to take expedited depositions and to propound expedited party and third-party discovery; it set a discovery closure date of September 30, with the preliminary injunction hearing to begin on October 1, 2014. ECF No. 12-1 at 8-9 and Text Order of Aug. 15, 2014. It is significant to note that, in granting the motion to remove the default, the Court referred to the August 15, 2014 Expedited Discovery Order as a reason why Plaintiffs would not be unduly prejudiced. ECF No. 28 at 16.

Craig[13] not only failed utterly to comply with the spirit of the August 15, 2014 Expedited Discovery Order but – worse – provided ersatz compliance, producing false and deceptive responses that resulted in delay by inducing Plaintiffs (and this Court) to refrain from swift action to compel him to comply. For starters, as of this writing, Craig has persistently refused to

---

[12] For example, in support of the motion to expedite discovery, Plaintiffs presented evidence establishing that Craig, Molly and their children took a vacation at Chamonix-Mont-Blanc, France, paid for using funds allocated for the grandchildren. ECF No. 12-6 ¶¶ 94, 98, 102.

[13] Molly's compliance with the August 15, 2014 Expedited Discovery Order and with the other orders discussed in this report and recommendation was no better. However, the circumstances of her ability to comply, independent of Craig, and her claim that she relied on Craig because she had no knowledge of their finances pose different considerations for this Court; that is why the sanction motion against Molly is being addressed separately.

sign any of the required authorizations necessary to provide Plaintiffs with access to third-party documents pertaining to the Parents' estates and related trusts or to his own (and Molly's) assets. See ECF No. 36-1 at 49-50.

The phony compliance began late,[14] on August 28, 2014, when Craig provided what purported to be certified financial statements for the estates, the Renate Revocable Trust, the Cego Foundation and the Winter Group. ECF No. 25-16 ¶¶ 7, 11-15.[15] The information gathered by Plaintiffs in their investigation, supplemented by the fruits of their third-party discovery, has since exposed that these statements are useless – they omit all expenses and payments out of the estates, as well as many categories of inheritance property that Plaintiffs discovered through their own investigation.[16] For example, they make no reference to Laurie's account at Huntington National Bank and contain no information regarding the whereabouts of $595,591.87 withdrawn from a Winter Group account at a Swiss bank. ECF No. 25-6 at 2-22; ECF No. 25-7 at 2. They make no mention of the Winter Group account that Craig controlled at Citizens Bank into which he apparently deposited the Winter Group funds set up for the grandchildren. ECF No. 43-2 at 96-144. Most important – and shocking – of all, third-party discovery has since established that Craig effectuated the final withdrawals from and the closing of this Winter Group Citizens account, as well as the closing of the "Estate of Laurie Hekking" Citizens account, on August 27, 2014, twelve days after this Court entered the August 15, 2014 Expedited Discovery Order and the same day that Craig signed, under oath, financial statements

---

[14] The August 15, 2014 Expedited Discovery Order set the deadline for August 22, 2014, seven days after entry of the Order. ECF No. 12-1 at 8 and Text Order of Aug. 15, 2014.

[15] The certified financial statements for the entities are attached to Declaration of Attorney Suryanarayan. ECF No. 25-3 at 2 to ECF No. 25-5 at 54 (Renate's estate); ECF No. 25-6 at 2-22 (Laurie's estate); ECF No. 25-7 at 2-3 (Winter Group); ECF No. 25-8 at 2 (Cego Foundation); ECF No. 25-9 at 2-64 (Renate Revocable Trust).

[16] Examples of these omissions are reflected throughout the record. See, e.g., ECF No. 25-6 at 2-22; ECF No. 25-3 at 2 to ECF No. 25-5 at 54; ECF No. 11-3 ¶¶ 43-56; ECF No. 11-5 ¶ 54; ECF No. 43 at 2 to ECF No. 43-2 at 144; ECF No. 44-1 at 14 to ECF No. 45 at 102; see also ECF No. 25-1 at 8-20; ECF No. 25-1 at 12-13.

for the Winter Group and Laurie's estate that deceptively omitted both accounts. ECF No. 43-2 at 67; ECF No. 43-2 at 143; ECF No. 25-6 at 2; ECF No. 25-7 at 3.

Craig's personal certified financial statement raises similarly serious issues, both with respect to compliance with the Order and with respect to the deceptive nature of the information ultimately provided. First, he failed to comply with the deadline set in the August 15, 2014 Expedited Discovery Order (August 22), as well as with the new deadline of September 1, 2014, informally agreed to by Plaintiffs. ECF No. 25-16 ¶¶ 6-7. Craig did not supply anything about his personal finances until September 16, 2014, on the eve of his deposition, when he submitted a sworn statement, which stated that he had had no income since shortly after the death of the Parents (two months after they died, he quit his job) and that since 2011 his only work, apart from serving as personal representative and trustee, had been as the owner/partner of "Argentiere Luxury Americas, LLC," a jewelry business that has never generated any income. ECF No. 36-1 at 11-26. In the statement, Craig certified that he has only one joint bank account at Citizens Bank with his wife and that its balance, $19,456 as of September 16, 2014, constituted his total cash assets. ECF No. 36-1 at 15-16. With respect to tax returns, he certified that his joint returns for 2011 and 2012 would "be produced," and that he had requested an extension to file for 2013. ECF No. 36-1 at 23, 26. Subsequent events exposed the averments regarding both the bank statements and the tax returns to be completely false.

Pursuant to the August 15, 2014 Expedited Discovery Order, Craig's deposition began on September 19, 2014. During the first session of his deposition, with the documents subpoenaed from third-parties yet to be produced, he confirmed that he and Molly had only one bank account at Citizens Bank; he claimed that his only source of funds since the death of the Parents had been from the distribution of assets from the Parents' estates, which he split with his brothers, taking

8

approximately $750,000 for himself. ECF No. 36-1 at 51; ECF No. 42-2 at 5-7. While acknowledging that his financial statements had omitted the account at Huntington National Bank originally owned by Laurie, which he had put into his name (jointly with Molly), he claimed to not recall the amount deposited in the account, but represented that "I'm sure we can get those [bank statements] for you." ECF No. 42-2 at 7, 9-11. He testified that no income from his parents' estates had ever been deposited in any account other than the joint Citizens account listed on his certified financial statement and the Huntington account. ECF No. 42-2 at 10-11. Regarding documents pertaining to assets in Europe, he testified that he could, and would, call up his lawyer in Switzerland and obtain, for example, the entire file on the Winter Group. ECF No. 36-1 at 49. With respect to the overdue tax returns, he testified that "I don't think we can get them today, but next week I think we can make that happen." ECF No. 36-1 at 51. Based on these promises to produce, Plaintiff agreed to delay the completion of the deposition until September 24. Virtually all of this testimony turned out to be false.

Unsurprisingly, Craig produced nothing before the resumption of his deposition. ECF No. 44 at 3-4. In the meantime, however, Citizens Bank produced the documents Plaintiffs had subpoenaed directly. ECF No. 43 at 2. They revealed that Craig had not one but six accounts at Citizens and that approximately $1.8 million had been deposited into the undisclosed accounts since the Parents died, a period when Craig had testified that his only source of money was $750,000, his share of the distributions he had made from the estate. ECF No. 43. These Citizens records show that, after Plaintiffs commenced suit, these accounts funded a series of $1,000 transactions for money spent at Foxwoods Casino in Connecticut and a vacation in New Hampshire. See ECF No. 43-2 at 140, 141, 143. Most troubling of all, except for the $19,456 identified in Craig's financial statement, all of the funds deposited in the hidden Citizens

accounts have disappeared; Craig made the final withdrawals and closed two of the Citizens

accounts after the August 15 Expedited Discovery Order requiring that he disclose them was

entered.  ECF No. 43-2 at 67, 143.  The withdrawals after August 15, 2014, amount to over

$30,000 and include three transactions for money spent at Foxwoods Casino on August 21, each

in the amount of $1,043.99.  ECF No. 43-2 at 67, 143.

With this background, when his deposition resumed on September 24, 2014, Craig

invoked his Fifth Amendment right against self-incrimination and refused to answer any more

questions concerning the Parents' estates or the related trusts, any domestic or foreign bank

accounts, or his actions as personal representative or trustee.[17]  ECF No. 36-1 at 55-59.

After the completion of Craig's deposition, Plaintiffs received more new documents in

response to their Huntington National Bank subpoena.  ECF No. 44-1 at 14.  They are nearly as

explosive as the Citizens records.  They show that this account was funded by a total of almost

$2 million wired between February 2012 and April 2013, ECF No. 44-1 at 14; see ECF No. 44-1

at 61-103; ECF No. 45 at 1-102, and that Craig then used the Huntington account to finance

luxury vacations, including $20,000 in airline tickets and expensive lodging in Chamonix-Mont-

Blanc, France.  See, e.g., ECF No. 45 at 2, 3.  Like the accounts at Citizens, the subpoenaed

records from Huntington reveal that all of this money is gone; Craig closed the Huntington

account in April 2013.  ECF No. 44-1 at 14; see ECF No. 44-1 at 35-103; ECF No. 45 at 1-102.

---

[17] Because this sanction motion is a civil matter, it is permissible to draw the inference that Craig's answers to these questions would be unfavorable to him in that they could expose him to criminal prosecution.  See In re Carp, 340 F.3d 15, 23 (1st Cir. 2003) (court has discretion to draw adverse inference in civil cases); see also Aradia Women's Health Ctr. v. Operation Rescue, 929 F.2d 530, 532 (9th Cir. 1991) (when fine is imposed as contempt sanction, it is considered remedial and civil; adverse inference from refusal to testify permissible); F.T.C. v. Fin. Res. Unlimited, Inc., No. 03-C-8864, 2006 WL 1157612, at *12-13 (N.D. Ill. Apr. 25, 2006) (based on invocation of Fifth Amendment, court relies on adverse inference to find defendant in civil contempt).

In all, the documents subpoenaed from the only two American banks that Plaintiffs already knew about[18] expose that Craig has taken in approximately $3.8 million[19] over a four-year period during which he swears that neither he nor Molly held a paying job and that their only revenue was Craig's inheritance of approximately $750,000. ECF No. 36-1 at 13, 30; ECF No. 42-2 at 5. These records show that Craig (and Molly) spent at least $195,000 since Plaintiffs filed this action in June 2014 and over $400,000 since February 2014, when Plaintiffs became suspicious and initiated their investigation, leaving all these accounts depleted except for the $19,456 listed by Craig on his financial statement. ECF No. 43-1 at 67-99; ECF No. 43-2 at 55-67; ECF No. 43-2 at 119-144. Finally, these records show that Craig not only certified materially misleading financial statements and lied in his deposition to cover up the existence of most of these accounts, ECF No. 42-2 at 10-11, but also drained and closed two of them after he was aware of this suit and the Court's Order that he disclose them. Meanwhile, since the session of his deposition when Craig refused to answer based on the Fifth Amendment, no other material information or documents[20] ordered to be produced by the August 15, 2014 Expedited Discovery Order have been provided. ECF No. 36 at 6-7 n.3; ECF No. 36-1 at 4-5.

---

[18] It is important to emphasize that Craig may well be successfully hiding other accounts in the United States, in Europe or elsewhere.

[19] At the final hearing on this motion for sanctions, held on November 12, 2014, Craig's new attorney argued that this total may include double counting if funds were transferred from account to account. I disregard this comment: only Craig knows if it is true and he has been afforded repeated opportunities to dispute these figures either by filing an opposition or by offering evidence at the November 12 hearing. He has failed to do so; accordingly, for purposes of this sanction motion, I rely on the figure proffered by Plaintiffs and supported by the bank records.

[20] As discussed *infra*, since invoking the Fifth Amendment, Craig has produced: (1) an incomplete set of statements from an Argentiere Luxury bank account at Citizens; (2) documents Plaintiffs had already discovered through their own investigation; (3) an incomplete, unsigned 2010 tax return; and (4) a box of completely irrelevant documents. ECF No. 36 at 6-7 n.3; ECF No. 41 at 12-13 n.7.

Based on the foregoing, I find that Craig intentionally and strategically flouted the substance and the spirit of the August 15, 2014 Expedited Discovery Order,[21] either by ignoring its requirements completely or by providing false and misleading information to delay Plaintiffs' efforts aggressively to pursue further information regarding the whereabouts of the estate and trust assets that have now disappeared. In defiance of this Court's clear warning that the lifting of the default was premised on the expectation that there had not been and would not be prejudicial delay in anticipation of compliance with expedited discovery, Craig intentionally defied the Court's directive that he must promptly provide information about what had happened to the assets entrusted to him in the Parents' estates and the related trusts; instead, once he was aware of this suit, he used the delays endemic to litigation to take steps affirmatively to hide the remaining assets. I find that this contumacious conduct persists as of this writing and that his conduct permits the inference that delay from the service of the complaint on July 3 until August 28, 2014 (when he produced the first set of certified financial statements) was used to close accounts and hide assets.

### C.    Chapter Three – Violation of the September 25, 2014 Discovery Order

Increasingly concerned by Craig's stonewalling, and with the preliminary injunction hearing fast approaching, Plaintiffs filed their motion to compel.[22]  ECF No. 25.  On September 25, 2014, I held a hearing at which, as ordered, Craig (and Molly) personally appeared with

---

[21] I considered whether this finding should be tempered by Defendants' filing of an out-of-time motion to extend the deadline set by the August 15, 2014 Expedited Discovery Order for compliance with Plaintiffs' First Request for Production.  However, Craig also ignored the second chance provided by the September 25, 2014 Discovery Order, which ordered production of the same material.  The subsequent noncompliance permits the Court to conclude that the motion to extend was part of the pattern of delay and not filed in good faith based on Craig's intent to comply if permitted sufficient time.

[22] The same motion asked for sanctions and triggered the series of hearings culminating in the issuance of this report and recommendation.  See n.4.

counsel.[23]  They argued that their failure to comply with the August 15, 2014 Expedited

Discovery Order should be excused because they needed more time and the volume of material

sought was not realistic to produce so quickly.  In the face of this asseveration, I crafted the

September 25, 2014 Discovery Order.  ECF No. 32.  It mandates production of the same

materials already ordered to be produced by the August 15, 2014 Expedited Discovery Order, but

in response to Craig's argument that he just needed more time, it was carefully calibrated to be

specific and to impose only obligations that Craig, present in the Court, could realistically

perform.  Before recessing the hearing, I confirmed on the record that Craig understood and was

capable of doing what I was ordering him to do and that he understood not only that his failure to

comply could result in sanctions, including the possibility of default, but also that the extent of

his compliance with this new Order would be considered as a mitigating factor in determining

whether to recommend sanctions for the violations already committed by his noncompliance

with the August 15, 2014 Expedited Discovery Order.

In effect, the September 25, 2014 Discovery Order gave Craig a second chance.  As with

the prior Order, however, he completely ignored its requirements, as to some categories, by

complete noncompliance, as to others, by the production of information that deceptively induced

delay, and, as to still others, by retracting prior offers to produce by representing that documents

(i.e., tax returns) that he had previously testified could readily be produced actually do not exist.

I begin with the strange tale of the tax returns.  ECF No. 32 ¶ 1(a).  Both Craig and Molly

had averred in their sworn financial statements and testified at their depositions that they had

---

[23] Two days before this hearing, the attorney for Craig and Molly moved to withdraw.  ECF No. 31.  That motion
was not allowed until October 28, 2014.  Text Order of Oct. 28, 2014.  Pending the attorney's withdrawal, I ordered
him to advise Craig and Molly of the importance of engaging substitute counsel; how to proceed *pro se* if they did
not engage substitute counsel; all matters pending in the case, including the upcoming hearing on sanctions on
November 12, 2014; all of the potential sanctions under consideration (including without limitation, default, civil
contempt and money sanctions); and their right to present evidence at the sanctions hearing if they wished.  Text
Order of Oct. 14, 2014.

filed jointly in 2011 and 2012 and sought an extension for their 2013 tax return. ECF No. 36-1 at 23, 26, 40, 43. Craig identified their tax accountant and testified that he could get copies of the tax returns within a week. ECF No. 36-1 at 51. Molly testified that she specifically remembered signing the tax returns. ECF No. 36-1 at 62-63. Then, in response to the September 25, 2014 Discovery Order, Craig produced three pages of an incomplete unsigned 2010 tax return with no schedules and claimed (though not under oath)[24] that he had filed nothing for tax years 2011 to 2013. ECF No. 36-1 at 4. Instead, he produced a strange letter dated September 26, 2014, addressed to his counsel and penned by a different accountant from the one named in Craig's deposition as his tax accountant. ECF No. 36-1 at 66. It states:

> [Craig] indicated that his only inflow of cash since the last half of 2010 through 2013 is from the parents' estate. Accordingly, he has no taxable income and accordingly, is not required to file a federal or state tax return for the 2011, 2012 and 2013 tax years.[25]

ECF No. 36-1 at 66. This remarkable turnabout permits the inference either that Craig's prior testimony was perjury committed to induce delay as Plaintiffs (and this Court) gave him time to produce the tax returns or that he is lying now, hiding his tax returns because of what they might expose to Plaintiffs. Either way, the conduct is sanctionable.

The second category covered by the September 25, 2014 Discovery Order was bank statements. ECF No. 32 ¶ 1(b). Based on Craig's testimony that his domestic banking relationship had largely gone "paperless," ECF No. 42-2 at 11, the Order required Craig immediately to produce all statements available online from 2010 to the present, as well as any

---

[24] After his September 24, 2014, invocation of the Fifth Amendment, Craig provided no more testimonial information. The response to the September 25, 2014 Discovery Order repudiating his sworn testimony about tax returns was in a representation signed by counsel. ECF No. 36-1 at 4-5.

[25] This statement – that Craig has had no taxable income since the Parents' deaths – is contradicted by his affidavit of August 13, 2014, which stated that he kept certain cash proceeds of his father's estate as a "means of remunerating [myself] for undertaking all of the work related to the administration of two very complicated estates." ECF No. 16 ¶ 12.

hard copies in his possession. He has simply failed to comply. Instead, his "Response to Order" reproduced to Plaintiffs the same Citizens records that Plaintiffs had produced to him one week earlier. ECF No. 36 at 6-7; ECF No. 36-1 at 4. The only new document was a bank statement for a Citizens account in the name of Craig's business, Argentiere Luxury, for the period between May 2013 and February 2014.[26] ECF No. 36 at 6-7 n.3. However, in defiance of both the August 15, 2014 Expedited Discovery Order and the September 25, 2014 Discovery Order, Craig has adamantly refused to provide statements for this account after February 2014, a period when the Citizens records show he drained over $400,000 from three of the other Citizens accounts. ECF No. 36 at 6-7 n.3; ECF No. 43-1 at 66-99; ECF No. 43-2 at 55-67; ECF No. 43-2 at 119-144.

For European bank statements, in light of Craig's testimony that his Swiss lawyer would promptly respond to his instruction, the September 25, 2014 Discovery Order required Craig to contact the attorney immediately and instruct him to send all bank statements in his possession or to which he has access and to provide a written explanation in the event of any delay. ECF No. 32 ¶ 1(c). In his "Response to Order," Craig produced no bank statements, but attached email communications with his Swiss lawyer demonstrating that he (Craig) had requested all bank statements, but that his effort was foiled because the Swiss attorney was on vacation in Greece and "unfortunately not able to act immediately," but that he would "get back to [Craig] on this matter when returning to my office on October 6." ECF No. 36-1 at 76. The production of this email exchange turned out to be yet another deception calculated to induce delay – October 6 came and went, yet Craig has produced nothing from his Swiss attorney. ECF No. 41 at 18-20.

---

[26] For reasons not disclosed by the record, these statements for Argentiere Luxury were not included with the documents produced to Plaintiffs pursuant to the Citizens subpoena.

The September 25, 2014 Discovery Order had two other requirements: that Craig produce documents and information "sufficient to explain what happened to the withdrawn funds" for ten specified transactions and that he produce the documents sought by Plaintiffs' First Set of Document Requests by October 5, 2014. ECF No. 32 ¶¶ 1(d), 2(a). To facilitate the latter requirement, the Order directed the parties to submit a claw-back order to protect Craig from inadvertent production of privileged material. ECF No. 32 ¶ 2(d). As with the balance of the actions mandated by the September 25, 2014 Discovery Order, Craig's compliance has been so tepid as to constitute noncompliance. His "explanations" for the account transfers on Plaintiffs' list of transactions (seven of the ten transactions identified by Plaintiffs) are meaningless misdirection, ECF No. 36-1 at 84-85, while his document production consisted of Laurie and Renate's applications for Social Security and Medicare, copies of expired life insurance policies and annuity contracts from 1998 to 2009, sporadic pre-death bank statements and other completely irrelevant documents. The rest were documents Plaintiffs already had. ECF No. 41 at 12-13 n.7.

Based on the foregoing, I find that Craig, fully aware that the consequences could include default and fully able to comply, intentionally violated the precise requirements of the September 25, 2014 Discovery Order and that his conduct continued the pattern of deception to achieve delay.

**D.     Chapter Four – Violation of the September 29, 2014 Consent Order**

Doubtless to avoid the scrutiny that the preliminary injunction hearing scheduled for October 1, 2014, would bring, Craig (and Molly) agreed to submit to a six-paragraph Consent Order that provided Plaintiffs with the relief they sought (on paper anyway) in their injunction motion – it was entered on September 29, 2014. ECF No. 33. This Consent Order enjoins Craig

(and Molly) from concealing, transferring or spending any assets of their own or any assets from the Parents' estates and related trusts; requires them to provide Plaintiffs, within five days, lists of the assets of the estates and related trusts and their own assets, as well as all domestic and offshore bank statements; and requires Craig to execute all documents necessary to transfer certain German assets to Plaintiff. ECF No. 33 ¶¶ 1-5. To make the ban on spending their own assets realistic, the Consent Order permits Craig and Molly to spend up to $9000 per month from sources other than the assets of the estates and related trusts but requires them to provide Plaintiffs with monthly operating statements. ECF No. 33 ¶¶ 1, 6.

I find that Craig has violated at least five of the six paragraphs of the September 29, 2014 Consent Order. The only provision for which Plaintiffs lack firm evidence is the prohibition on disposing of assets because Craig's (and Molly's) spending continues behind a curtain of obfuscation. Otherwise, Craig has failed to provide any information identifying his own property or the remaining property of the Parents' estates and related trusts, or any more information pertaining to bank statements; he has failed to produce any material pertaining to "Swiss, German, or any other offshore bank accounts;" and he has failed to provide a monthly operating statement for the months of October and November 2014. ECF No. 41 at 24-27. Finally, he has failed to execute the critical document necessary to allow Plaintiffs to retrieve funds from a specific account (containing approximately $85,000) in Germany. Instead, in defiance of the September 29, 2014 Consent Order, he has refused to sign, leaving the funds frozen. ECF No. 42 ¶¶ 8, 9.

### E.  Chapter Five – Violation of October 2, 2014 Sanction Order

The October 2, 2014, Sanctions Order, based on Craig's perjury at the hearing to remove the default, required Craig to pay $30,777.93 from personal assets (i.e., funds that did not

originate from the estates or related trust) by October 10, 2014, at 3 p.m.  ECF No. 34 at 2-3.  To date, Craig has ignored this obligation to pay the monetary sanction.[27]

### F.        Chapter Six – Violation of the October 2, 2014 Order to Appear

In the midst of this difficult situation, I scheduled a hearing on the withdrawal motion of the first attorney for Craig and Molly; it was held on October 14, 2014.  Because of the serious issues pending, including this motion for sanctions, I ordered both of them to attend in person.  Text Order of Oct. 2, 2014.  Neither complied.  At the hearing, their attorney represented that he had made them aware that the Court had ordered their attendance and could not explain their whereabouts or why they had failed to appear.  While Plaintiffs have not included the violation of this Order in their litany of reasons for the imposition of sanctions, Craig's willingness to disregard even so simple an order must be considered when this Court considers how to sanction his conduct.

## II.        Plaintiffs' Motion for Sanctions

Plaintiffs argue that Craig's conduct evinces a pattern of delay and obfuscation that has continually frustrated their attempts to discover the information they need to sustain their burden not just as to Craig's liability, but also as to the calculation of damages.  Despite repeated Court orders requiring disclosure, they contend that Craig has withheld and falsely understated his personal financial information, failing even to disclose items as simple as bank statements.  More importantly, despite his fiduciary obligations to Plaintiffs, Craig has refused to provide meaningful financial information regarding what has happened to the Parents' estates and related trusts.  As a result, what Plaintiffs have uncovered has been accomplished through their own investigation and third-party discovery at tremendous cost.  They contend that Craig's conduct

---

[27] Craig's new counsel represented at the November 12, 2014, hearing that Craig is attempting to sell a car so that he can pay the sanction.  As of this writing, it remains unpaid.

permits the inference that he is continuing to spend or hide inheritance assets, while doing everything he can to impede Plaintiffs' efforts to stop the bleeding.

Invoking the Court's ability to sanction under its inherent powers and pursuant to Fed. R. Civ. P. 37, Plaintiffs argue that Craig's willful disregard of this Court's authority warrants the most extreme sanctions, starting with default against Craig, as well as the imposition of additional monetary sanctions for the added and unnecessary costs associated with the extensive motion practice arising from his conduct. They ask the Court to convert the unpaid sanctions award of $30,777.93 into a partial final judgment so Plaintiffs can begin to execute on Craig's property. Finally, they ask the Court to enter an order removing Craig as personal representative of the Parents' estates and as trustee of the Renate Revocable Trust and requiring him to execute whatever documents are necessary swiftly to achieve that result.

Consideration of this sanction motion has been protracted by this Court's effort to provide Craig with sufficient notice of the risk he faces and an adequate opportunity to contest the contentions in Plaintiffs' sanctions filings. For example, in connection with compliance with the September 25, 2014 Discovery Order, Craig was invited to file a response to Plaintiffs' memorandum but he did not do so. ECF No. 32 ¶ 3(b). Again at the October 14, 2014, hearing on the motion of Craig's first attorney to withdraw, I ordered counsel to advise Craig (and Molly), *inter alia*, of all pending matters, including the upcoming hearing on sanctions, all potential sanctions under consideration (including without limitation default, civil contempt and money sanctions) and their right to present evidence at that hearing if they wished. Text Order of Oct. 14, 2014 on Motion to Withdraw. I also set a deadline of November 10 to allow Craig to respond to Plaintiff's supplemental memorandum, but he did not do so. Text Order of Oct. 14, 2014 on Sanctions Hearing. Finally, at the November 12 sanctions hearing, which Craig (and

Molly) attended in person, accompanied by Craig's new attorney, I afforded Craig the opportunity to present substantive argument or evidence in connection with the pending motion. Again, he presented no evidence or testimony and his attorney argued only that he just needs more time to make things right.

## III.    Applicable Law

A district court has the inherent power to manage its own proceedings and to control the conduct of litigants who appear before it through orders or monetary sanctions for bad-faith, vexatious, wanton or oppressive behavior.  Johnson v. U.S. Judges, No. 14-11273-DPW, 2014 WL 3109962, at *3 (D. Mass. July 7, 2014) (citing Chambers v. Nasco, Inc., 501 U.S. 32, 46–50 (1991)); see John's Insulation, Inc. v. L. Addison & Assocs., 156 F.3d 101, 108-09 (1st Cir. 1998) (district court properly entered default judgment under inherent powers as a sanction for plaintiff's protracted delay and repeated violation of court's orders).  The court's inherent powers include the power to default a party that abuses the discovery process.  Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 12 (1st Cir. 1985).  Fed. R. Civ. P. 37 also permits the court to impose sanctions if a party "fails to obey an order to provide or permit discovery."  Fed. R. Civ. P. 37(b)(2)(A).  It provides the Court with a "veritable arsenal of sanctions," including default.  Companion Health Servs., Inc. v. Kurtz, 675 F.3d 75, 84 (1st Cir. 2012); Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii).  Faced with a disobedient litigant, the court has wide latitude to choose from among an armamentarium of available sanctions; while default is strong medicine to be prescribed only in egregious cases, a party who flouts a court order does so at his own peril.  Hooper-Haas v. Ziegler Holdings, LLC, 690 F.3d 34, 37-38 (1st Cir. 2012); see Smith v. Kmart Corp., 177 F.3d 19, 28 (1st Cir. 1999) (choice of appropriate sanction is left to discretion of district court).  Our Circuit has consistently held that default is appropriate when a court is

confronted with a persistently noncompliant litigant, particularly when the conduct also interferes with the judicial system's ability impartially to adjudicate the matter. Aoude, 892 F.2d at 1118; see also Hull v. Municipality of San Juan, 356 F.3d 98, 102 (1st Cir. 2004).

The appropriateness of default as a sanction must be evaluated case by case based on a totality of the circumstances. Hooper-Haas, 690 F.3d at 38. Relevant factors include, but are not limited to, the nature of the misconduct, its repetition (or lack thereof), its degree of deliberateness, the extent to which the offender had fair warning of the possible consequences of misconduct, the opportunity to offer an explanation or to plead for leniency, the legitimacy of any proffered excuse, any other aggravating or mitigating circumstances, the presence or absence of prejudice to the other party, the degree of interference with the functioning of the court, and the adequacy of lesser sanctions. Id. In the last analysis, these factors require a court to balance the desirability of resolving cases on the merits against the importance of "the orderly and efficient administration of justice." Id. Procedurally, the court should consider (1) whether the offending party was given sufficient notice, and (2) whether the offending party has been given an opportunity to explain its noncompliance or argue for a lesser penalty. Vallejo v. Santini-Padilla, 607 F.3d 1, 8 (1st Cir. 2010); Angiodynamics, Inc. v. Biolitec AG, 991 F. Supp. 2d 283, 290 (D. Mass. 2014).

In short, the law is clear: as long as the scofflaw is given adequate notice and an opportunity to mount a defense, when the discovery abuses subvert the judicial process and the deceits are substantial, going to the heart of the case, a case-ending sanction is well within the discretion of the district court. Hull, 356 F.3d at 102-03.

## IV.     RECOMMENDED DISPOSITION

Craig has committed perjury, engaged in pervasive discovery abuses, intentionally frustrated the progress of the action and willfully violated numerous orders of the Court.  His conduct, now exacerbated by his invocation of the Fifth Amendment, permits the inference that he has fueled his extravagant lifestyle (including but not limited to trips to Chamonix-Mont-Blanc, New Hampshire and Foxwoods Casino) with money stolen from the estates and related trusts.  More troubling is the inference that, in the face of orders aimed at opening up the books of the Parents' estates and related trusts to allow Plaintiffs to litigate their claim, Craig's scheme has continued unabated, permitting him to hide the stolen assets as this Court has allowed delay upon delay to give him time to explain and defend.

The nub of Plaintiffs' complaint is that Craig breached his fiduciary duty, converted his brothers' inheritances to the tune of at least $3.8 million and has continued to pilfer while Plaintiffs stand by helpless.  And Craig is in possession of the information Plaintiffs need – but they cannot access most of it without his assistance.  By flouting the Court's orders, he has frustrated their efforts with contumacious conduct that undermines the very relief sought by their complaint.  See Hull, 356 F.3d at 102 (unconscionable scheme resulting in unfairness to other side can result in judgment when party's fraud relates to main issue in case).  Plaintiffs have repaired to the Court for relief to stop the dissipation of their inheritance, but Craig's contravention of the Court's orders has stymied them in their quest for justice.  In all, Craig's actions amount to a calculated decision to engage in delay to frustrate discovery of the facts at the crux of this matter; indeed, his conduct may fairly be labeled as shocking when one focuses on the fiduciary responsibilities he assumed when he gained access to the assets he appears to have stolen.  See id.; Aoude, 892 F.2d at 1120.

Neither potential ambiguities in the operative orders nor claimed impossibility of compliance provides Craig with a defense to this sanction motion. While our Circuit Court requires that orders be "clear and unambiguous" and that compliance must be realistically possible, these principles are not to be applied in the abstract to test how the order is worded as a general matter. United States v. Saccoccia, 433 F.3d 19, 27-28 (1st Cir. 2005). Rather, this Court must examine whether the words of the orders have clearly and unambiguously required the precise conduct whose omission is at issue; the Court's focus must be whether the actions not performed were realistically possible. See id.; UTGR, Inc. v. Mutuel/Gaming Clerks Union, No. 09-046, 2010 WL 231122, at *2 (D.R.I. Jan. 12, 2010) (court order should be applied to conduct in question, not in a vacuum). Thus, the relevant inquiry is not whether any of the orders is vague or impossible as to some imagined infraction, but whether Craig's obligations to comply were sufficiently clear, unambiguous and possible so as to render his noncompliance sanctionable. Here, the core requirements of the August 15, 2014 Expedited Discovery Order, the September 25, 2014 Discovery Order and the September 29, 2014 Consent Order – that Craig promptly disclose his personal finances and the status of the assets of the estates and the related trusts – were crisply "clear, definite, and unambiguous." See Asociacion De Suscripcion Conjunta v. Sec'y of Treasury, No. 08-1707, 2013 WL 132684, at *5-6 (D.P.R. Jan. 9, 2013). Further, Craig's plaint that the August 15, 2014 Expedited Discovery Order imposed impossible obligations was cured by the September 25, 2014 Discovery Order, which reiterated the same requirements, but in more precise detail, and was fashioned in Craig's presence with the goal of assuring that he could realistically comply with every requirement.

Enough is enough. I find that Craig's conduct is intentional and warrants the imposition of the most severe sanctions. I further find that Craig's blatant disregard for the October 2, 2014

Sanctions Order requiring him to pay a monetary sanction demonstrates eloquently that a sanction less draconian than default would be ineffective and would simply perpetuate the conduct by leaving him free to continue to squander and hide whatever assets remain.  See Aoude, 892 F.2d at 1119 ("[c]ourts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system").  Put differently, a sanction less severe than default would effectively condone Craig's conduct and make the Court a party to his tactics, a result the Court cannot countenance.  Starski v. Kirzhnev, 682 F.3d 51, 55 (1st Cir. 2012) (court must maintain judicial integrity and deterrence of future misconduct).  Because Craig's discovery misconduct directly impacts the core allegations of the complaint and prevents Plaintiffs from proving their case, default is appropriate.  Aoude, 892 F.2d at 1118; see also Jackson v. Murphy, 468 F. App'x 616, 618, 620 (7th Cir. 2012) (dismissing case brought by party who forged document, lied to court, and forced costly hearing by creating a factual dispute where none existed); Brown v. Oil States Skagit Smatco, 664 F.3d 71, 77-80 (5th Cir. 2011) (dismissal appropriate when plaintiff gave conflicting testimony from prior lawsuit on key aspect of case); Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488-89 (9th Cir. 1991) (alteration of deposition testimony on key aspect of case warrants dismissal); Rodriguez v. M & M/Mars, No. 96 C 1231, 1997 WL 349989, at *2 (N.D. Ill. June 23, 1997) (concealing relevant information by perjury warrants dismissal). Accordingly, I am recommending that the Court reinstate the default that it removed on sufferance of Craig's good behavior after the hearing at which Craig committed perjury. September 17, 2014, Memorandum and Order (ECF No. 28 at 18).  In addition, in light of the unnecessary expense Plaintiffs have had to incur yet again due to Craig's intentional misconduct, I am recommending that the Court impose monetary sanctions.

A coda: after plowing through all of their evidence, Plaintiffs' seemingly hyperbolic charge that Craig is a professional charlatan rings true; further, by his pattern of noncompliance with virtually every order this Court has entered in this case, Craig has dragged the Court itself into the circle of those he has duped by his repeated requests for delay. While the findings set out above are principally intended as the foundation for my recommendation of the sanction of default, and mindful that contempt must be based on clear and convincing evidence, Saccoccia, 433 F.3d at 27, I find also find that Plaintiffs' carefully assembled evidence clears the bar, in that they have presented clear and convincing proof sufficient to support contempt of the orders outlined in this report and recommendation.[28] Accordingly, I also certify these findings for the Court to use as the foundation for issuance of a show cause order why Craig should be not held in contempt of court, either civilly or criminally.[29] See Yates v. United States, 355 U.S. 66, 74-75 (1957) (act or omission in violation of court order may subject a party either to criminal or civil contempt, or both); United States v. Brier, CA 09-607-ML, 2011 WL 917981, at *1 (D.R.I. Mar. 15, 2011) (quoting United States v. Winter, 70 F.3d 655, 661 (1st Cir. 1995)) (contempt should be imposed only after notice and an opportunity to be heard); see also 28 U.S.C. § 636(e)(6)(B)(ii)-(iii) (magistrate judge must certify facts constituting civil or criminal contempt to a district judge). Craig's contumacious conduct merits this Court's consideration whether to employ its contempt power. See Victor Stanley, Inc., 269 F.R.D. at 540-41 (in addition to justifying sanctions, evidence establishes contempt by clear and convincing evidence; civil

---

[28] During the October 14 and November 12 hearings, and in the notice of the hearing of November 12, 2014, Craig was explicitly placed on notice that civil contempt was one of consequences under serious consideration. See Text Order of Oct. 14, 2014.

[29] If this Court considers criminal contempt, I note that the adverse inference arising from Craig's invocation of the Fifth Amendment may not be held against him.

contempt order of two years of incarceration to be imposed if defendant fails to pay monetary sanction).

## V.      Conclusion

I recommend that this Court reinstate the sanction of default against Craig.  Specifically, I recommend (i) that a finding of default liability against Craig enter on Counts I to VI of the complaint; (ii) that Craig be ordered to provide an accounting in connection with his discharge of his fiduciary duties as personal representative of the Parents' estates and as trustee of the Renate Revocable Trust; and (iii) that Craig be enjoined from acting as the personal representative of the Parents' estates or as trustee of the Renate Revocable Trust, as well as from taking any further action with respect to property that belongs to the Parents' estates, the Renate Revocable Trust, the Cego Foundation or the Winter Group.  To effectuate the injunction, I recommend that Craig be ordered to execute all documents necessary to remove himself as personal representative of the Parents' estates and as trustee of the Renate Revocable Trust within five days of the adoption of this report and recommendation.  Should the Court adopt this aspect of this recommendation, I also recommend that the Court schedule a hearing to determine the appropriate amount of compensatory (and punitive if appropriate) damages to be awarded on Counts I to VI of the complaint.

With respect to monetary sanctions, I recommend that the Court enter a partial final judgment against Craig in the amount of $30,777.93, based on his failure to satisfy the October 2, 2014 Sanctions Order.  I further recommend that this Court impose additional monetary sanctions to compensate Plaintiffs for the considerable expenses incurred in connection with this motion for sanctions; should the Court adopt this aspect of this recommendation, I also

recommend that the Court direct Plaintiffs to submit a bill for their fees and expenses within seven days of adoption, and that Craig may have seven days thereafter to file any response.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 25, 2014