# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

DARREN MALLOY HEKKING and :
SHAUN EGAN HEKKING, on behalf of :
himself and on behalf of C.H. and B.H., :
      Plaintiffs, :
  :
     v. : C.A. No. 14-295ML
  :
CRAIG ANTONY HEKKING and :
MOLLY DURANT HEKKING, :
      Defendants. :

## REPORT AND RECOMMENDATION
## REGARDING SANCTIONS AGAINST DEFENDANT MOLLY DURANT HEKKING

Patricia A. Sullivan, United States Magistrate Judge

On November 25, 2014, I recommended that this Court impose the most extreme sanctions in its arsenal on Defendant Craig Antony Hekking for his blatant failure to comply with five Court Orders, two of which were entered to require him to respond to discovery regarding what he has done with assets entrusted to him as the court-appointed personal representative of his deceased parents' estates and the trustee of one of their trusts (collectively, the "estate assets").[1] The motion, ECF No. 25 ("sanctions motion"), that led to this recommendation was also directed at his wife and codefendant, Molly Durant Hekking.[2] After the sanctions motion was referred to me, I severed the motion against Molly from the motion against Craig both because Molly's role in the scheme is different from Craig's and because her conduct before this Court appeared to be materially different from that of her husband.

---

[1] My report and recommendation regarding sanctions against Defendant Craig Antony Hekking sets out the relevant background. See ECF No. 50. This report and recommendation assumes the reader's familiarity with those details.

[2] To avoid the confusion inevitable in a case where every party and both decedents have the same last name, I refer to Defendant Craig Antony Hekking as Craig and Defendant Molly Durant Hekking as Molly; for the same reason, I refer to Plaintiff Darren Malloy Hekking as Darren, to Plaintiff Shaun Egan Hekking as Shaun and to the deceased parents (Laurie Vonderwind Hekking and Renate E. Danhardt Hekking) as Laurie and Renate (collectively, "the parents").

Since issuing the report and recommendation regarding Craig, I have conducted two hearings, the second an evidentiary hearing at which Molly testified, and permitted the parties to engage in additional discovery, including a limited deposition by written questions of Keith Kyle, Esq., the attorney who represented both Molly and Craig until he was permitted to withdraw on October 28, 2014 ("Attorney Kyle").[3] Unlike Craig, who has asserted his Fifth Amendment right not to testify, Molly has been subjected to more than twenty hours of cross-examination[4] regarding the matters at issue on this sanctions motion.

The sanctions motion against Molly is now ripe for decision.

## I. Background

In this inheritance dispute, Craig's younger brothers have charged that Craig abused his fiduciary position as personal representative of their parents' estates and trustee of their stepmother's trust by stealing millions of dollars in estate assets to fund a fruitless business venture and an extravagant lifestyle for himself, Molly and their family. The younger brothers

---

[3] Because Molly's knowledge of the Court Orders affects the outcome of this sanctions motion, Plaintiffs were given leave to propound written deposition questions to Attorney Kyle pursuant to Fed. R. Civ. P. 31. ECF No. 64. The deposition was limited to whether he communicated the Court Orders to her, a topic that is not protected by the attorney-client privilege. United States v. Bey, 772 F.3d 1099, 1101 (7th Cir. 2014); see United States v. Kinsella, 545 F. Supp. 2d 148, 155-56 (D. Me. 2008). Attorney Kyle's written deposition questions and answers are in Hearing Exhibit 1(A).

[4] On September 18, 2014, Molly testified at a day-long deposition in compliance with this Court's August 15 Expedited Discovery Order; in connection with the sanctions motion, she testified for another full day on January 2, 2015, and for almost five more hours on January 15, 2015. Because I deemed her credibility pivotal to the outcome of the sanctions motion, I ordered her to testify in person at the final hearing on January 26, 2015, which she did for over two hours.

Plaintiffs have raised a minor issue arising from Molly's depositions, which may be disposed of quickly. They complain that Molly's counsel's instructions not to answer certain questions during the January depositions increased their expenses and presumably are another reason to impose sanctions. I disagree. Having carefully reviewed both transcripts, I find nothing sanctionable in any of these instructions. To the contrary, I find that Molly's attorney was generally appropriate in raising issues pertaining to the attorney-client privilege, the marital privilege and his reasonable confusion regarding the scope of permissible examination for a special purpose deposition that, by then, was well outside the seven-hour cap imposed by Fed. R. Civ. P. 30(d)(1). In addition, I find that these transcripts demonstrate that Molly took seriously and complied fully with her Court-ordered obligation to appear and respond to Plaintiffs' questions. If any of the attorneys present at these depositions are to be criticized for time-wasting colloquy, the critique should focus on the conduct of counsel for Craig and for Plaintiffs.

have assembled dramatic evidence of Craig's malfeasance in both Europe and the United States, including evidence from their pre-filing investigation and documents procured from third-party subpoenas establishing that Craig willfully failed to disclose bank accounts where he had stashed the purloined funds in flagrant disregard of a series of Orders of this Court.

Plaintiffs' claims against Craig's wife, Molly, are found in Counts Five, Six and Seven of the complaint. ECF No. 1. Counts Five and Six charge Craig and Molly jointly with conversion and civil theft of estate assets that included cash, art, jewelry, designer clothing, furniture, a watch collection, wines and vintage cars. Count Seven is leveled only at Molly, charging her with aiding and abetting Craig; the younger brothers claim that Molly provided Craig with substantial assistance in stealing and hiding the assets. Further, knowing that she was living off stolen funds, they allege that she lived an extravagant, indeed profligate, lifestyle until this litigation (or the money running out) forced her to stop. In connection with the sanctions motion, Plaintiffs contend that the spending spree permits the inference that Molly committed perjury to cover up at least some of the bank accounts in violation of this Court's Orders so that the same sanctions that were recommended for Craig should also be recommended for her.

In defense, Molly paints herself as a clueless spouse who has never had responsibility for family banking, taxes or financial matters. A theater major, she claims that she has always existed in a cocoon; other people handle financial matters for her. Moreover, having been married to Craig for only two years when the parents died, she claims to have known little about the estate assets. As a result, she contends that the ignorance Plaintiffs claim is feigned and evinces disregard for Court Orders – particularly her failure to disclose bank accounts and her inconsistent testimony about tax returns – is not willful misconduct. Rather, she argues that her

spacy and incomplete responses to Plaintiffs' discovery are the result of genuine nescience, coupled with confusion about her obligations.

Focusing on the Court Orders, Molly claims that she did not comprehend the real nature of this lawsuit and was oblivious to the obligations imposed on her personally by this Court's August 15 Expedited Discovery Order until beginning just before her deposition on September 18, 2015, when she carefully read the complaint for the first time. ECF No. 71. A week later, on September 23, 2014, Attorney Kyle, who had entered his appearance for her and Craig, moved to withdraw. ECF No. 31. Then, more than a month passed before, on November 25, 2014, her own attorney entered his appearance, ironically, on the same day that I issued my report and recommendation recommending sanctions against Craig. ECF No. 48. Until then, Molly did not have a legal adviser looking out for her separate interests or able to explain her unique obligations to the Court in a case focused on Craig and what he did with the estate assets. ECF No. 49. Even as it began to dawn on Molly that she is personally sued, that she is personally subject to the Orders and that her personal assets are at risk, she remained confused by how to comply when each of the Orders is addressed to "defendants." Both prior to, but clearly since, the entry of the appearance of her separate counsel, Molly has tried to comply with the pending Orders to the extent that she is able. She would have Plaintiffs – and this Court – believe that this compliance, despite a good faith effort, has been unhelpful because she simply does not know what Craig was really up to.

Based on the record developed in connection with this sanctions motion,[5] and mindful that Plaintiffs have exposed Molly to over twenty hours of cross-examination, as well as that the

---

[5] It must be emphasized that these findings relate to the sanctions motion and not to the merits of Plaintiffs' claims against Molly. A spouse who has her head in the sand may avoid sanctions based on ignorance, but such ignorance may not be effective to avoid liability. For example, under the False Claims Act, an ignorant spouse who acted in "deliberate ignorance" or "reckless disregard" of the facts may nevertheless be responsible. United States v. Rachel,

limited deposition of Attorney Kyle did not contradict her testimony, I cautiously find that Molly is largely credible. While some of her glaring ignorance of her own affairs is hard to swallow, her testimony has been consistent and her gaffes (unlike Craig's) do not seem calculated to facilitate a cover-up. The fact that she knew that a substantial amount of money was being spent on unnecessary luxuries at a time when neither she nor Craig were working, yet she never challenged his decisions, may prove that she was foolish, but not that she has committed perjury or defied the Court Orders. In reliance on these findings, I do not recommend sanctions. It remains conceivable that Molly is just a better liar than Craig. If new information exposes the fallacy of my findings, I invite Plaintiffs to renew their motion and seek default against Molly.

The analysis follows.

## II.     Facts[6]

### A.     Prior to Death of Craig's Parents

Molly and Craig married on June 14, 2008, just two years before Craig's father, Laurie, and his stepmother, Renate, died in Switzerland within eight days of each other. Hr'g Ex. 9 at 8-11; ECF No. 11-5 at 3. Craig and Molly have two children together. Hr'g Ex. 9 at 4. Molly was a theater major who attended a community college before graduating from a state university in New York in 2000. Id. at 11-12. After graduation, Molly worked as a TV stage hand, ran an art gallery and worked as a real estate agent. Id. at 13-21. Her first marriage ended in divorce

---

289 F. Supp. 2d 688, 695-96 (D. Md. 2003) (wife who signed documents used for fraud without reading or understanding may be held liable); see also In re Anton, No. 08-64144, 2013 WL 1747907, at *6-9 (Bankr. E.D. Mich. Apr. 12, 2013) (willful blindness while enjoying fruits of fraudulent scheme can subject spouse to liability).

[6] The facts laid out in this report and recommendation are primarily drawn from the record developed in connection with the sanctions motion against Molly. Exhibits are identified by their number or letter from the hearings on sanctions (Hr'g Ex. __). Molly's three pre-hearing depositions transcripts were marked as hearing exhibits and will be referred to by their exhibit designations: the September 18, 2014, deposition transcript is Exhibit 9; the January 2, 2015, deposition transcript is Exhibit 10; and the January 15, 2015, deposition transcript is Exhibit 11. No transcript of the evidentiary hearing is available. In addition, some of these facts are drawn from Plaintiffs' sworn declarations proffered in support of their motion for preliminary injunction, motion for expedited discovery and the sanctions motion. I refer to those by their docket number. See ECF Nos. 11, 12, 25, 36, 42.

leaving her with one child, child support and ownership of a house (with a mortgage) in

Newport.  Id. at 4, 143-44, 304, 311.  In approximately 2007, she connected with Craig; they

started a children's clothing store together and then married.  The store did not last long, closing

when the economy slowed.  Id. at 19-20.  Molly became a stay-at-home mom caring for her three

children and, sometimes on weekends and for part of the summer, Craig's two children from his

first marriage.  Id. at 21, 299-301.  After the store failed, Craig went to work, first he worked for

a computer company, then for a few months for a company in Florida, and ultimately for a

company called Telesto, where he worked for about a year before quitting shortly after his

parents died.  Id. at 22-25.

As a relatively new member of the Hekking family, Molly's contact with and knowledge

of the parents and their assets was scanty.  Other family members never visited the home in

Newport that Craig and Molly shared.  Id. at 94.  Molly did not attend the baptism of Craig's

brother's child, even though Craig was godfather.  Id. at 93-94.  She met Craig's stepmother only

once, briefly, before her death, id. at 134, and never visited Craig's parents in Switzerland.  She

entered their Swiss apartment for the first time after their deaths, when Craig told her to pack it

up.  Id. at 124-26.  While she did see the inside of the Florida condominiums before the parents

died, she did not enter Renate's bedroom.  Id. at 127.  Molly believed that Craig's stepmother did

not like her.  Id. at 141.  As a result of this limited contact, she credibly professed to have little

more than vague awareness of Renate's jewelry and diamonds, including her seven-carat yellow

canary diamond ring, or of her designer gowns, bags and shoes.  Id. at 129-30, 137-39.

B.      After Death of Craig's Parents

Molly did not attend the parents' funerals.  Hr'g Ex. 9 at 96.  She became involved only

afterwards when Craig assigned her the task of packing up their condominiums and apartments;

6

by the time Molly was carrying out this job, whatever there may have been of value was already gone.  Id. at 124, 127-32.  From Craig, Molly understood that one of the Plaintiffs (Shaun) had collected all of Renate's valuable jewelry and sold it in New York, sharing the proceeds with his brothers.  Id. at 139-41.  Apart from three small Louis Vuitton bags that she gave to her daughters, after offering them to the wife of one of the Plaintiffs, she does not know what happened to any of the designer clothing, shoes or bags.  Id. at 131-32.  Molly never asked Craig how much money he inherited from the parents: "it was a very touchy subject, and he was quite sad for a long time.  So that would be rude."  Id. at 96.

Shortly after his parents died, Craig quit his job at Telesto.  Id. at 25.  Neither Craig nor Molly has been employed since.  Id. at 26, 42.  Craig immediately began talking to contacts in Switzerland about a jewelry venture.  Id. at 28-30.  His idea was to create a website to sell jewelry designed and manufactured by a designer he met in Switzerland.  Id. at 30, 50-51.  After Craig had been talking to his Swiss contact about the plan for a year or more, he formed Argentière Luxury.  Molly knows she is a partner and first started helping in 2012; however, she described her role as, "I, you know, act like a secretary to Craig most days."  Id. at 31-32.  Since its formation, Argentière Luxury has had almost no sales.  Molly sold one item to her personal trainer for $350 from a sample set and earned $2500 from a trunk sale in December 2014.  Hr'g Ex. 9 at 52; Ex. 10 at 310.  Molly has no idea how Argentière Luxury was to be financed: "I trust that [Craig]'s doing the right thing."  Hr'g Ex. 9 at 55.

C.     Spending Spree

The record is studded with dramatic evidence that Craig and Molly lived large after the death of the parents.  For example, in 2011 and again in 2012, Molly, Craig, and all of the children vacationed in Chamonix in France; they flew business class and rented a chalet; other

vacation destinations include Vermont, New York and Montreal.  Hr'g Ex. 9 at 168-76, 300;

Hr'g Ex. 11 at 167-68.  Craig paid, Molly has no idea how.  Hr'g Ex. 9 at 169-70.  During just

one illustrative month, January 2014, Molly and Craig decided to join the Carnegie Abbey Club

and paid $3,866 towards a deposit, spent thousands on Botox and spa treatments for both of

them, paid for indoor tanning, and spent over $600 on clothing.  Hr'g Ex. 11 at 145-46, 148-50;

Hr'g Ex. 17.  In one year, Molly and Craig collectively spent almost $8000 on spa and cosmetic

procedures, almost $19,000 on clothing, and $6,000 at Foxwoods and other casinos.  Hr'g Ex.

17.  In 2012, Craig and Molly bought each other Louis Vuitton bags as gifts and Craig bought

Molly a Cavalli bag in 2013.  Hr'g Ex. 9 at 119-23; Hr'g Ex. 11 at 219.  Just one of these bags

cost almost $2000.  Hr'g Ex. 11 at 74.  Throughout the period, the Hekking children attended

private school, which cost over $8000 per child.  Hr'g Ex. 9 at 148.  Also throughout the period,

Craig was constantly having work done on Molly's house.  Id. at 152.

     As the spending spree went on, Molly did not worry about money even though neither of

them was earning any income: "I assumed my husband was taking care of the finances, and we

were able to do this."  Hr'g Ex. 11 at 119, 186 ("My husband took care of these things").  For

Molly, the gravy train abruptly skidded to a halt in August 2014.  At that point she became aware

for the first time that the family's cash position was such that she needed to monitor the balance

in their Citizens Circle Gold account.  Hr'g Ex. 11 at 198-99.  Illustrating the abrupt nature of the

change for her, on September 15, 2014, she spent $692 on dresses, and returned them a few days

later because of the financial straits the family had fallen into.  Id. at 211-213.  For the same

reason, the children began to attend public school.  Hr'g Ex. 9 at 5.  In October 2014, Molly

applied for and began to receive SNAP food benefits.  Hr'g Ex. 10 at 324; ECF No. 60-16 at 16.[7]

---

[7] Somewhat anomalously, throughout the period of the spending spree when she and Craig were not working,
Plaintiffs point out that Molly procured subsidized health insurance for the children through the State of Rhode

D.    Bank Accounts

Plaintiffs contend that Molly's use, or Craig's use on her behalf, of various bank accounts at Citizens Bank, Huntington National Bank and Bank of America permits the inference that her responses, like Craig's, were deliberately deceptive for the purpose of covering up the existence of the accounts where the stolen assets were hidden.  Molly defends her incomplete responses with her consistent testimony that she was utterly unfocused on the bank accounts: "I never looked at the accounts."  Hr'g Ex. 11 at 17.  She also knew little about Craig's banking and rarely asked any questions.  Hr'g Ex. 9 at 81.  The evidence corroborates that Craig was secretive about banking; for example, when he met with one of the Swiss bankers he dealt with regarding the estates, Craig and the banker spoke German in front of Molly, which she does not understand, even though the banker speaks fluent English.  Id. at 201-04.

Citizens Circle Gold.  In September 2010, Molly opened the Circle Gold account at Citizens; Craig was added to the account in November 2010.  Hr'g Ex. 18; Hr'g Ex. 19 (compilation showing balances and Molly's debit card transactions).  Molly thinks of it as her primary bank account; she used its debit card to make point of sale purchases.  See Hr'g Ex. 9 at 80-81, 161; Hr'g Ex. 10 at 231.  However, because she forgot her PIN number for the Citizens Circle Gold account, Molly testified that she did not use the debit card to withdraw cash or to check balances.  Hr'g Ex. 9 at 84-85; Hr'g Ex. 11 at 14-15.  As a result, until August 2014, when she began to understand her precarious financial position, she was oblivious to what was going into the Citizens Circle Gold account, including having no knowledge of the source of the funds or the account balances.  Hr'g Ex. 9 at 84; Hr'g Ex. 11 at 187-194, 198-99.

---

Island.  Hr'g Ex. 9 at 147.  While this fact raises eyebrows, it has no bearing on Molly's compliance with the Court Orders.  I have disregarded it for purposes of this report and recommendation.

The Citizens Circle Gold account was disclosed by both Craig and Molly in their separate verified financial statements as required by the August 15 Expedited Discovery Order. ECF No. 36-1 at 16; ECF No. 60-2 at 7. Molly produced incomplete bank statements pertaining to it; Plaintiffs got complete records from their subpoena served directly on Citizens. With these records, Plaintiffs have traced substantial sums that allegedly constitute estate assets flowing into and out of the Citizens Circle Gold account, but they have not found Molly's fingerprints on any of these transactions. Further, the transactions that Molly was responsible for, consistent with her testimony, are pedestrian; apart from an occasional charge for a spa or airline tickets, they largely reflect modestly sized purchases of ordinary necessaries at such stores as Stop & Shop, T.J. Maxx, BJ's, McDonalds, the Christmas Tree Shop, A-1 Pizza and Shell Oil. Hr'g Ex. 19.

Plaintiffs highlight eight ATM transactions in January through May 2011, starting on January 18, 2011, when Molly's debit card was used to withdraw $100 in cash in Vermont (apparently during a skiing vacation). Hr'g Ex. 18. They contend this is proof of perjury in that it contradicts Molly's testimony that she forgot her PIN, did not use the card to withdraw cash and could not check her balances. I find that this handful of ATM withdrawals during a five month period four years ago proves the opposite – eight ATM transactions over a few months, followed by years and hundreds of transactions with no ATM usage corroborates Molly's testimony that she forgot her PIN, and could not and did not check cash balances for most of the relevant period.

<u>Citizens Argentière Luxury</u>. Molly's verified financial statement did not list the account Craig opened at Citizens Bank jointly in his and Molly's names for Argentière Luxury. Hr'g Ex. 15. However, at her September 18, 2014, deposition, she testified openly about the account, including that she believed that she was not an authorized user. She explained that she thought

she should be and once challenged Craig regarding why he had not given her access to it.  Hr'g Ex. 9 at 81-83.  At her January deposition, by which time she knew that her earlier testimony was wrong, Molly explained that her September testimony was based not only on her recollection, but also on misinformation provided when she asked the bank for the records of the Citizens Argentière Luxury account, in the course of compliance with the August 15, 2014 Expedited Discovery Order.  Hr'g Ex. 10 at 100 ("When I picked up the Citizens papers, the lady at the bank said my name wasn't on it.").

Plaintiffs claim that this testimony is perjury, pointing to the subpoenaed records from Citizens, which establish that Molly wrote three checks on the Argentière Luxury account, two on the same day in September 2013 to a jewelry designer (a total of $1672.70) and one to the Newport Animal Hospital, apparently for care of family pets.  ECF No. 60-8 at 2-5.  The former use – two relatively modest checks written the same day to the same designer – is one that is easily forgotten, corroborating rather than contradicting her testimony that she knew of the account but did not think she had access.  Similarly, the single use of this business account for personal pet care is more likely a mistake than the proof Plaintiffs contend it constitutes of Molly's chicanery.  Apart from these three checks and one transfer order for $1,200 in October 2013, there is no evidence of Molly's use of this account at any time over the year that it was open.  ECF No. 60-8 at 7; Hr'g Ex. 15.  Molly was not associated with the debit card that made many point of sale transactions associated with the account.  I do not find that her testimony that she did not realize she was an authorized account holder on the Citizens Argentière Luxury account is perjury.

Huntington National.  During the eight-month period from August 2012 until April 2013, Molly used a debit card issued in her name on a joint account at Huntington National Bank, a

Florida bank where Craig's father had maintained accounts before his death.  Hr'g Ex. 12; Hr'g Ex. 13 (compilation showing Molly's debit card transactions).  While she omitted it from her verified financial statement, at her September 18 deposition, Molly testified that she was vaguely aware of an account at Huntington, that Craig may have told her about it, but that (inaccurately) she did not believe that she was an account holder on it.  Hr'g Ex. 9 at 103.  At the time of this testimony, Molly knew that Plaintiffs had already subpoenaed the Huntington records.  Id. at 104.  By the time of her January 2 deposition, she knew the records showed she had been an authorized user of the Huntington account, but testified that she just forgot about it because it had been closed for some time.  Hr'g Ex. 10 at 207.  When confronted with evidence of her extensive use of a debit card issued in her sole name for the Huntington account, Molly testified that she cannot explain why she used the debit card for the Huntington account, somewhat interchangeably with her Citizens Circle Gold debit card; she said that someone, probably Craig, gave her the debit card and she used it, paying no attention to which debit card she was using or to either the balances or deposits in the account.  Hr'g Ex. 11 at 30-35; Hr'g Exs. 13, 19.  Further, in addition to disclosing what she could recall at the September 18, 2014, deposition, once she knew she was on the Huntington account, she tried to comply with the Court Orders by getting copies of the Huntington records.  Hr'g Ex. 10 at 217.

Plaintiffs claim that this testimony is perjury, pointing to evidence that Molly charged $63,569 on her Huntington debit card between August 23, 2012, and April 12, 2013.  Hr'g Ex. 13.  However, this evidence also establishes that each of Molly's purchases was relatively small, most under $1000, and that, while the Huntington account was open, she used the Huntington debit card and her Citizens Circle Gold debit card (the latter less frequently) for quotidian necessaries as groceries, pharmacy, clothing, pizza and gas.  Hr'g Exs. 13, 19.  In defense of her

failure to recall her usage of the Huntington debit card, Molly presented evidence permitting the inference that the two cards were similar in appearance. Hr'g Exs. C, D. Having observed her testimony on this topic and having carefully reviewed her extensive deposition testimony about the Huntington account, I find credible her testimony that she forgot that she used a debit card connected to the Huntington account over an eight-month period in 2012 and 2013. In making this finding, I note that Molly disclosed the existence of the Huntington account at her first deposition and tried to procure copies of the account records; most importantly, her failure to recall her Huntington debit card use did not facilitate Craig's cover-up, but merely exposed her as inattentive, indeed oblivious, to her own financial affairs.

Bank of America. Molly and Craig had a joint account with Bank of America from November 2008 until December 2012. Hr'g Ex. 6. This account was omitted from Molly's verified financial statement; however, Molly did not try to cover it up. Rather, at the September 18, 2014, deposition, Molly testified that she had had an account at Bank of America when she and Craig were first married, but thought she had closed it after she and Craig jointly opened the Citizens Circle Gold account. Hr'g Ex. 9 at 80. When subpoenaed, the Bank of America records establish that Molly's initial testimony about it was not strictly accurate: although the Citizens Circle Gold account was opened in September 2010, the Bank of America account remained open until the end of 2012. Hr'g Ex. 6; Hr'g Ex. 18. Moreover, on October 15, 2010, $80,000 was deposited into it; Plaintiffs claim this money came from estate assets. Hr'g Ex. 6. However, a more careful review of the records demonstrates that Craig was not added to the Citizens Circle Gold account until November 2010 and by December 2010, the use of the Bank of America account dwindled to almost nothing. From January 2011, until it was closed at the end of 2012, the Bank of America account had small balances and went unused for weeks on end, punctuated

by an occasional flurry of small deposits and insubstantial activity.  Id.  Molly was unable to explain the source of the $80,000 deposit.  Hr'g Ex. 10 at 280-81.  With her disclosure of the existence of the account, permitting Plaintiffs to subpoena the records, which they did, Molly's failure to testify with precision about when it was closed caused no prejudice to Plaintiffs.  I do not find that her testimony about the Bank of America account constitutes perjury.

Citizens Winter Group.  Craig maintained an account at Citizens Bank in the name of the Winter Group to which Molly did not have access – Craig's cover-up of the existence of this account is part of the evidence supporting my recommendation that this Court impose extreme sanctions on him for his disregard of the Court Orders.  See Hr'g Ex. 16; Hr'g Ex. 17 (compilation showing Craig's debit card transactions arranged by category of purchase).  Through the Citizens Winter Group account flowed substantial funds from the parents' estates, which were used by Craig to pay for much of the extravagant lifestyle enjoyed by Molly, Craig and their children.  When the music stopped in August 2014, Craig emptied and closed it, just before signing a verified financial statement that made no mention of it in defiance of the August 15, 2014 Expedited Order.

Despite access to (through third party subpoenas to the bank) complete account records, which they have exhaustively analyzed, as well as many hours of cross-examination of Molly, Plaintiffs have not uncovered evidence establishing that Molly ever used the Citizens Winter Group account.  Plaintiffs instead rely on Craig's use of the account to buy things for Molly to prove that she must have been aware of its existence, so that her testimony to the contrary amounts to an intentional cover-up.  In support of this contention, Plaintiffs make much of a snippet of confused testimony in which Molly acknowledged being vaguely aware that Craig had an account for Winter Group, but expressing confusion regarding whether it was at Citizens

Bank or in Switzerland.  Hr'g Ex. 9 at 87-89.  Her first answer seems to indicate there is an account at Citizens, but she corrects herself, saying that she thinks it is in Switzerland. Throughout this testimony, Molly repeated that she simply does not know.  Id. at 87-89.  When pressed, Molly testified: "So I really did not ask questions.  I did not want to start arguments.  I didn't want to stress him out because everything was just crazy."  Id. at 91-92.  Plaintiffs draw the inference from this exchange that Molly's initial testimony that there was a Winter Group account at Citizens Bank was a blunder – she told the truth when she meant to cover-up – that she quickly corrected when she shifted to say that the account was in Switzerland.

Having heard her testify at the hearing before me on this issue, I find that Molly's testimony permits the inference that she had only a vague understanding of the parents' affairs, including only a vague comprehension of what the Winter Group was, so that she provided confused testimony, but did not commit perjury, regarding what accounts might exist in the name of the Winter Group.  Similarly, while use of the Citizens Winter Group account to fund their extravagant lifestyle compels the question how Molly reconciled the consumption of expensive luxuries (e.g., glamorous vacations, spa treatments, designer bags, private schools) with the reality that neither she nor Craig was working, having heard Molly's testimony on this point, I find that Plaintiffs have proved that Molly's blind trust of Craig was unfounded, but not that her testimony about the Citizens Winter Group account constitutes perjury.  Tellingly, at her September 18, 2014, deposition, right after she had read the Winter Group allegations in the complaint for the first time, Molly testified that she had confronted Craig about what had happened to the Winter Group money.  He told her that all of it had been spent and nothing was left: "[t]hen I stopped the conversation because I was just upset and, of course, finding out some of this stuff it was a lot to take in, and that's where we left that conversation."  Id. at 212-14.

E.      Tax Returns

Plaintiffs are right that, in her verified financial statement and at her September 18, 2014, deposition, Molly testified that she signed federal tax returns for 2011 and 2012 and she and Craig had an extension for 2013 returns; since, she has reversed course, testifying that she now believes that no tax returns were filed.  Compare Hr'g Ex. 9 at 40, 45, 314, and ECF No. 60-2 at 14, 17, with Hr'g Ex. 10 at 89, 246-47.  However, the inference permitted by this inconsistency in Molly's case (unlike Craig's) is merely that she relied entirely on Craig with respect to taxes, including that Craig provided the information regarding the 2011 and 2012 tax returns in her verified financial statement.  Hr'g Ex. 9 at 45 ("I did not write that.")

Molly has never deviated from her testimony that she knows nothing about their taxes, including that she does not know the name of their tax accountant or where copies of returns might be stored, that she last filed individually in college and that her only participation in paying taxes during either her first or second marriage was to sign when she was asked to do so. Hr'g Ex. 10 at 88-90.  Based on the events that unfolded after September with respect to Craig's failure to produce the returns, by January, Molly had come to believe that nothing had actually been filed for either 2011 or 2012.  Plaintiffs counter that, if this were true, Molly should have completed the IRS form that would allow them access to whatever may have been filed in her name, as they demanded.  This proves nothing – Molly has colorably argued that the IRS form Plaintiffs demanded is not the one narrowly tailored to accomplish their goal.  Ultimately (and after Molly's attorney researched what is the correct IRS form), Molly has executed an IRS form that is sufficient to give Plaintiffs direct access to her IRS records.  I find that her confused testimony about taxes is largely credible and that her completion of the IRS form is more than adequate compliance with the Court Orders on this topic.

F.     <u>Mortgage Modification</u>

While not directly pertinent to compliance with the Court Orders, in support of their claim that Molly has engaged in sanctionable conduct, Plaintiffs put into evidence documents procured from the subpoena to Bank of America, specifically, a letter to Bank of America, then the holder of Molly's mortgage, as well as an attached profit and loss statement for "Craig Hekking d/b/a Winter Group Consulting." Hr'g Exs. 22, 23. The letter is signed by both Molly and Craig. Hr'g Ex. 22. When confronted with the letter at the sanctions hearing, Molly affirmed its authenticity, but professed ignorance of the contents, testifying that Craig had written it; she denied ever having seen the profit and loss statement. The letter claims that Craig was starting a consulting business venture regarding which Molly professed to have no knowledge ("Winter Group Consulting"). <u>Id.</u> This evidence permits the inference that Craig committed (or attempted to commit as it is unclear from the record whether the mortgage was modified in reliance on this letter) a fraud on the bank and that Molly allowed herself to be used as a tool to perpetrate this fraud. It makes Molly look like Craig's hapless dupe, unthinkingly signing anything he placed in front of her; it does not prove perjury or disregard for the Court Orders.

## III.     Compliance with Court Orders

A.     <u>Craig's Perjury Regarding Service of Complaint</u>

After Plaintiffs filed their complaint, Craig and Molly failed to respond and default was entered. On August 5, 2014, Attorney Kyle entered his appearance on behalf of both of them and asked the Court to remove the default. Following a hearing that Molly did not attend, this Court issued the Memorandum and Order of September 17, 2014, which found that Craig's testimony was perjury, "a complete fabrication." In testimony given on September 18, 2014, that

was not contradicted by Attorney Kyle's sworn answers, Molly stated that she met with him and read the complaint carefully for the first time in mid-September 2014: "I did not know that I was involved to this amount until recently . . . . I believe because [Craig] didn't want me to freak out, he didn't mention me as much as I should know because he wanted to – I don't know – talk with Keith, figure this out and then kind of come to me with some information." Hr'g Ex. 1(A); Hr'g Ex. 9 at 47-48; Hr'g Ex. 10 at 29. At this point, Molly did not even understand that Attorney Kyle was her attorney: "So I did not understand him representing me when everything was about Craig." Hr'g Ex. 10 at 23. There is no evidence suggesting that Molly had anything to do with Craig's perjury regarding service of the complaint.

B.     August 15, 2014 Expedited Discovery Order

The August 15, 2014 Expedited Discovery Order required Molly to prepare a verified financial statement, produce bank and other records and to testify at a deposition. ECF No. 50 at 6. In compliance, Molly signed the incomplete and inaccurate verified financial statement prepared by Craig; she made efforts to produce bank records; and she testified at the September 18, 2014, deposition, clarifying much of the misinformation in her flawed financial statement. Her initial tepid compliance reflects her near complete lack of information regarding the litigation, which is not contradicted by the sworn answers provided by Attorney Kyle. For example, she testified that her verified financial statement, which she signed on September 16, 2014, was filled in by Craig; she read and signed it "quickly . . . I didn't sit there and pay attention . . . ." Hr'g Ex. 9 at 35-36; Hr'g Ex. 10 at 212 ("I didn't write them. I didn't fill them in."); ECF No. 60-2. Because it is palpably a copy of Craig's financial statement, signed the same day, Molly's statement is riddled with absurd errors (such as listing Craig's ex-wife in the

space for the name of Molly's former husband), in addition to omitting the bank accounts whose existence Molly candidly acknowledged in her testimony two days later.

Until mid-September 2014, Molly testified that she was unaware of the discovery required by the August 15 Expedited Discovery Order. Hr'g Ex. 9 at 163, 317 ("This has all come about to me very recently."); Hr'g Ex. 10 at 29. Indeed, she did not even understand that she had to be deposed until three days before the deposition was scheduled to occur, when she dropped off a document with Attorney Kyle's paralegal who mentioned it to her. Hr'g Ex. 10 at 31. Her first meeting with Attorney Kyle, also attended by Craig, was a day or so later; at about the same time, she learned of this Court's Memorandum and Order of September 17, 2014 (finding Craig guilty of perjury), and began – for the first time – to understand that the lawsuit was directed at her personally. Id. at 43-45, 79.

Once she understood that she was involved and that it was not just a suit against Craig, Molly immediately began to look for documents responsive to the August 15 Expedited Discovery Order; for example, she went to Citizens to try to get copies of statements and began forwarding any emails she could find involving Craig, Shaun or Darren to Attorney Kyle's paralegal. Id. at 45-48, 51. Even then she did not yet fully understand that she was subject to a Court Order; rather, she thought the obligation was simply to respond to discovery propounded by Plaintiffs. Id. at 52. She did not clearly understand that there was a Court Order affecting her until September 25, 2014, when she sat in Court with Craig and listened to my comments during the hearing on this motion. Attorney Kyle's written answers corroborate Molly's testimony. Hr'g Ex. 1(A) ("I did not speak directly to Molly at this time.").

C.    September 25, 2014 Discovery Order

In compliance with my Order, Molly and Craig both attended the September 25, 2014, hearing on Plaintiffs' motion to compel and for sanctions.  At that hearing, they were both represented by Attorney Kyle, although his motion to withdraw had been filed on September 23, 2014, just two days before.  ECF No. 31.  What she heard at the September 25 hearing came as a shock to Molly: "I was frantic."  Hr'g Ex. 10 at 83.  She came to understand "that I'm seriously involved here."  Id. at 150-51 ("[s]eriously involved and kind of thrown into it").  She learned for the first time that the required discovery "had to be done immediately."  Id. at 82-83.  Immediately after the hearing, she began working on finding copies of bank records and working with Attorney Kyle's paralegal to provide information regarding ten transactions as required by the September 25 Order.[8]  Id. at 81.  Nevertheless, she found it confusing to distinguish what parts of the Court Orders clearly applied to her and what applied to Craig.  Id. at 102-07.

D.    September 29, 2014 Consent Order

Molly received, read and signed the Consent Order, communicating about the contents with Attorney Kyle, who had already moved to withdraw as her counsel.  Hr'g Ex. 10 at 118-20.  To comply, she promptly prepared the list of personal property and focused on how to comply with the spending cap.  Id. at 118-19, 123.  While her monthly operating statements were initially provided a little late, since her new attorney entered his appearance in November 2014, id. at 142-43, she has been providing Plaintiffs with the information required by the Consent Order and has been trying to live within half of the monthly spending cap that it established.  She has not taken any steps to comply with the Order's requirement that she and Craig provide a list of

---

[8] The September 25 Order required Craig and Molly to explain fully (including the source of funds) ten transactions to be identified by Plaintiffs.  Plaintiffs contend that the resulting responses are materially inadequate.  As to Craig, who apparently did nothing to try to comply, they are right.  As to Molly, who tried to comply by providing such information as she had, they are not.  Plaintiffs have not demonstrated that any of these responses omit information that they have shown Molly actually possessed.

the remaining estate assets because "[t]here is nothing I could do," other than to rely on Craig to comply. Id. at 135-37. As with the September 25 Order, she found the references in the Consent Order to "defendants" confusing. Id. at 142 ("it was a little confusing for me because they're saying defendants but asking for things I have no idea about").

Plaintiffs' claim of sanctionable conduct arising from the Consent Order focuses on Molly's failure to untangle the source of funds. Based on the evidence before me, the only step she could take is to ask Craig, who is asserting the Fifth Amendment, the attorney-client privilege[9] and his rights pursuant to R.I. Gen. Laws § 9-17-13, the Rhode Island marital privilege, which bars Molly from testifying in a civil proceeding regarding their confidential communications. Based on Craig's assertion of every privilege available to him, I find credible Molly's testimony that she has been unable to get information from Craig.

E.    October 2, 2014 Sanctions Order

Although this Court's Memorandum and Order of September 17, 2014, addressed only Craig's misconduct, imposing sanctions on him for perjury by requiring him to pay counsel fees and other expenses, ECF No. 28 at 18, the October 2, 2014 Sanctions Order that followed was not limited to Craig; the Order makes "defendants" responsible to pay the sanction of $30,777.93 by October 10, 2014, at 3:00 p.m., thereby imposing the obligation to pay the sanction for Craig's perjury on Molly. See ECF No. 34. This potentially confusing circumstance, coupled with the fact that when this Order entered, Molly did not have an attorney able to advise her separately from Craig, may mitigate Molly's (but not Craig's) failure timely to comply.

---

[9] Craig has invoked the attorney-client privilege to prevent Molly or Attorney Kyle from testifying about privileged communications between counsel and Craig alone or Craig and Molly together during the engagement. This is consistent with the "common interest" doctrine, which applies when multiple persons are represented by the same attorney. In that situation, communications made to the shared attorney to establish a defense strategy remain privileged as to the rest of the world. N. River Ins. Co. v. Phila. Reinsurance Corp., 797 F. Supp. 363, 366 (D.N.J. 1992); see Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 446 (S.D.N.Y. 1995); Edna Selan Epstein, Attorney-Client Privilege & the Work-Product Doctrine § 1.III.E3.H.10 (2015).

In the weeks since, Molly has arranged to sell her Range Rover and made a substantial payment (over $22,000) towards the fine. Hr'g Ex. 10 at 158-61, 317-18. While Plaintiffs complain that the Range Rover, purchased for Molly by Craig in 2011, was probably bought with estate assets, Molly testified that she thought the Range Rover was purchased with Craig's share of the proceeds of the parents' condominium. Hr'g Ex. 9 at 114-15. The balance of this sanction remains unpaid.

F.     October 2, 2014 Order to Appear

In the midst of this difficult situation, I scheduled a hearing on the withdrawal motion of Attorney Kyle on October 14, 2014. Because of the seriousness of his withdrawal to both of them as a result of the pendency of this motion for sanctions, I ordered Molly and Craig to attend in person. Text Order of Oct. 2, 2014. Neither appeared. Molly has explained her failure as the result of miscommunication because Attorney Kyle talked only to Craig about the requirement; while she was aware of the Order, she understood that there would be another instruction, which never came. Hr'g Ex. 10 at 167-68, 325. In addition, by then, Molly was extremely upset; she testified that, at her private meeting with Attorney Kyle, "[w]hen he told me I should get my own lawyer, all I was doing was sitting there crying and sobbing." Id. at 189. While technically sanctionable, I find her failure to appear may be excused by these circumstances. In addition, Molly's violation of this Order was not among the grounds on which Plaintiffs relied in their sanctions motion.

IV.   **Applicable Law**

A district court has the inherent power to manage its own proceedings and to control the conduct of litigants who appear before it through orders or monetary sanctions for bad-faith, vexatious, wanton or oppressive behavior. Johnson v. U.S. Judges, No. 14-11273-DPW, 2014

WL 3109962, at *3 (D. Mass. July 7, 2014) (citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 46–50 (1991)); <u>see</u> <u>John's Insulation, Inc. v. L. Addison & Assocs., Inc.</u>, 156 F.3d 101, 108-09 (1st Cir. 1998) (default judgment under inherent powers proper sanction for protracted delay and repeated violation of court's orders). The court's inherent powers include the power to default a party who violates discovery orders. <u>Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.</u>, 771 F.2d 5, 12 (1st Cir. 1985). Similarly, Fed. R. Civ. P. 37 permits the court to impose sanctions, including default, if a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Nevertheless, courts interpreting Fed. R. Civ. P. 37 recognize that default "is . . . a drastic sanction that should be employed only in an extreme situation," and the adequacy of lesser sanctions should be considered. <u>Malloy v. WM Specialty Mortg. LLC</u>, 512 F.3d 23, 26 (1st Cir. 2008); <u>Luis C. Forteza e Hijos, Inc. v. Mills</u>, 534 F.2d 415, 419 (1st Cir. 1976); <u>Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Auth.</u>, 325 F. Supp. 2d 15, 60-61 (D.R.I. 2004). Put differently, "[t]he decision to . . . enter default judgment 'ought to be a last resort – ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders.'" <u>United States v. Prop. Located at Route 1</u>, 126 F.3d 1314, 1317 (11th Cir.1997) (quoting <u>Cox v. Am. Cast Iron Pipe Co.</u>, 784 F.2d 1546, 1556 (11th Cir.1986)). Thus, if a sanction less drastic than default will accomplish the twin goals of punishment and deterrence, such a penalty is appropriate. <u>Angiodynamics, Inc. v. Biolitec AG</u>, 991 F. Supp. 2d 283, 294 (D. Mass. 2014), <u>aff'd</u>, No. 14-1603, 2015 WL 1055519 (1st Cir. Mar. 11, 2015).

Whether default, issue preclusion, or a monetary sanction, the choice of a particular sanction is in the sound discretion of the district court. <u>Vallejo v. Santini-Padilla</u>, 607 F.3d 1, 7-8 (1st Cir. 2010). The First Circuit has enumerated a number of factors to be weighed to determine whether the facts justify a particular sanction in a specific context. <u>Vallejo</u>, 607 F.3d at 8. These

factors distinguish good faith attempts to comply with discovery obligations from deliberate, bad faith refusals to do so; they serve as a guide and need not be applied mechanically. See Benitez-Garcia v. Gonzalez-Vega, 468 F.3d 1, 5 (1st Cir. 2006). Specifically, the Court of Appeals has directed trial judges to consider: (1) the severity of the violation; (2) the legitimacy of the party's excuse for failing to comply; (3) whether the violations have been repeated; (4) the deliberateness of the misconduct; (5) any mitigating excuses; (6) prejudice to the other side and to the operations of the court; and (7) the adequacy of lesser sanctions. Vallejo, 607 F.3d at 8. Procedurally, the court should consider whether the offending party was given sufficient notice, as well as an opportunity to explain noncompliance or to argue for a lesser penalty. Id.; Angiodynamics, Inc. v. Biolitec AG, 991 F. Supp. 2d 283, 290 (D. Mass. 2014), aff'd, No. 14-1603, 2015 WL 1055519 (1st Cir. Mar. 11, 2015).

In examining the severity of the violation, a critical factor is whether the relevant conduct is willful or constitutes no more than negligence. Atkins v. Fischer, 232 F.R.D. 116, 129 (D.D.C. 2005). Thus, "when it has been established that failure to comply [with court discovery orders] has been due to inability, and not to willfulness, bad faith, or any fault of [the disobedient party]," serious sanctions are not appropriate. Societe Int'l v. Rogers, 357 U.S. 197, 212 (1958); see Malloy, 512 F.3d at 27; Marx v. Kelly, Hart & Hallman, P.C., 929 F.2d 8, 11 (1st Cir. 1991). Similarly, as long as a party makes a good faith attempt to comply with court-ordered deadlines, and any intransigence has minimal consequences on the other party and the court, the court should limit the consequence to lesser sanctions, if any are imposed. Malot v. Dorado Beach Cottages Assocs., 478 F.3d 40, 45 (1st Cir. 2007). If a party is legitimately confused by what he or she is required to do or lacked a competent legal advisor at the time of entry of the relevant order, sanctions may not be appropriate. Companion Health Servs., Inc. v. Kurtz, 675 F.3d 75,

86 (1st Cir. 2012) (sanction of default vacated where defendants unrepresented by counsel at time order entered); United Artists Corp. v. Freeman, 605 F.2d 854, 857 (5th Cir. 1979) (sanction reversed because defendant not sophisticated, faced difficult legal issue, and was confused by advice of counsel).

The burden of proof for the facts foundational to the imposition of sanctions should be as stringent as the circumstances require. Gates Rubber Co. v. Bando Chem. Indus., Ltd., 167 F.R.D. 90, 108-09 (D. Colo. 1996). Thus, default judgment should be ordered only based on evidence that is clear and convincing; to do otherwise would be to contravene the strong public policy which favors adjudication of cases on their merits. Id. at 108. Lesser sanctions may be grounded in proof based on a mere preponderance of the evidence; nevertheless, if the evidence presented fails clearly to show that the court's discovery orders were violated, sanctions should not be awarded. LaFarge Corp v. M/V Macedonia Hellas, No. Civ. A. 99-2648, 2000 WL 1586402, at *5-6 (E.D. La. Oct. 23, 2000) (while allegations are cause of grave concern to court, sanctions denied without prejudice where evidence insufficient). For example, proof that a party's compliance with court's orders was dilatory is insufficient for issue preclusion where plaintiffs failed to demonstrate that deliberately-unproduced documents are missing. Sokolow v. Palestine Liberation Org., No. 04-CV-397, 2014 WL 5313930, at *4-5 (S.D.N.Y. Oct. 17, 2014) (sanctions denied because plaintiffs did not carry their burden of proof).

When the relevant conduct is mere negligence, particularly when it is "grounded in confusion or sincere misunderstanding," dismissal or default is unwarranted, but the court may still consider whether some lesser sanction may be appropriate. See Marshall v. Segona, 621 F.2d 763, 768 (5th Cir. 1980); see also Finley v. Hartford Life & Acc. Ins. Co., 249 F.R.D. 329, 333 (N.D. Cal. 2008); Atkins, 232 F.R.D. at 137. In circumstances involving relatively minor

conduct, courts usually impose an award of attorney fees to eliminate the prejudice to the opposing party.  See Finley, 249 F.R.D. at 333 ($9,000 in fees awarded, reduced from $57,800 request); Atkins, 232 F.R.D. at 137 ($5,000 fine imposed).  In such cases, however, the moving party must make a demonstrable showing that its costs were increased by the other's negligent acts.  Id. at 141 (sanction for negligent noncompliance based on plaintiffs' proof that they expended extra time and resources specifically linked to conduct).  When there is no prejudice directly linked to negligent fulfillment of Court-ordered obligations, the court still may consider a nominal monetary penalty based on the need to protect the integrity of its orders.  See Atkins, 232 F.R.D. at 137 (lack of prejudice does not excuse negligent noncompliance; imposing $5000 sanction).  Whatever sanction is chosen, the district court must be clear in delineating the acts being sanctioned and the power invoked to do so.  Chambers, 501 U.S. at 76.

## V.  Recommended Disposition

I do not recommend that this Court impose any sanctions on Molly.  For the limited purpose of this sanctions motion, I find credible her testimony that she simply does not have the information critical to the outcome of this litigation – the whereabouts of the estate assets – that Plaintiffs seek and the Court Orders required be disclosed.  I further find that she was unaware of the initial Court Order and later was reasonably confused both because the claims in the case and the language in the Orders are focused on Craig and because for a substantial period she did not have an attorney able to explain her obligations apart from those of Craig.  Also critical to my recommendation is the finding that Molly has made serious and good faith efforts to comply, particularly through her submission to twenty hours of cross-examination under oath.  While she made many mistakes and suffered many lapses of memory about her own financial history, these appear mostly to be errors arising from her inattention to finances.  Importantly, and in sharp

contrast to Craig, Plaintiffs have not established a single fact that Molly strategically omitted from her testimony on September 18, 2014, or from her later depositions. Nor have they demonstrated expenses that they have incurred as a direct result of Molly's (as opposed to Craig's) misconduct.

At worst, Molly has been negligent in her discharge of her discovery obligations. While a person of reasonable prudence would not have made some of Molly's mistakes – particularly signing a blatantly false verified financial statement listing Craig's ex-wife as her former husband – these errors are consistent with her demonstrated legal and financial naiveté and not indicative of nefarious intent. Unlike Craig, who intentionally covered up Court-ordered information, Molly's twenty hours of testimony has provided Plaintiffs with clues they have used to develop the record though third party discovery. Molly's haphazard approach to compliance with the Orders has not unduly hampered Plaintiffs' ability to prove their case, in contrast to Craig's deceitful tactics, which went to the heart of Plaintiffs' claims. Hull v. Municipality of San Juan, 356 F.3d 98, 102-03 (1st Cir. 2004). Apart from her failure fully to pay the money sanction for Craig's (not Molly's) perjury, Plaintiffs have not pointed to an Order where Molly's noncompliance has adversely impacted them. Further, apart from her failure to appear on October 14, 2014, Plaintiffs have not pointed to an Order as to which Molly has not made a good faith effort to comply.

In evaluating the severity of Molly's conduct, it is important to emphasize that, before her current attorney entered an appearance on November 25, 2014, Molly did not have an attorney able to advise her separately on what was required of her; this included the period of the time when all of the Court Orders in issue were entered. Kurtz, 675 F.3d at 86 (sanction vacated where defendants unrepresented by counsel at time order entered). Rather, she was represented

by an attorney who found himself in such an untenable situation that he was forced to move to withdraw early in the litigation; while his withdrawal motion was pending, ethically, he could not put the interests of Molly ahead of those of Craig. Also significant is the reality that all of the Court Orders generically refer to "defendants" and do not distinguish Craig from Molly.

Under these circumstances, I find that Plaintiffs' evidence does not approach clear and convincing proof of willful and bad faith disregard for any of the Court Orders, which is required as a predicate for imposition of the sanction of default. Rather, the evidence establishes that much of Molly's failure to comply is "due to inability," Societe Int'l, 357 U.S. at 212, "confusion [and] sincere misunderstanding of the Court's orders." Marshall, 621 F.2d at 768. Based on these findings, I do not recommend default as an appropriate sanction.

In considering lesser sanctions, the Court is impeded by Plaintiffs' insistence that Molly's conduct is egregious enough to have earned a "death-knell" sanction. See Garcia Morales v. Instituto Comercial de Puerto Rico Junior Coll., 215 F.3d 1311 (1st Cir. 2000) (court must carefully examine whether conduct sufficiently egregious to warrant "death knell" of lawsuit). While they have adverted in passing to lesser sanctions, Plaintiffs have not identified a specific monetary sanction that they contend would redress specific increased costs inflicted on them by Molly's misconduct. Similarly, they point to no adverse impact caused by Molly's conduct that would appropriately be addressed by the lesser sanction of preclusion on a specified issue. Under these circumstances, what remains for this Court to consider is a nominal monetary penalty based on Molly's negligent compliance with the Orders. See e360 Insight, Inc., 658 F.3d at 642 (imposing $5000 sanction for negligent noncompliance with order that did not cause identified prejudice); Finley, 249 F.R.D. at 333 ($9,000 in fees awarded, reduced from $57,800 request); Atkins, 232 F.R.D. at 137 ($5,000 fine imposed). Mindful that Molly abided fully with

the Court Orders requiring her to submit to hours of cross-examination, I do not find that she now needs the wake-up call of a nominal sanction – the pendency of this sanctions motion has had a profound impact on her; I find it is enough. Accordingly, I recommend that the Court exercise its discretion to decline to impose any sanction at all. See Marx, 929 F.2d at 10 (choice of sanctions lies within the sound discretion of the court).

A cautionary note: Molly cannot continue to rest on the excuse that she is befuddled by her obligations. If she is confused by the language of Orders[10] as they pertain to her going forward, she can – and should – seek clarification; she defies them at her peril. For now, however, based on the findings laid out in this report and recommendation, I recommend that Plaintiffs' motion for sanctions as to Molly be denied.

## VI. Conclusion

I recommend that this Court deny Plaintiffs' motion for the imposition of sanctions (ECF No. 25) on Defendant Molly Durant Hekking.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
March 17, 2015

---

[10] For example, as of this writing, Molly's obligation to pay the balance of the October 2, 2014 Sanctions Order based on Craig's perjury remains unsatisfied. She must either promptly comply or seek clarification of her duty. She cannot just drift.