**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

DARREN MALLOY HEKKING & SHAUN EGAN
HEKKING, on behalf of himself and
on behalf of C.H. and B.H.,
          Plaintiffs,

                    v.                          C.A. No. 14-295-ML

CRAIG ANTONY HEKKING &
MOLLY DURANT HEKKING,
          Defendants.

**DECISION AND ORDER**

      The plaintiffs in this longstanding inheritance dispute,

Darren Malloy Hekking ("Darren")[1] and his brother Shaun Egan

Hekking ("Shaun", bringing claims on his own behalf and that of

his two minor children and, together with Darren, the

"Plaintiffs"), have alleged that their older brother, Craig

Antony Hekking ("Craig"), has systematically depleted and

converted their late father's (Laurie Vonderwind Hekking,

"Laurie") and stepmother's (Renate Danhardt Hekking, "Renate")

estate (the "Estate"), which was to be equally shared by the

three brothers. By the terms of Laurie's and Renate's wills,

Craig was appointed as the executor of the Estate; he also

functioned as the trustee of the Cego Foundation (the

---

[1]

      Because the parties to this litigation share the same last
name, and for ease of reading, the Court will use first names.

"Foundation"), a separate trust[2] established by Laurie for the benefit of Craig's four and Shaun's two children to assist in their education. The Plaintiffs have further alleged that Craig's wife, Molly Durant Hekking ("Molly," together with Craig, the "Defendants"), has assisted her husband in his schemes and that she, too, has converted Estate property rightfully belonging to the Plaintiffs. After a contentious discovery period that was frequently drawn out by Craig's delaying tactics and outright refusals to provide necessary information, the case culminated in a seven-day bench trial. The case is now ready for a decision.

## I. Procedural History[3]

This case began on June 27, 2014, four years after the deaths[4] of Laurie and Renate, when Shaun and Darren brought a seven-count complaint (the "Complaint") against Craig and Molly

---

[2]

It was not established with any clarity what became of the Renate E Hekking Revocable Trust Agreement (the "Trust") established by Renate.

[3]

The lengthy procedural history of this litigation has also been set forth in two prior Memoranda and Orders (Dkt. Nos. 28, 94) and two Reports and Recommendations ("R&R") (Dkt. Nos. 50, 85); therefore, only an abbreviated summary is provided herein.

[4]

Renate and Laurie died in Switzerland. Renate died on June 1, 2010; her husband, Laurie, died only eight days later. Both had made wills that devised their respective personal properties to the surviving spouse or, if their spouse should predecease them, to the three Hekking brothers in equal parts. In addition, Renate's remaining non-personal property was devised to the Trust.

2

(Dkt. No. 1). The first two claims against Craig allege breach of fiduciary duty as personal representative (Count I) and as trustee (Count II) under Florida state law, Fla. Stat. §§ 733.609 and 736.0706 *et. seq.* Two further claims assert breach of fiduciary duty (Count III) and fraud (Count IV) under Common Law. Claims of conversion (Count V) and civil theft (Count VI) are leveled against both Craig and Molly. Finally, the Complaint includes a claim of aiding and abetting as to Molly (Count VII).

In essence, the Plaintiffs allege that their older brother Craig — who was appointed as executor of the Estate and functioned as the trustee of the Foundation after the death of their father and his wife — concealed, misrepresented, and misappropriated assets that rightfully belonged to all three brothers or that were intended to benefit Craig's four and Shaun's two minor children. With respect to Molly, the Plaintiffs allege that she knew of her husband's fraudulent conduct and that she provided him with substantial assistance by concealing property Craig had converted from the Estate and Foundation.

The Plaintiffs sought compensatory damages of no less than $2 million, punitive damages, an injunction against Craig to enjoin him from acting as personal representative or trustee, a complete accounting of the Estate and Foundation assets, as well as attorneys' fees and costs.

After receiving no response to their Complaint, the Plaintiffs filed a motion for entry of default (Dkt. No. 6) on July 25, 2014. Shortly thereafter, the Plaintiffs sought an order to expedite discovery and disclosure of the Estate and Foundation assets, alleging that Craig had concealed the existence of the Trust and other valuables in order to misappropriate them. (Dkt. No. 12). That request having been granted by the Court, the Defendants were required, *inter alia*, to provide complete financial statements; to allow the Plaintiffs access to records and documents; and to authorize the Plaintiffs to obtain documents from third parties concerning the Estate assets (Dkt. No. 12-1).

Default against the Defendants was entered on August 15, 2014 (Dkt. No. 18). The Defendants, however, promptly sought to remove the default, asserting — notwithstanding the affidavits of service filed with the Court, which had both been signed by Craig — that they had never been served with the Complaint (Dkt. No. 14). In support of their motion to remove the default, the Defendants also submitted a sworn affidavit executed and signed by Craig, in which he reiterated that denial.

To resolve the apparent discrepancy and to determine the Defendants' motion to set aside the default, the Court conducted an evidentiary hearing on September 4, 2014. Craig took the stand

4

and, under oath, categorically denied that he had ever been served, insisting that he and his family had been out of town on the date when the Plaintiffs maintained service was effected. Molly elected not to attend the hearing. On their part, the Plaintiffs offered (1) detailed and highly credible testimony by Constable James Sylvester of how he had personally served Craig, and (2) the well-supported conclusion by Document Examiner Jeffrey Luber that the signatures on the affidavits of service belonged to Craig.

In light of the unrefuted evidence presented by the Plaintiffs, the Court concluded that Craig's representations, both in his testimony before the Court and in two sworn affidavits, were blatantly untruthful and perjurious. Memorandum and Order at 15 (Dkt. No. 28). Nevertheless, because there appeared to be no real legal prejudice to the Plaintiffs so early in the litigation, the case was allowed to proceed. As the Court noted, there was no evidence at that time that the Defendants had tried to gain an advantage by delaying the retention of counsel and their failure to provide a responsive pleading. However, the Court expressed its misgivings about the willfulness of the default and the apparent lack of good faith displayed by Craig. Accordingly, the Plaintiffs were advised that if it were to be determined that the delays orchestrated by Defendants were shown

to have resulted in a litigation or practical advantage, the Court would reinstate the default. In addition, the Court required Craig to pay counsel fees and other costs incurred by the Plaintiffs in connection with the removal of the default. Id. at 18. On October 2, 2014, the Court ordered the payment of $30,777 in counsel fees to the Plaintiffs by October 10, 2014, cautioning that no Estate or Trust funds were to be used therefor (Dkt. No. 34)[5].

In the interim, upon the Plaintiffs' motion to compel discovery and for sanctions (Dkt. No. 25), Magistrate Judge Sullivan issued a detailed order (Dkt. No. 32) on September 25, 2014, in which she required the Defendants to provide certain discovery materials. On September 29, 2014, the parties submitted a consent order that allowed the Defendants — who had not been gainfully employed for some time — to use up to $9,000/month for their living expenses. To show that such sums did not come from the Estate or Trust assets, the Defendants agreed to submit monthly financial statements. (Dkt. No. 33).

Subsequently, the Plaintiffs submitted two reports (Dkt. Nos. 36, 41) advising the Court that the Defendants continued to

---

[5]

Subsequently, Molly sought clarification of whether she, too, was responsible for the $30,777 payment (Dkt. No. 92). The sum has long since been paid and, in view of the couple's shared financial assets and multiple joint accounts, the Court finds that such a clarification is no longer necessary.

violate Court orders; failed to comply with discovery requests; and continued to dissipate Estate property. The Plaintiffs, who were forced to obtain discovery documents through third parties, discovered that the Defendants had withdrawn more than $400,000 since Craig had learned that his brothers had begun an investigation into his activities, and that the Defendants had spent or withdrawn $195,000 from the Estate during the four months since the litigation began. In addition, the $30,777 in counsel fees awarded to the Defendants was nearly a month overdue at that time.

On November 12, 2014, Craig advised the Court that he agreed to be removed as trustee/executor. At that time, the Defendants were separately represented by newly engaged counsel, and Craig had begun to invoke his rights under the Fifth Amendment in the course of his deposition. In two detailed and well-supported R&R's (Dkt. Nos. 50, 85), the Magistrate Judge recommended, *inter alia*, that the default be reinstated against Craig, but not as to Molly.  With respect to the latter, the Magistrate Judge based her recommendation on the finding that much of Molly's failure to comply with Court orders was due to inability. R&R at 28 (Dkt. No. 85).  The Magistrate Judge noted, however, that the findings in her R&R did not relate to the merits of Plaintiffs' claims against Molly and that "some of [Molly's] glaring ignorance of

7

her own affairs is hard to swallow." Id. at 5.

In the interim, the Defendants filed a number of motions designed to put a stop to the litigation (Dkt. Nos. 51, 52, 53, 54, 55), including two motions to dismiss the Complaint, in which the Defendants suggested that their children should be included as plaintiffs because their interests were not represented (Dkt. Nos. 53, 54). Craig also objected to the R&R recommending his default; but he waived any substantive arguments by failing to address his noncompliance with Court orders or with the September 29, 2014 consent order. (Dkt. No. 58).

Following an April 30, 2015 hearing on the Defendants' various motions and their objections to the two R&R's issued by the Magistrate Judge, the Court accepted the Magistrate Judge's recommendation that the default not be reinstated against Molly. The Court noted that the recommendation was based on a credibility determination made by the Magistrate Judge after she observed Molly testify, reviewed the transcripts of Molly's deposition testimony, and considered Molly's efforts to comply with Court orders. The Court also denied Craig's motion to dismiss the case based on the so-called "probate exception" (Dkt. No. 52). The Defendants' remaining motions and Craig's objection to the R&R recommending reinstatement of the default against him were taken under consideration.

8

On June 11, 2015, this Court issued a Memorandum and Order in which it denied the remainder of the Defendants' motions. Hekking v. Hekking, C.A. No. 14-295-ML, 2015 WL 3650062 (D.R.I. Jun. 11, 2015.

In light of Craig's conduct in the course of this litigation, which included, *inter alia*, deliberate and repeated violations of Court orders; a complete failure to provide discovery materials or to execute necessary documents as he had repeatedly promised; the provision of incomplete and false responses; and Craig's refusal to participate in his deposition after initially agreeing to it, all the while continuing to dissipate the assets of the Estate and spending money on non-essential items, the Court deemed it appropriate to reenter the default against Craig. Id. at *7-8. Craig was ordered to provide a complete and full accounting; he was enjoined from acting as executor or trustee; and he was ordered to execute all necessary documents to remove him from those positions. Id. at *8. The Court scheduled a further hearing on July 16, 2015 to ensure Craig's compliance with the Court's orders. Id. at *9.

At the July 16, 2015 hearing, Craig was given a further opportunity to provide a complete and accurate accounting in connection with his fiduciary duties by July 23, 2015. Shortly

9

thereafter, both Defendants' counsel[6] sought to withdraw from representing Craig and Molly (Dkt. Nos 97, 100). Following a hearing on August 17, 2015, counsels' motions to withdraw were granted and the Defendants were advised that they had to represent themselves unless and until they engaged successor counsel. Two days later, the Plaintiffs filed a motion[7] to adjudge in contempt (Dkt. No. 115), in which they detailed the numerous deficiencies in the accounting information provided by Craig, particularly with respect to the whereabouts of large sums of cash that Craig admitted to having withdrawn from Estate and/or Foundation accounts.

After both parties filed their respective pre-trial memoranda (Dkt. Nos. 123, 126), together with a flurry of motions *in limine* (Dkt. Nos. 128, 129, 130, 131, 132, 133), the parties agreed to proceed to trial without a jury (Docket Entry 09/29/15). On October 5, 2015, one day before the bench trial was scheduled to begin, the Defendants, *pro se*, filed a "Motion for

---

[6]

    The Defendants were initially represented by joint counsel who withdrew from the case on October 14, 2014, because further representation had become untenable. (Dkt. No. 31).

[7]

    At that time, the Court had already imposed the extreme sanction of reinstating the default against Craig; Craig had signed documents that relieved him of his positions; he had asserted his Fifth Amendment rights; and the case was poised to proceed to trial. As the matter has now been decided on the merits, the motion is moot.

Sanctions of Dismissal with Prejudice and Award of Attorney's Fees and Costs against Plaintiff's [sic] and their Counsel for Fraud on the Court" (Dkt. No. 144), denying all allegations made against them and suggesting that they had been the target of "false claims and vexatious litigation stemming from a family dispute." Defs.' Mot. at 2. In light of the findings and rulings made herein, that motion is denied.

Beginning on October 6, 2015, the Court conducted a seven-day trial without a jury. The Plaintiffs offered the testimony of (1) Shaun, (2) Darren, (3) Molly, (4) Alexandra Hekking ("Alexandra"), who has been married to Shaun for twenty years and who is the mother of the two minor plaintiffs, and (5) Plaintiffs' expert witness Joseph DeCusati, a CPA and Certified Fraud Examiner. With the exception of Molly, who also testified in the Defendants' case, each of the Plaintiffs' witnesses was subjected to rigorous cross-examination by Craig and/or Molly.

After the Plaintiffs rested their case, Molly testified on the Defendants' behalf. Because the Defendants had not succeeded in engaging new counsel, this took the form of Molly posing and answering her own questions. The testimony of Craig, who had been instructed not to testify on any subject to which he had previously invoked his right under the Fifth Amendment, was successfully objected to by the Plaintiffs and/or stricken from

11

the record. At that point, the Defendants rested as well.

Both parties were ordered to submit post-trial memoranda. As to the Plaintiffs, they were instructed to address Molly's liability for the claims made against her, particularly the aiding and abetting claim, and to support their claim for attorney fees as a matter of damages. TR VII 38:19-40:7. The Plaintiffs promptly submitted their post-trial memorandum on December 15, 2015 (Dkt. No. 163). The Defendants, after advising the Clerk on January 14, 2016, the day before their memorandum was due, that they were unable to deliver their brief to the Court and would "overnight" it, submitted their post-trial memorandum on January 21, 2016 (Dkt. No. 167). In response, the Plaintiffs submitted a 36-page reply memorandum (Dkt. No. 168).

After presiding over this case for two years, having considered the testimony of all the witnesses at trial, and having reviewed the extensive records and materials admitted into evidence, the Court will now proceed to render a decision.

## II.  Standard of Review

Federal Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . .  the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court. Judgment must be

12

entered under Rule 58." Fed. R. Civ. P. 52(a)(1).

As explained by the First Circuit Court of Appeals, "Rule 52(a)(1) is designed to ensure not only that the parties are adequately apprised of the district court's findings and rationale but also that a reviewing court will thereafter be able to evaluate the bona fides of the district court's decision." Valsamis v. Gonzalez-Romero, 748 F.3d 61, 63 (1st Cir. 2014). The directive of Rule 52(a) "'impose[s] on the trial court an obligation to ensure that its *ratio decidendi* is set forth with enough clarity to enable a reviewing court reliably to perform its function.'" Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 180 (1st Cir. 1997)(quoting Touch v. Master Unit Die Prods., Inc., 43 F.3d 754, 759 (1st Cir. 1995)).

## III. Findings of Fact

The following constitutes the Court's findings of facts after considering all the testimony and evidence introduced by the parties in the course of the seven-day bench trial.

## A. Shaun Hekking

Shaun, the youngest of the three Hekking sons, has been married to Alexandra for more than twenty years. They have two sons, one of whom has special educational needs for which he attends a private school. Trial Transcript 10/06/15 (TR I) at 17:9-16. Shaun's descriptions of Laurie and Renate Hekking, their

personalties, lifestyle, and possessions were markedly consistent with those later provided by his wife Alexandra and his brother Darren.

After Laurie's divorce from the mother of his three sons in 1983, he married Renate, a citizen of Germany, in 1986; the couple remained married for 24 years until they died within eight days of each other in June 2010. Trial Transcript 10/06/15 (TR I) at 15:1-5. Laurie and Renate first lived in Hamburg, Germany, and later moved to Erlenbach, Switzerland, just outside of Zurich. They also kept a separate residence in Naples, Florida. TR I at 16:1-3.

Laurie had worked in the aerospace and defense business, primarily in the service of the government. Toward the end of his career, he founded several companies in Europe involving aerospace and engineering. TR at 15:12-22. As described by Shaun and echoed by his brother Darren, Laurie was a *bon vivant* who enjoyed the good life and who liked to display his financial success in his lifestyle. TR I at 16:9-21. At the same time, Laurie was a very generous man who loved his sons and who, together with his wife, doted on his grandchildren. TR I at 16:6-17:4.

Shaun and his family would spend time with Laurie and Renate two or three times a year, usually visiting them in Florida. TR I

14

at 17:21-18:1. In addition, Laurie and Renate would come to New York and Connecticut around Christmas and Shaun would see his father in between business trips. TR I at 18:8. The visits in Florida included dining out in fine restaurants, taking trips in Laurie's Corvettes, and enjoying Laurie's extensive wine collection. TR I at 19:1-15.

When Laurie and Renate visited New York, they booked a suite at the St. Regis luxury hotel. Renate loved to go shopping, taking Alexandra to her favorite boutiques such as Louis Vuitton, Bulgari, and Gucci. TR I at 19:16-20:11.

Laurie and Renate owned two condominiums in Naples: the upscale St. Pierre with a gulf view, and the Breakwater, which Laurie called his "guesthouse." TR I at 20:18-21:6. By contrast, their lakeside apartment in Erlenbach was rented. TR I at 21:13-16.

Renate died on June 1, 2010. TR I at 24:22-23. On June 9, 2010, the day of Laurie's death, all three sons were present in Switzerland. Shaun and Darren left shortly thereafter, while Craig stayed behind. TR I at 24:24-25:8. Because Renate predeceased her husband, all her tangible, personal property was devised to Laurie; her remaining property was devised to the Trust. Ex. 142 at 0007-0008. Under the terms of Laurie's will, if his wife predeceased him, all property was devised to his three

15

sons or, in the event any son was deceased at the time of distribution, that son's share was to be distributed to his children, *per stirpes*, and, if there were no children, to Laurie's other sons or their children, *per stirpes*. Ex. 143 at 0021.

Under the terms of both wills, if the spouse was no longer living, Craig became the personal representative of both estates (in the event Craig was unable or unwilling to perform the role, Darren was to be appointed, and after him, Shaun). Ex. 142, 143. Craig petitioned the Probate Division of the Circuit Court of Collier County, Florida, to be appointed as the personal representative. Ex. 142 at 0001, Ex. 143 at 0001. Craig also commenced probate and estate administration proceedings in Switzerland. Ex. 143 at 0005, TR I at 28:21-29:2. At first, Craig, the only brother to speak some German, kept his brothers informed about the administration of the Estate. TR I at 29:3-15. However, although Shaun repeatedly made a request for an accounting as to the Estate, Craig never provided one, offering a number of different excuses instead. TR I at 29:18-30:4.

As previously agreed upon by the three brothers, the Florida condominiums were put up for sale. TR I at 30:9-22. In early July of 2011, the Breakwater condominium was sold for $495,000 and the proceeds were split three-ways. TR I at 31:1-19. According to

Shaun, he received $141,000 as his share. After the sale, Craig informed his brothers that the Breakwater condominium was sold "as is" and that the sale included the personal property that was inside. Id.

The St. Pierre condominium was sold in June of 2012 for $1.1 or $1.2 million, of which Shaun recalled receiving approximately $318,000.[8] TR I at 32:9-22.  After the St. Pierre condominium had sold, Craig told his brothers that all its contents had been included in the sale. TR I at 33:22-25. As Shaun recounted, Craig had not contacted him prior to the sale to obtain Shaun's consent to an "as is" sale. According to Shaun, given the value of the furnishings in the St. Pierre and of Laurie's and Renate's other belongings — for which no accounting had been provided by Craig — the inclusion of that personal property made no sense. TR I at 34:8-15. In response, Craig took the position that the contents of the condominium were not worth that much and he explained that it had been the best way to get the deal done quickly. TR I at 34:16-21.

Related to the sale of the St. Pierre condominium, Craig initiated proceedings against the listing agent and engaged the Florida law firm of Cohen & Grigsby. TR I at 35:2-24. Shaun, upon

---

[8]

Instructions for disbursement of funds reflect that Shaun and Darren received $311,700 each, whereas Craig received $319,700. Ex. 162.

request by Craig, gave Craig $7,000 for legal bills. TR I at 36:8-12, 36:25-37:3. When Shaun learned that a settlement was discussed in the case, he offered to attend related meetings in Florida, but was dissuaded from doing so by Craig. TR I at 36:8-20. In the spring of 2013, sporadic updates from Craig about the litigation stopped. E-mail correspondence between Craig and Cohen & Grigsby reflects that in March 2013, the law firm wired $62,503 to Craig and charged $3,496 in fees. Ex. 157 at 0012. A corresponding transaction detail report shows that $62,503 were wired to a bank account held jointly by Craig and Molly on March 28, 2013. Ex. 163.

Shaun last visited his parents in the St. Pierre condominium in March of 2009. TR I at 39:7-15. According to Shaun, whose description is consistent with that provided by Darren and Alexandra, the St. Pierre was Laurie and Renate's showplace where they liked to entertain. TR I at 40:11-19. The condominium was lavishly furnished, professionally decorated, and it contained designer furniture, high-end electronics, and artwork. Id. With the help of eight pictures taken from a real estate website listing, Ex. 94, Shaun described the approximately 2,300 square foot, three-bed, three-bath St. Pierre condominium with a view of the Gulf of Mexico. TR I at 41:4-43:11. *Inter alia*, Shaun listed three signed Miro lithographs, two Tiffany candlesticks,

18

three Eames chairs, several other Tiffany items such as silverware and picture frames, as well as high-end electronics, including two large plasma televisions. TR I at 43:14-45:10. Shaun also described several furs belonging to Renate, including a sable, a mink, a "white" one, and a fur-lined jacket. TR I at 45:17-46:3. Renate had a special chest of drawers built for her jewelry with velvet-lined compartments, and she owned many designer clothes, bags, and shoes. TR I at 48:6-21.

The St. Pierre condominium also contained two safes. Shaun recounted that, on one occasion, his father took him aside and showed him stacks of banknotes in the larger safe, which Shaun estimated to be between $100,000 and $150,000. TR I at 49:5-17. The safe also contained jewelry and a box for one of Laurie's Rolex watches. TR I at 49:21-23. Laurie owned two vintage Corvettes[9] and a Mercedes S-Class sedan; Renate drove a Cadillac sedan. TR I at 50:11-13. Laurie also owned a collection of high-end wines, including such high-priced wines as Chateau Petrus, which can cost up to $2,000 to $3,000 per bottle.

When he became terminally ill, Laurie expressed that it was important for Shaun and Craig to go down to Florida to make sure everything was accounted for and recovered. TR I at 52:10-18.

---

[9]
The Plaintiffs are not seeking recovery for the two Corvettes. It is unclear what happened to the Corvettes.

Shaun next set foot into the St. Pierre condominium in July of 2010, after Laurie's and Renate's deaths. TR I at 51:24-52:6. Shaun and Craig went to the St. Pierre together. TR I at 52:19-23. Although most of the condominium looked the same and the furnishings appeared to be intact, Shaun was surprised to notice that almost all the clothing was no longer in the closets. TR I at 53:1-9. Both Laurie's and Renate's jewelry containers were empty. TR I at 53:10-16. Shaun and Craig tried to open the safe but, although Craig said that he had been given the combination by Laurie, he was unable to open it. TR I at 53:17-20. Shaun then discovered a green folder that contained an inventory of Renate's jewelry. TR I at 55:11-21. Shaun went through the itemized list with Craig who admitted that he was in possession of Renate's jewelry. TR I at 56:12-57:3. As to the safe, the brothers were unable to locate a locksmith who was willing to open the safe on a Sunday. Craig offered to stay behind and take care of the matter and Shaun returned to work in New York. TR I at 57:9-23. The following day, Craig told Shaun that he had found a locksmith to open the safe, but he contended that the safe had been empty. TR I at 57:24-58:8.

Shaun and his family vacationed in Naples in the spring of 2012, initially with the intention of staying at the St. Pierre condominium, but they later changed their minds, feeling

20

uncomfortable. TR I at 54:2-16. Shaun did visit the condo and found that, although the furnishings and housewares were still present, Laurie's and Renate's clothes, designer bags, jewelry, and other personal effects were gone, and there were "more contemporary and less high-end" clothes in the bedrooms and dressers. TR I at 54:25-55:5.

When Shaun visited his father during Laurie's final days in May and June 2010, he and Craig stayed at Laurie and Renate's Erlenbach apartment. TR I at 63:16-64:2. According to Shaun, the Erlenbach apartment was smaller than the St. Pierre condominium, but it was also elaborately decorated with designer furniture and artwork. TR I at 64:4-8. Laurie had a Mercedes S-Class sedan in Switzerland. TR I at 68:20-24.[10] Some of Laurie's watches and his coin collection were at the apartment, as were much of Renate's jewelry, designer clothes, gowns, furs, and handbags. TR I at 65:10-15. As Shaun described in some detail, Laurie's coin collection consisted of seven or eight large display folders holding, *inter alia*, Morgan half-dollars, American gold eagles, Canadian gold coins, Mexican 50 peso gold coins, Krugerrands from South Africa, as well as German and old British silver coins. TR I at 67:6-68:2. As to Laurie's watch collection, Shaun recalled

---

[10]

    According to Shaun, he received $10,000 as his one-third share
of the Mercedes. TR I at 123:20-24. Darren, on the other hand,
received no share from the sale of the car.

seeing a gold Hamilton Electric, a Patek Philippe gold watch, a Rolex Oyster Perpetual gold watch, and a stainless steel Rolex Daytona Chronograph. TR I at 69:3-12. Laurie was wearing his gold Rolex Daytona in the hospital and gifted it to Shaun at that time. TR I at 69:10-18. Shaun never saw any of the watches, the coin collection, or the wines again, and Craig provided no accounting or explanation as to what happened to any of these items. TR I at 70:3-71:10.

During their visit just prior to Laurie's death, Craig and Shaun discovered an extensive wine collection in a wine cellar located in a basement area allocated to the apartment. The collection included Lafite Rothschild, Mouton Cadet, and at least one case of Chateu Petrus. TR I at 65:16-66:11. They also discovered CHF 70,000 [Swiss francs] (approximately $62,000 at the June 2010 exchange rate) in cash. TR I at 71:11-21. The following day, with the help of Laurie's lawyer Jürg Reichenbach and at Laurie's recommendation, Craig and Shaun opened two accounts at the local Raiffeisenbank. TR I at 72:4-21.

After Laurie's death, Shaun asked Craig how the Erlenbach furnishings would be brought back to the United States and Craig suggested that those should just be sold in Switzerland. TR I at 73:21-74:3. Shaun also described the jewelry he and Craig found in the Erlenbach apartment. TR I at 74:20-75:6. Renate's "lower-

end" jewelry, which included gold necklaces and bracelets, was kept in an airline flight bag. Renate's "high-end" jewelry, kept in a jewelry box, included two large diamond rings, diamond tennis bracelets, diamond necklaces, and Bulgari rings. TR I at 75:7-23. Craig and Shaun agreed that Shaun should take the jewelry of lesser value, have it appraised in New York City, and sell it. As to the expensive jewelry, Craig stated that he had connections in Newport and he offered to have it appraised and sell it. TR I at 76:14-78:17, 86:16-25, 88:6-16.

Documentation related to Renate's jewelry in the form of invoices[11], expert and insurance appraisals, and/or certificates of authenticity or origin was contained in the green folder Shaun and Craig located in the St. Pierre condominium after Laurie's death. Ex. 156, TR I at 80:5-22. Renate's jewelry included, *inter alia*, a yellow diamond ring purchased for $100,000, Ex. 156 A; her large diamond engagement ring appraised at $73,150, Ex. 156 C; and a diamond necklace appraised at $16,696, Ex. 156 E. Shaun and Craig went through every item of jewelry on the list and Craig confirmed that the jewelry was in his possession. TR I at 84:10-24, 94:7-15.

---

[11]

Although some of the invoices reflected that jewelry had been shipped to Craig's ex-wife, Shaun confirmed that the pieces actually belonged to Renate and had been worn by her on many occasions. TR I at 82:8-83:11

In August of 2010, after getting an appraisal for the lesser jewelry in New York, Shaun sold the jewelry for $17,000 or $18,000 and sent half of the proceeds to Craig. TR I at 100:25-101:24. That same month, Craig delivered Renate's two large diamond rings to Shaun so that Shaun and Alexandra could have them appraised in New York City as well. TR I at 103:2-104:7. The rings were appraised at $100,000 and $125,000, respectively. TR I at 104:18-20. Ostensibly unhappy with those numbers, Craig retrieved both rings from Shaun and Alexandra's apartment, with the stated intent to sell the rings in Newport, together with the other high-end jewelry. TR I at 105:2-106:24.

At a family wedding in October of 2010, Shaun observed that Molly was wearing Renate's engagement ring and Renate's gold Cartier wristwatch. TR I at 107:21-108:23, 118:8-119:1. Shaun confronted Craig and Craig told him that he had not found a buyer yet and that this was a special occasion. TR I at 109:11-18. During a family ski vacation in December 2010, Shaun again observed Molly wearing Renate's engagement ring. TR I at 110:10-111:3. As before, Shaun confronted Craig about the ring and demanded answers about the ring being sold. Again, Craig told Shaun not to worry and that he would take care of it. TR I at 111:6-15.

Laurie and Renate owned two country club memberships in

24

Naples. The brothers discussed redeeming the membership interests in both clubs and dividing the proceeds. TR I at 112:10-113:3. Craig told his brothers that it would take time and that the clubs would not provide the equity back. TR I at 113:4-14. Craig never informed his brothers that he had, indeed, received checks from both clubs. TR I at 114: 7-10. The evidence submitted at trial established that on December 30, 2010, a check for $85,065 was issued by Club Pelican Bay to the Estate of Laurie Hekking. Ex. 28 at 0014. On March 4, 2014, the LaPlaya Beach and Golf Resort issued a $40,000 check to the Estate of Laurie Hekking and mailed the check to Craig at his Newport address. Ex. 27 at 0012, 0014. Neither Darren nor Shaun ever received a portion of those proceeds. TR I at 122:10-13.

In April 2013, Shaun learned that Renate had an account at the HASPA [Hamburger Sparkasse] in Hamburg, Germany. TR I at 114:18-21. Shaun received a document in German from a German court. Shaun asked Craig about the document and was told by Craig that he would take care of it. TR I at 114:23-115:5. In December 2013, Shaun received a second communication from the German court and took it to the German Consulate in New York City, where it was translated for him. TR I at 115:8-20. At that time, Shaun learned that Craig had petitioned the German court to be appointed as personal representative in order to gain access to

Renate's HASPA account. TR I at 116:1-7. Shaun hired a German law firm and obtained an injunction against Craig; Shaun and Darren were eventually appointed personal representatives so that they could close out the account. Eventually, approximately $40,000 from the HASPA account was remitted to Shaun and Darren. TR I at 116:16-117:10.

Shaun repeatedly asked Craig whether Laurie and Renate had other foreign bank accounts; Craig told him he didn't think so and discouraged Shaun from pursuing it. TR I at 119:2-18.  Upon Laurie's directions while they were in Switzerland, Shaun and Craig went to the ZKB [Zürcher Kantonalbank] to open Laurie's safe deposit box. The box contained Laurie's gold Montblanc pen and documents in German, which Shaun did not understand. TR I at 120:22-121:1.

Shaun learned of the existence of the Cego Foundation in late May 2010, when Laurie summoned his lawyer Jürg Reichenbach ("Reichenbach") to the hospital. Laurie advised Shaun and Craig that he was setting up an educational trust through the Winter Group, one of Laurie's companies, to provide tuition for Shaun's and Craig's children. TR I at 124:23-125:13. On that occasion, Shaun and Craig were asked to sign a document written in German and enter the names of their children as beneficiaries of the Cego Foundation. TR I at 126:4-18, Ex. 78, 79. Shaun was informed

26

by Reichenbach and by Antoine Garreau ("Garreau"), Laurie's private banker at the Swiss bank of E. Gutzwiller & Cie. ("Gutzwiller"), that there was money at Gutzwiller for the education of Shaun's and Craig's children. TR I at 133:5-14. Garreau advised Shaun and Craig that the quickest way to communicate with him was via Facebook Messenger. TR I at 134:1-4. At the time of Laurie's death, the Winter Group account had a balance of $1.147 million. TR I at 136:11-16. In 2010, the $53,000 annual tuition for Shaun's younger son, who has special educational needs, and the tuition for Shaun's older son, who attends a boarding school, were promptly paid. TR I at 134:14-135:19.

The following year, Shaun notified Craig that tuition payments needed to be made; he also communicated with Garreau via Facebook Messenger. TR I at 135:20-136:6. Both responded to Shaun that there were problems with the account. TR I at 135:7-10. According to Shaun, he had empowered Craig to deal with the Gutzwiller account because Craig was frequently in Switzerland, dealing with the Estate. TR I at 135:21-25. Unable to obtain further tuition payments, and after communicating with Garreau for several weeks, Shaun advised Craig and Garreau that he was coming to Geneva in December of 2012 to pick up the checks or get the matter settled. TR I at 138:4-24. Although Craig tried to

discourage Shaun from the trip because "the funds were blocked and because we didn't want any more problems" with the account, Shaun proceeded to Geneva, where he visited Garreau's offices at Gutzwiller with Craig. TR I at 139:2-24. Shaun asked for $30,000 that were needed to keep his younger son in private school. He was advised by Garreau that the funds were blocked; that there was trouble with the regulators; and that "we didn't want to cause any undue suspicion." TR I at 140:12-142:3. Instead, Shaun received CHF 10,000 (about $11,000 at that time). TR I at 141:20-23. Craig offered to drive Shaun to the airport and, on the way, asked his brother to lend him CHF 3,000 for expenses, which Shaun gave him. TR I at 142:10-21. After this event, Shaun received no further monies from the Winter Group account. Including the CHF 7,000 he obtained in Geneva, Shaun received $88,000 from the account, all of which were used for tuition payments. TR I at 143:13-144:11.

In May of 2013, after pressing Garreau for an answer as to why the tuition payments were not made, Garreau informed Shaun that the account had been closed and that he should probably talk to Craig about that. TR I at 144:16-145:1. After a number of attempts to communicate with Craig, Craig finally admitted to Shaun that he had a check for CHF 548,000 that constituted the remaining balance of the Winter Group account. TR I at 145:2-9.

28

Craig explained to Shaun that he was trying to cash the check but that the funds were blocked domestically. Craig insisted that this was only a minor hiccup and that, once his bank cashed the check, the funds would be divided so Shaun could pay for his children's education. TR I at 145:25.

Shaun's testimony regarding these events was corroborated by online communications between him and Garreau, including a message from Garreau dated June 17, 2013, in which he informed Shaun (upon Shaun's inquiry regarding the status of tuition payments) that the Winter Group account had been closed for almost five months. Ex. 141 at 0009. Garreau also informed Shaun that Craig had attempted to cash the check for CHF 548,000 at the Gutzwiller office in Zurich. TR I at 150:10-15, EX 141 at 0017. Shaun never received an answer from Craig as to what happened to the funds in the Winter Group account. TR I at 149:24-150:3.

Shaun stopped communicating with Craig in October or November 2013. At the time of trial, he had spent more than $600,000 on investigators and lawyers in Germany, Switzerland, and the United States, in order to determine what happened to the Estate assets. TR I at 153:9-154:3.

The cross-examination of Shaun conducted by Craig reconfirmed much of Shaun's testimony; established no facts inconsistent with Shaun's prior testimony; and added only few

29

additional facts that are relevant to the case: Shaun did not receive a copy of the Purchase and Sales Agreement ("PSA") or settlement statement for the sale of the Naples condominiums. Transcript 10/07/15 ("TR II") at 13:22-14:16, 15:18-22. Shaun recalled that Laurie told him that the Tiffany silverware was worth $15,000. TR II at 23:6-11. Craig sold an Ocelot fur coat that belonged to Renate while he was in Switzerland. TR II at 82:10-24. In November 2013, Shaun borrowed $30,000 from Craig because there was a problem with the Winter Group account and Shaun needed the money to pay his sons' tuition. TR II at 70:13-71:19. The remainder of Craig's cross-examination of his brother consisted of attempts to establish that Shaun had no photographic proof of Estate items that were now unaccounted for; that Shaun had initially not known about the Winter Group — along with the suggestion that Shaun had not been as close to Laurie as claimed; and other lines of questioning that appeared to be more designed to antagonize Shaun than to extract any relevant information.

## B. Darren Hekking

Darren's testimony regarding the St. Pierre condominium was consistent with that provided by Shaun, but included more specifics. Darren added that the St. Pierre condominium, where he visited Laurie and Renate twice a year, was 2600 square feet in size and contained expensive items such as two Eames chairs with

30

ottomans, a flat screen television, a Bang & Olufsen stereo, custom-made furniture, fine crystal, lithographs, and other art objects. TR II at 101:2-103:12.

Darren recounted that his father owned a number of Brioni suits and Hermes neckties and he confirmed the makes and models of Laurie's watches as previously described by Shaun. TR II at 104:15-105:5. As to Renate's property, Darren recalled her large diamond engagement ring and gold Cartier watch, as well as a closet stocked with bags, gowns, dresses, golf wear, and furs. TR II at 105:8-106:1. In addition to the Miro lithographs, Darren described a Lalique crystal elephant sculpture Laurie and Renate had bought in Dubai. TR II at 106:17-20. Darren confirmed that there was a Mercedes S-500 and a Cadillac STS and a collection of expensive wines. TR II at 107:3-108:3.

As to the two safes in the St. Pierre condominium, Darren recounted that, on his April 2009 visit, his father opened both safes in front of him. The smaller safe contained a gun Laurie described as "home defense," and the larger safe contained a couple of jewelry boxes and was "chock-full" of hundred-dollar bundles, each with a $10,000 band around it. Laurie told Darren that it was his "get-out-of-jail" or "kidnap money." TR II at 109:1-9. Darren did not know the combination for the safe; he was told by Laurie that Craig knew the combination. TR II at 109:10-

31

16.

After Laurie died, Darren discussed the Estate with Craig, who told him that he was working on identifying where everything was and putting everything together. TR II at 113:1-18. Although Darren repeatedly requested an accounting from Craig, none was ever provided. TR II at 113:21-114:11. Like Shaun, Darren stopped communicating with Craig in November 2013. Darren recounted that he also received a notice (in German, which Darren does not speak) from a German court and that, upon asking Craig whether there was money in Germany, he was told that there was no money, but that some money might be owed in Germany for Renate's estate. TR II at 114:12-115:2.

After the Breakwater condominium sold in 2011, Darren received his one third share of the sales proceeds. TR II at 115:8-15. Darren was aware that there was a problem with the sale of the St. Pierre condominium, although the sale did close in 2012. TR II at 115:16-116:5. Like Shaun, Darren was told by Craig that the St. Pierre condominium had been sold with all contents and, like Shaun, Darren was "absolutely beside [him]self" because of the value of the furnishings and other items. TR II at 116:12-25. Darren requested the PSA and closing binder from Craig, but he never received either. TR II at 117:1-15. Darren was aware that Craig had instituted proceedings against the listing broker

32

related to the broker's commission for making a sale below asking price, TR II at 117:16-118:11; however, Darren was never advised by Craig that he had settled the case on behalf of the Estate and that $62,500 had been wired to Craig and Molly's joint account. TR II at 118:21-119:5.

Darren learned that Craig had taken Laurie's Mercedes when Craig drove up in the car while visiting Darren in 2013. When he questioned Craig about this, Craig told Darren that he had bought the car from Laurie prior to Laurie's death for $35,000. TR II at 120:2-121:19. Craig refused to produce any paperwork and Darren noted that the Mercedes still had Laurie's Florida vanity plates on it. TR II at 121:20-25. Darren was also given no accounting regarding Renate's Cadillac. TR II at 122:1-3.

Likewise, Darren received no accounting regarding any personal property in Switzerland. TR II at 122:8-20. As to the Mercedes S-500 in Switzerland, Craig advised Darren that he had sold the car and that there would eventually be a reconciliation of the funds. Darren received no portion of that sale. TR II at 123:9-22.

Darren was aware of the 7.8 carat yellow diamond ring Renate owned and recalled seeing her frequently wear her 3.75 carat diamond engagement ring and her gold Cartier watch. TR II at 125:2-16. Darren identified a picture of the engagement ring on

33

the insurance appraisal form. Ex. 156 at 0006. Like Shaun, Darren saw Molly wearing the engagement ring and Cartier watch at the family wedding in Florida. TR II at 126:13-127:3. Darren confronted Craig and Molly, asking them why she was wearing jewelry belonging to the Estate. In response, Craig asked Darren not to make a scene and assured him that the jewelry would be sold and that there would be an accounting. TR II at 127:4-13. A second confrontation occurred when Molly was wearing the ring again at the Vermont ski vacation. TR II at 127:18-10. Molly was present during both conversations, but "didn't have much to say." TR II at 127:14-17, 128:11-15. Craig confirmed to Darren that he was in possession of Renate's jewelry, but he provided no update regarding its appraisal or sale, nor did he ever inform Darren what had become of it. TR II at 129:9-24.

Similarly, Craig did not inform Darren that he had received the redemption checks from the two Florida country clubs. TR II at 131:11-15. The only bank account Craig identified as belonging to Renate was an account at Huntington Bank in Florida; in response to Darren's questions regarding any Swiss accounts, Craig said that he was looking into it but that there "was not much there." TR II at 131:16-132:17. Other than one third of the proceeds from Laurie's life insurance and the condominium

34

sales,[12] Darren received no further money from the Estate. TR II at 133:1-17.

On cross-examination by Craig, Darren reconfirmed that Laurie owned a number of Brioni suits (conceding that he did not look at the labels but noting that his father only wore Brioni suits), as well as various Hermes ties, and specific luxury watches. Transcript 10/08/15 (TR III) at 6:13-7:10. Darren also provided some specific information regarding Laurie's high-priced wine collection, TR III at 13:11-14:21, and he reconfirmed seeing several $10,000 stacks of cash in the safe at the St. Pierre condominium. TR III at 16:23-17:5.

Darren explained that when he visited his father in Switzerland shortly before Laurie's death, he stayed at a hotel because Craig informed him that Laurie did not want anyone at the Erlenbach apartment. TR III at 17:11-19, 198:25-19:20. In response to a series of questions from Craig, Darren acknowledged that, although Shaun had told him in the fall of 2010 that he had sold the "lesser" jewelry, Shaun did not provide Darren with an accounting of the transaction, nor did he tell Darren until 2011

---

[12] Plaintiffs' attorney's reference to the "sales proceeds from the Club at Pelican Bay," rather than the St. Pierre condominium, appears to have been in error. Darren testified that he did receive his share of the two condominium sales, but was unaware that Craig had also received two checks for the club redemptions. TR II at 133:6-8.

that he had realized about $17,000 or $18,000 from that sale. TR III at 21:13-25:9. Darren again confirmed that he saw Molly wearing Renate's engagement ring during the Vermont ski vacation. TR III at 25:24-25:7.

## C. Alexandra Hekking

Alexandra has been married to Shaun for twenty years; they have two children. TR IV at 7:11-17. Alexandra's description of her relationship with Renate and Laurie echoes that described by both Shaun and Darren. Every spring break (Alexandra is a teacher), she and her family visited Renate and Laurie in Florida, and her in-laws often came to New York City during the Christmas season. TR IV at 8:6-21. Alexandra and Renate were friends; Renate liked to shop for the grandchildren and she liked to take Alexandra shopping. Alexandra and Renate went to the beach together and visited museums. Id. at 8:22-9:2. Renate was extremely close to the children. Id. at 9:3-4.

Alexandra and Shaun stayed at the La Playa beach club when they visited Florida, but had dinner with Laurie and Renate at the St. Pierre condominium most evenings. TR IV at 9:9-22. Alexandra provided a description of the layout and furnishings of the condominium consistent with that provided by Shaun and Darren. TR IV at 10:10-17. She described the Eames chairs and ottomans, Miro lithographs, Baccarat crystal, Tiffany silver, and

Villeroy & Boch china. TR IV at 15:18-16:8.

In addition, Alexandra described the velvet-lined jewelry compartment Renate had added to the drawers in her closet, which contained a lot of jewelry. TR IV at 11:6-20. Renate wore a gold Cartier watch, a gold elephant bracelet, a diamond solitaire pendant and her engagement ring on a regular basis. TR IV at 12:5-14.

Renate owned very expensive clothing and evening wear, including from designers Escada, Pucci, Roberto Cavalli, Badgley Mischka and Oscar de la Renta. She also owned five fur coats, including two mink-lined raincoats, a floor-length mink, a long sable coat and a shorter, light-colored fur coat for the evening. TR IV at 12:19-13:12. Renate's closet contained dozens of shoes and handbags by Louis Vuitton, Chanel, Christian Dior, Stuart Weitzman, and Fendi; these items were kept in special compartments. TR IV at 13:15-22, 46:10-49:14.

When Shaun returned to New York after Laurie's and Renate's deaths, he brought back some of Renate's costume jewelry and smaller pieces. TR IV at 17:8-14. Alexandra took them to a jeweler on Fifth Avenue in Manhattan to have them appraised. TR IV at 17:17-20. The jewelry was appraised at $17,000 and, with Craig's approval, Shaun and Alexandra sold the costume jewelry. TR IV at 17:24-20:5.  Later that summer, Craig brought Renate's

two large diamond rings to Shaun and Alexandra's apartment to have them appraised by the same jeweler in New York City. TR IV at 20:6-23.

Shaun and Alexandra took the jewelry to the same appraiser, who estimated each ring at about $100,000. TR IV at 21:4-15. Shaun also obtained a second appraisal for the rings. TR IV at 21:16-20. Alexandra and Shaun discussed the matter with Craig, who told him that he could do better in Newport and that he already had buyers. TR IV at 22:1-7. After it was decided that Craig should sell the rings in Newport, Craig returned to the apartment for a brief visit and picked up the rings from Shaun in Alexandra's presence. TR IV at 22:18-23:4. Craig also stated that he was working on finding buyers for Renate's other fine jewelry. TR IV at 23:13-15. Craig never got back to Shaun or Alexandra on whether he had sold any of the jewelry. TR IV at 23:25-24:2.

In October 2010, Alexandra saw Molly wearing Renate's engagement ring, a round solitaire diamond on a platinum band, and her gold Cartier watch at the family wedding in Florida. TR IV at 24:3-25:5, 51:8-20. Alexandra asked Molly about the ring and Molly responded that they hadn't sold the ring yet and she was wearing it for a special occasion. TR IV at 25:23-26:7. During the ski vacation in December of the same year, after Darren brought it to her attention, Alexandra again observed

38

Molly wearing Renate's engagement ring. TR IV at 26:17-19.
Alexandra commented to Molly that she was wearing the ring again,
and Molly stated that they hadn't sold it yet and that they were
"working on it." TR IV at 27:15-18:13. After December 2010,
Alexandra asked Molly on multiple occasions about the status of
Renate's jewelry and was told that they were "working on it." TR
IV at 28:19-20:2.

On occasion, Molly told Alexandra about the overseas trips
she and Craig were taking. When asked how they could afford their
travel, Molly told Alexandra that their jewelry business was
doing well and that they had to hire a baby-sitter because Molly
was so busy. TR IV at 376:22-37:14.

Since 2006, Laurie had been paying a portion of the tuition
costs for Shaun and Alexandra's younger son, who attends a
special school for children with communication disorders. TR IV
at 62:2-63:2. Alexandra knew that Laurie had established the
Winter Group trust for the purpose of educating his
grandchildren. TR IV at 63:3-64:6. After Laurie died, tuition
payments from the Winter Group funds continued, at first. TR IV
at 30:4-14. Less than a year after Laurie died, however,
Alexandra experienced problems with getting the tuition paid. TR
IV at 31:16-23. Alexandra addressed the issue with Craig, who
told her that he would write a check for the tuition. TR IV at

39

31:25-32:3. At a large family gathering for Easter 2012, Alexandra advised Craig (in Molly's presence) that her child was in jeopardy of losing his place at the school if she did not get the tuition payment. In response, Craig told her he would get the funds to her. TR IV at 32:7-33:3. Although Alexandra still communicated with Craig via e-mail afterwards, she mostly communicated with Molly. TR IV at 33:10-16. Alexandra frequently texted Molly and when she did not receive a response, she called Molly and told her that she needed the tuition money to keep her child in school. TR IV at 33:19-25. Molly assured Alexandra that she would talk to Craig about writing Alexandra a check, but neither Molly nor Craig ever got back to Alexandra with a response. TR IV at 34:17-25.

At that time, the tuition for Alexandra and Shaun's younger son was $52,000 per year and the school was refusing to renew the contract without payment. TR IV at 35:7-16. Alexandra called Molly again and asked her how things stood with the Winter Group money for the tuition. TR IV at 35:22-25. Molly advised her that Garreau would take care of the tuition; that Molly had talked to him; and that the tuition for Molly and Craig's daughters was taken care of. TR IV at 35:25-36:16. Molly did not know what the holdup was regarding Alexandra's son; Alexandra asked her to look into it. Id. at 36:17-21. Shaun then traveled to Switzerland to

see what the holdup was, but the issue was not resolved. Id. at
38:4-9. Even after Shaun and Craig stopped speaking to each
other, Alexandra continued to appeal to Molly via text to have
the situation resolved. TR IV at 39:1-8. Although Molly appeared
kind and sympathetic as a friend and she promised Alexandra that
she would speak with Craig, she never got back to Alexandra and
told her that she "didn't want to get in the middle of stuff with
the boys." Id. at 39:15-21. At some point, after a recurring
discussion about the fact that Molly and Craig were not
responding to Shaun and Alexandra's phone calls, e-mails, or
texts, there was an abrupt end to the communications between
Molly and Alexandra. TR IV at 29:10-25.

**D. Molly Hekking**

Molly assisted Craig in packing up the St. Pierre
condominium belongings, after which they were put in storage by a
moving company. TR III at 34:5-8. In stark contrast to the
testimony given by Shaun and Darren, Molly explained that she was
not familiar with the "stuff" in the St. Pierre condominium; that
she "didn't see a thing of value;" and that there were some old
shoes and some golf outfits, and "some old jewelry...trinkets and
whatnot." TR III at 38:9-25.

Molly was present in Florida when the movers conducted a
final walk-through of the St. Pierre Condominium on May 29, 2012.

41

TR III at 41:22-42:15. The bill by the William C. Huff Moving and Storage Company ("Huff") shows a $2,250 charge for "5 men, 9 hours" to "pack, prep, inventory & load to Huff" on that date, plus a charge of $1,500 for "5 men, 6 hours" to "finish load, unload." Together with a flat mileage fee and fee for packing materials, which included six book crates, two "Queen/King" and an unspecified number of crates for an additional $230, the total bill came to $4,447 and was made out to Craig and signed by Craig. Ex. 26 at 0014

As Molly acknowledged, all of the personal property at the St. Pierre, except for items donated or sold at the consignment store, was placed into storage. TR III 46:5-10. A 2-page Household Goods Descriptive Inventory includes, *inter alia*, six chairs, two "wood-leather" chairs with ottomans, a wooden chest, two small televisions, a Plasma television, end tables, dishes, and approximately two dozen boxes of varying sizes. Ex. 26 at 0021-22. An "Interim Storage Space Rental Agreement" between Huff and Craig indicates that Craig rented four or five storage vaults to accommodate the items removed from the St. Pierre condominium. Ex. 26 at 0016. In addition, Craig requested insurance coverage in the amount of $50,000.

On June 25, 2012, Huff employees (two men) loaded property from the storage facility and transported it to Rhode Island,

where it was delivered to Craig and Molly's residence at their Newport address. By his signature, Craig confirmed that all furniture and belongings had been unloaded at that location and had been received in good condition. Ex. 26 at 0019. According to Molly, although in June of 2012 she lived at the Newport residence — which is in her name and for which she is the only borrower — she was not there when the furniture and belongings were delivered to her home and she does not recall such a delivery. TR III at 48:18-21.

Molly also helped pack up the Erlenbach apartment, which she visited for the first time a week after Laurie and Renate died; after that initial visit, she returned several more times. TR III at 52:7-10, 54:16-55:12. Molly denied all knowledge of Laurie's and Renate's personal items being moved back to the United States. A payment transfer statement and related e-mail from Craig to Rene Kurth, the director of the Winter Group, reflects a balance due of $10,505 for the move of personal items from Switzerland to the United States. Ex. 152. Molly testified that, in her opinion, there was nothing of value in the apartment, "nothing nice. Beat-up ugly shoes, that were all flats, which I don't wear; size eight clothing, which I also don't wear, nothing I would like." TR III at 52:11-18. Although she visited Erlenbach three or four times and helped Craig to pack up all the

belongings in the apartment, Molly maintained that she did not take charge, that Craig took care of everything, and that she had nothing to do with any of it. TR III at 60:2-24.

In 2010, Molly kept a personal checking account at Bank of America, to which she later added Craig as a signatory. TR III at 63:2-18. Although she periodically checked that account, Molly testified that she was unaware of the source of an $80,000 transfer into that account in October of 2010, nor did she ever ask Craig where the money came from. TR III at 63:19-64:16. Similarly, Molly maintained that she never asked Craig about the value of the inheritance and that he told her they were "fine and taken care of." TR III at 64:23-65:

As Molly acknowledged, neither she nor Craig have held a paying job since Laurie died in 2010, and they have earned no income during the four years between Laurie's death and the commencement of this litigation or thereafter. TR III at 65:4-66:3. Sometime in 2011, Craig and Molly started a company called "Argentiere Luxury," which had yielded no income by September 2014. TR III at 66:4-10. Every year between 2010 and 2014, Craig and Molly had home renovations performed on their Newport residence. TR III at 68:11-25. Craig paid for those renovations, mostly in cash. TR III at 69:1-10. Notwithstanding having to pay a mortgage, taxes, private school tuition for three children, all

while starting a new business, Molly maintained that she asked no questions about the costs of the renovations, trusting that Craig knew "what he was doing." TR III at 69:11-15.

In 2011, Craig and Molly rented a chalet in Chamonix, France for two weeks and they, together with Molly's daughter, her mother, and Craig and Molly's two children and his two children from his former marriage, traveled in Business Class. TR III at 4-22. Craig paid for the vacation and Molly did not ask how. TR III at 7-11. From there, Craig and Molly drove to Geneva, Switzerland, where they met with Antoine Garreau, Laurie's personal banker. Transcript 10/09/15 (TR IV) at 77:17-78:14. On another occasion, Garreau and his wife met them in Chamonix. TR IV at 79:11-22.

Molly and Craig returned to Switzerland twice in 2012, once for a long ski weekend in the Swiss Alps and once to Zurich. TR IV at 80:16-82:3. Molly knew that the rent on Laurie's apartment continued to be paid for some time from Winter Group funds at the Gutzwiller bank. TR IV at 82:77-83. In February of 2013, Molly and Craig returned to Geneva, where they met Rene Kurth at his office. TR IV at 83:8-22. Molly acknowledged that Craig received a check for CHF 548,000 from Kurth at that time, but she claims that she "did not see him physically take a check from Rene." TR IV at 84:3-25.

45

In total, Molly made seven trips to France or Switzerland. On one or two occasions, she returned to the United States by herself; she claimed not to know whether Craig went to Germany on those occasions before returning home. TR IV at 85:17-87:12.

Molly flatly and repeatedly denied that Alexandra Hekking ever approached her about tuition payments from the Winter Group, although she conceded that Alexandra had called her a few times and asked if Craig would please call, and that Molly said she would tell him to do so. TR III at 75:11-24, 85:14-86:7. Molly stopped speaking to Alexandra after receiving emergency texts from her. Id. Molly denied that anyone confronted her about wearing Renate's engagement ring and Cartier gold watch at the family wedding (although she did not deny wearing them). TR III at 77:6-78:5. Molly also denied anyone asking her why she was wearing Renate's engagement ring during the ski vacation in Vermont, maintaining that she was not wearing it on that occasion. TR III at 78:6-12.

Regarding her and Craig's Bank of America ("BoA") checking account, Molly acknowledged that prior to October 15, 2010, when she received an $80,000 deposit, she never received a deposit in excess of $30,000. TR III at 80:15-81:9.

Prior to marrying Craig in 2008, Molly owned her own business and was a working mother. TR III at 86:23-87:5. Molly,

who graduated with a bachelor of arts degree, started two businesses on her own, both of them art galleries, which she ran and operated for several years. TR III at 87:6-88:6. In 2003, Molly obtained her real estate license and listed rental apartments and homes. TR III at 88:7-11. At some point, she and Craig started a children's clothing shop, but Molly decided to shut it down because she did not want to put any more of her money into the business. TR III at 89:2-90:12. After Laurie died, Craig and Molly started a new business, Argentiere Luxury. TR III at 90:13-23. Although Molly was a partner in the business, she never asked Craig how much money was invested in that business or what the source of the funds were. TR III at 91:21-92:16. Molly acknowledged that Argentiere Luxury had yielded no revenue, but she insisted that she did not ask Craig how much money was flowing out of the business. TR III at 93:4-15.

In 2011, Craig bought a $56,000 Landrover for Molly. TR III at 106:10-12. Molly did not question where the money for that purchase was coming from, as "it seemed everyone was buying a car around that time." TR III at 106:16-107:5. At that time, only the smaller of the two Florida condominiums had sold, yielding a share of $145,000 for Craig, who was not working. TR III at 108:1-14.

By her own account, Molly considered herself financially

secure following Laurie's death without ever feeling the need to ask Craig where the money was coming from. TR III at 93:16-94:10. At the same time, Molly sought a number of need-based loan modifications on her house. TR III at 96:6-97:25. A letter dated August 2, 2010 and signed by both Molly and Craig, sought a loan modification on Molly's home loan and explained the hardship that had caused them to be late with the $4,500 monthly mortgage payments. Ex. 175. In February 2011, Molly's lender requested that she provide additional financial information to establish her claim of need. TR III at 104:1-8. Ex. 180. According to Molly, she provided "whatever they asked for, in order to get into a program," but did not provide such materials in discovery in this case because she did "not think [she] had to." TR III at 104:18-105:12.

A May 18, 2012 letter to Molly from her mortgage lender reflects that the loan was in foreclosure at that time. Ex. 182. Molly was eventually approved for a temporary modification program which required her to make a qualifying payment of $11,356. Ex. 179, TR III at 117:6-16. In a letter acknowledgment dated August 14, 2013 and signed by Molly, Molly acknowledged financial hardship, but asserted that she had sufficient income to make future modified loan payments. Ex. 179 at 0002, TR III at 120:15-121:17. The necessary $11,356 payment was wired to the

48

lender from Craig and Molly's joint Citizens bank account on August 30, 2013. TR III at 121:18-24; Ex. 179 at 0006. At that time, in addition to her BoA account, Molly had a Citizens Circle Gold account; she was also on the Argentiere Luxury account at Citizens and on an account at Huntington Bank. TR III at 122:17-123:9. Molly had her own bank cards for the Citizens Circle Gold and Huntington Bank accounts with which she made purchases. TR III at 123:17-124:5. The Circle Gold account statement from July/August 2013 reflects that, only two days before the $11,356 payment for the loan modification was due, $50,000 was transferred into the Citizens Circle Gold account; without that transfer, the balance in the account would have been insufficient to cover the payment. TR III at 133:2-134:7; Ex. 171 at 159. As to her account at Huntington Bank, Molly acknowledged using a debit card issued by the bank, but claimed not to be aware that she had made $64,000 worth of purchases within a six-month period (as established by account statements). TR III at 123:23-127:15.

At the time Molly entered into her need-based loan modification program, Craig and Molly applied, and were accepted, for membership in the Carnegie Abbey country club. TR III at 136:17-137:8. On August 28, 2013, Molly wrote a check for the $6,475 membership deposit from the joint Citizens Circle Gold account. That payment would not have been covered, were it not

for the $50,000 wire transfer into the Citizens account on the same day. Ex. 188-0002; TR III at 137:9-138:16. According to Molly, although she and Craig discussed in some detail whether to join the club, they never discussed how they would afford the fees. TR IV at 89:11-90:1.

After Laurie died, Craig purchased nice things for Molly, including designer bags, a beautiful ring, shoes, and a car. TR IV at 90:22-91:11. Molly never asked how Craig could afford these purchases. Id. After Craig quit his job, the family (apart from Molly's daughter from her first marriage) no longer had health insurance benefits. TR IV at 96:6:19. For the following years, Molly applied for health insurance for the family through the State of Rhode Island on the basis that she and Craig had no income. TR IV94:7-96:19. At the same time, her daughter and her two children with Craig went to private schools with $8,500 annual tuition fees per student. TR IV at 96:20-97:18.

According to Molly, she and Craig "did a lot after Laurie died. Took vacations, going out to eat," TR IV at 89:21-22. The couple also underwent various cosmetic procedures, including botox, laser hair removal, and "cool sculpting" at a cost of $2,100-$2,300 for two procedures. TR IV at 97:24-100:10.[13]

---

[13]

As noted by the Magistrate Judge in her March 17, 2015 R&R, during this time of free spending while neither of them had paid employment, "Molly procured subsidized health insurance for the

Molly — who, like Craig, represented herself — also testified in the Defendants' case by responding to a number of questions she had prepared. Molly, who visited the St. Pierre condominium once before Laurie's and Renate's deaths and five times thereafter, does not recall seeing china, crystal, or gold silverware in 2006. Transcript 10/14/15 (TR VI) at 79:9-23, 96:20-23. She did see a "three-by-three" abstract painting, but does not know if it was a Miro. TR VI at 97:21-98:2. Molly also recalls that one of the bedrooms contained "a bed, a dresser, and a toy chest with a lot of old toys that were outdated from the kids." TR VI at 80-7. When she returned in 2010, she looked through the closets; Molly recalled seeing little plastic bags with slippers and eye masks given out on premium air travel, fake floral arrangements, and a cream-colored raincoat. TR VI at 80:16-24.

In Laurie's closet, Molly saw shoes, button down polo shirts, and a "few old luggage bags," but does not recall seeing any suits. TR VI at 81-14-19. As to Renate's closet, Molly saw a few suits, lots of golf wear, but does not recall seeing anything

---

children through the State of Rhode Island." R&R at 8 n. 7 (Dkt. No. 85. Following entry of the September 29, 2014 consent order, pursuant to which Craig and Molly were limited to $9,000 in monthly living expenses, Molly applied for, and began to receive, SNAP [Supplemental Nutrition Assistance Program] food benefits. Id. at 8.

by Louis Vuitton or Channel. TR VI at 81:20-82:2. She recalled a long, light blue dress, but no other evening gowns and only few pocketbooks, one purchased in Portugal and a "fake Louis Vuitton." TR VI at 82:13-20. Molly also described less than two dozen pairs of shoes, a lot them flat, and all of them worn. TR VI at 82:21-25.  According to Molly, a large velvet box that covered most of Renate's dresser contained only "some trinkets, a few little silver pieces," but no "diamonds, gold, anything of value." TR at 83:5-11.

Molly visited the Erlenbach apartment for the first time in 2010, shortly after Laurie's and Renate's deaths. TR VI at 84:13-19. Craig "was there taking care of business" and picked her up in Laurie's Mercedes. TR VI at 84:15-17. In general, the apartment was much smaller and simpler than the St. Pierre condominium and included smaller furnishings. TR VI at 85:1-86:21. Molly saw fewer clothes and shoes at the apartment and no jewelry, furs, or designer bags. TR VI at 90:5-8, 93:14-94:11. Molly described the apartment as bare and not containing anything nice, although she acknowledged making several trips to help Craig pack up the apartment and she asserted in a signed submission to this Court that at least $6,000 was spend to ship items from the apartment to the United States. TR VI at 117:5-122:25.

52

Molly acknowledged making personal purchases from the Argentiere Luxury account. Transcript 10/15/15 (TR VII) at 5:22-6:17; Ex. 115 at 453-455. According to Molly, she was unaware that she was on the account, and she explains writing a check for more than $500 from the Argentiere Luxury account by claiming that the checks looked the same as those from her own Citzens account and that she "wrote out a check, not paying attention to what was on the top of it," *i.e.* the heading "ARGENTIERE LUXURY AMERICAS LLC" in prominent font. Ex. 115 at 0478; TR VII at 14:12-15:13.

Molly also conceded that she benefitted from goods or services paid for by Winter Group funds. TR VII at 7:17-8:9. Although Molly was frequently present when Craig bought her clothes, cosmetics, or other items, she never asked how he was paying for those purchases, notwithstanding the fact that Craig had not held a paying job since Laurie died. TR VII at 8:10-24, 9:2-17.

Molly flatly denied ever wearing Renate's Cartier watch, her seven-carat yellow diamond ring, or her engagement ring. TR VI at 98:21-99:3. As to Renate's clothes, shoes, and bags, Molly asserts that she packed up Renate's belongings, put them in large black contractor garbage bags and then donated them, but does not know where the items were dropped off. TR VI at 99:4-16.

53

On cross examination, Molly conceded that she took three "tiny Louis Vuitton bags" from the St. Pierre condominium after Renate's death and gave them to her daughters, but claims that she did so after Alexandra declined them. She also asserted, for the first time, that she had just learned that one of the bags was a fake. TR VI at 104:1-23. As was established at trial, Molly had previously acknowledged in sworn deposition testimony that there were Eames chairs in the St. Pierre condominium and that she believed that one of the Miro lithographs was in storage in Florida. TR IV at 107:3-108:18. Having been to the St. Pierre condominium five times, in part to help Craig pack up all the belongings, Molly still insisted that she "did not see anything of value." TR IV at 109:22-110:24. When specifically questioned whether she knew if any items on the mover's inventory list were ever delivered to her 4,500 square foot house in Newport, she carefully responded "I have nothing from the St. Pierre in my house." TR VI at 111:8-11. Although Molly signed the Defendants' joint pretrial memorandum in which they assert that the cost of shipping the contents of the Erlenbach apartment was $6,000, she maintained that she "didn't write that;" that she didn't ship anything; that the apartment contents were of minimal value; and that she knew "nothing." TR VI at 119:21-122:25.

54

**E. Joseph DeCusati**

Joseph DeCusati ("DeCusati") is a certified public accountant and fraud examiner who was engaged by the Plaintiffs to assess their damages. Transcript 10/13/16 (TR V) at 4:23-5:5. Regarding the actual loss of property, cash, and other assets, DeCusati concluded that the Plaintiffs incurred $2 million in damages. TR V at 7:24-8:8. In addition, DeCusati calculated the loss of investment opportunity to the Plaintiffs, had they received their rightful share of the Estate assets within a reasonable period after Laurie's death. DeCusati concluded that the Plaintiffs lost $1,008,000 to $2,018,000 in possible investment gains. TR V at 8:9-21. Finally, DeCusati considered the legal costs incurred by the Plaintiffs, which he calculated at $983,853. TR V at 8:22-9:3.

In forming his opinions, DeCusati reviewed a seven-page list of documents, including bank account statements for varying time periods for over twenty accounts. TR V at 11:5-13. He also reviewed the pleadings in this case, deposition transcripts and exhibits, wills, trust documents, and investigative reports from investigators in Europe, and he conducted interviews with Shaun, Darren, and Alexandra. TR V at 11:19-12:21.

To arrive at a calculation of damages, DeCusati analyzed eleven bank accounts held in Craig's and/or Molly's name and

reviewed the Defendants' earnings in the two-and-a-half years prior to Laurie's and Renate's deaths. TR V at 13:17-14:20. DeCusati then reviewed Craig and Molly's financial history after the deaths, analyzing and reconciling funds that were going into their joint bank accounts. TR V at 14:21-15:2. To make sure there were no duplicate entries of deposits and withdrawals, DeCusati traced each transfer of funds between the Defendants' accounts, identified both ends of that transaction, and excluded it from his income calculation. TR V at 15:3-16:15. DeCusati concluded that $384,684 in funds from unaccounted sources — not otherwise identified as income or as Craig's rightful share of the inheritance — were deposited into Molly and Craig's joint accounts. TR V at 13:13-14:6. DeCusati's review established that $194,023 were spent from two Citizens accounts and three Huntington Bank accounts. The Citizens accounts, both in the name of the Estate of Laurie Hekking were initially funded by deposits from redeeming the two country club memberships; the funds were then spent and the accounts closed. TR V at 18:14-20:16. To calculate what was actually owed to the Plaintiffs, DeCusati multiplied the sums by two thirds to represent the portion of the inheritance to which the Plaintiffs were entitled under Laurie's will. TR V at 21:5-12.

As to the Winter Group, DeCusati identified two Swiss bank

56

accounts at the time of Laurie's death: the Gutzwiller account with a balance of $1,147,174, and a VP Bank account with a balance of $81,857. TR V at 21:18-23:6. Of those amounts, Shaun's children received a total of $94,070. TR V at 23:7-11. Between August 2, 2011 and December 20, 2012, Craig withdrew $222,577 in cash from the Gutzwiller account. About a year's rent on the Erlenbach apartment was paid after Laurie's death, and there were multiple payments made from the account for Craig and Molly's vacations and other personal expenses. TR V at 23:14-24:25. While the funds in the Gutzwiller account were initially invested in income generating assets such as equity funds, in May 2011, the funds were converted to straight cash assets, making them easier to withdraw. TR V at 25:1-26:23. The Gutzwiller account was closed on February 20, 2013, after issuance of a cashier's check in the amount of CHF 548,000, made out to the Winter Group. On the same date, Rene Kurth, the director of the Winter Group, endorsed the check over to Craig. TR V at 27:4-23. On July 8, the funds were received into a new Citizens account titled Craig Antony Hekking, d/b/a The Winter Group Limited (the "d/b/a Winter Group Account"). Following the conversion into U.S. currency, that Citizens account was credited with $563,216 on July 15, 2013. TR V at 28:2-29:6. Of that deposit, $228,000 in funds were directly transferred into Craig and Molly's joint Circle Gold

Citizens account in twenty-two transactions. TR V at 29:8-30:10. In addition, $74,593 of the d/b/a Winter Group Account funds were transferred into the Argentiere Luxury America, LLC account, also held jointly by Craig and Molly. TR V at 31:20-7. Of the remaining funds in the d/b/a Winter Group Account, $167,851 were spent in debit card transactions, including $35,000 in travel expenses; $18,000 for clothing; restaurants bills in excess of $10,000; wine and spirits in excess of $5,000; home improvement costs in excess of $19,000; membership fees to Carnegie Abbey Club for $8,000; home goods for $6,000; food bills for $6,000; entertainment costs of $4,500; vehicle expenses and gas for $5,500; utilities and cable bills for $6,000; and monies to a gambling casino in excess of $6,000. None of the funds were spent on private schools for Craig's children. TR V at 34:5-25; Ex. 170.

Based on his financial review and analysis, DeCusati concluded that the Plaintiffs were owed $520,445 from the Winter Group, $239,122 from unknown sources, $129,348 spent from Laurie's and Renate's checking accounts, and $26,350 from a ZKB account, for a total of $915,268.  TR V at 36:3-38:11. With respect to the HASPA account, DeCusati explained that, based on Craig's own testimony, there were approximately EUR 60,000 on deposit at Laurie's death. By the time the Plaintiffs received

the funds, the amount had dwindled to only EUR 34,870. TR V at 41:4-42:16.

DeCusati concluded that the Plaintiffs sustained about $150,000 in damages from the Erlenbach personal property, based on interviews he conducted with Shaun and Alexandra. TR V at 44:7-25. Shaun, in particular, described the contents of the apartment to DeCusati; in addition, Shaun provided him with a $8,000 invoice for cleaning Renate's furs at the end of the season, details of Laurie's coin collection, pictures of watches identical to those worn by Laurie, and an extensive list of luggage, shoes, and clothing owned by Laurie or Renate. TR V at 46:4-48:22. With respect to two art prints of Paris street scenes, DeCusati based his value estimate of $40,000 to $45,000 on pictures of similar art from a website. TR V at 47:25-49:4. DeCusati's valuation also included furniture as described to him by Shaun, and Laurie's extensive collection of high-priced wines. TR V at 49:9-52:12-53. Approximate values of Laurie's Brioni suits and Bruno Magli shoes (on the secondary market) were provided to him by Shaun; DeCusati conceded that he did not see any of this property and, in great part, he relied on Shaun's evaluation. TR V at 53:15-54:9.

Similarly, DeCusati relied on detailed descriptions provided by Shaun and Alexandra for his evaluation of the St. Pierre

condominium furnishings and other contents. TR V at 54:17-56:14. In essence, DeCusati was advised of the items that had been in the condominium; with respect to some items, he was provided with specific brand or model information, or with pictures of similar items from web sites that also provided a monetary value of such items. TR V at 55:3-61:12. For Laurie's watches alone, DeCusati assigned a conservative value of more than $100,000. TR V at 62:23-63:65. As to the cash which both Darren and Shaun had seen in Laurie's safe, DeCusati estimated a value of $100,000. TR V at 61:13-62:8. In total, DeCusati assigned a value of $200,000 to $300,000 to the personal property in the St. Pierre condominium. TR V at 62:7-11. As DeCusati pointed out, he never saw any accounting from Craig as to the Estate property. TR V at 62:12-16.

DeCusati assessed Renate's jewelry at $300,000, noting that he was provided with documentation evidencing a value of $246,000, but that there were a number of pieces for which there was no backup documentation. TR V at 65:15-66:21. One such item was Renate's gold Cartier watch, for which there was no documentation; however, the precise watch which Renate was said to have owned was valued in excess of $50,000. TR V at 66:22-67:7. DeCusati also saw a picture of Renate wearing the watch. Transcript 10/14/15 ("TR VI") at 71:9-15.

DeCusati made similar assessments with respect to Renate's fur coats, designer bags, designer shoes, and other personal items, arriving at an estimated value of approximately $250,000. DeCusati based that evaluation on descriptions of those items by Shaun and Alexandra, supported by information regarding the make and model, where applicable. DeCusati then verified the assessed value by consulting secondary market web sites, acknowledging, however, that he never saw the items and could not be sure of their age and condition. TR V at 67:12-68:28, 71:20-73:11.

DeCusati estimated a combined value of $50,000 for Laurie's and Renate's cars in Florida, based on the model, year, and equipment. TR V at 73:23-75:7. DeCusati did not include the Mercedes which was kept in Switzerland. TR V at 75:9. Based on Craig's own deposition testimony and court filings, DeCusati assessed $50,000 for funds in an Alpine Bank account in Switzerland, noting that Craig had not supplied any of the banking information requested by the Plaintiffs. TR V at 75:10-76:15. Based on sworn reports by private investigators, who conducted interviews with Laurie's banker, lawyer, and accountants, DeCusati also assessed combined balances of CHF 200,000 for deposits at UBP [Union Bancaire Privee] and ZKB [Zürcher Kantonalbank]. TR V at 76:16-77:25. He noted that, with respect to those accounts, he also received no backup

61

information, although such information had been repeatedly requested by the Plaintiffs. TR V at 77:23-78:8.

DeCusati identified specifically accounted for assets for a total value of $915,268, and added to that the midpoint of the value range of assets he had to assess through other means for a total value of $1,066,603, for a total economic loss of $1,981,871. TR V at 78:9-22. In addition, DeCusati explained that he calculated a $1,008,000 "deprived investment return" loss which the Plaintiffs suffered by not receiving proper and timely distribution of their inheritance. TR V 78:23-80:22. DeCusati's final damages category involved the costs incurred by the Plaintiffs in investigating this matter and in prosecuting this litigation. TR V at 80:23-81-8. *Inter alia*, the Plaintiffs incurred a total of $983,853 in investigation and legal costs, of which they had paid $527,374, with $436,479 still outstanding. TR V at 81-85:23.

On cross examination, DeCusati acknowledged that, on October 1, 2013 and November 7, 2013, Shaun received two loans for $8,000 and $30,000, respectively, from the Citizens account held jointly by Craig and Molly. TR V at 98:22-100:18. DeCusati confirmed that a total of $358,684 flowed into Molly and Craig's accounts from unidentified sources. TR V at 105:20-107:6. Apart from $8,614 in condo fees—which were paid out of the two Citizens accounts Craig

had opened with the $125,000 in receipts from the two club memberships— no other funds were used for estate administration expenses. TR V at 108:1-20.

The Winter Group assets, held in two separate accounts, contained approximately $1,229,03 at the time of Laurie's death. TR V at 110:20-13. To calculate the loss to Shaun's children, DeCusati allocated to them 50% of the total funds, and reduced that amount by $94,070, which had been paid for the education of Shaun's children, for a total loss of $520,455. TR V at 111:1-22. DeCusati's assumption that half of the educational funds belonged to Shaun's children was based on his understanding of the Cego Foundation provisions. TR V at 111:23-16. Based on the information available to DeCusati, he confirmed that only $94,070 were paid from the Gutzwiller account for the benefit of Shaun's children and that Shaun advised him that he did not convert the equities in the Winter Group funds into cash. TR V at 122:12-123:25. As previously noted, EU34,870 were paid to the Plaintiffs from the HASPA account in Hamburg, Germany. TR V at 124:10-15. As DeCusati confirmed, he did not receive bank statements regarding that account, but he relied on correspondence related to it. TR V at 127:12-21.

On cross-examination, DeCusati acknowledged that he is not a certified gemologist, nor is he certified or accredited in the

appraisal of furniture, furs, or real estate. TR V at 131:13-25. DeCusati confirmed that his assessment of the coin collection, the expensive wines, and the furnishings and personal items in the Erlenbach apartment were based on descriptions by Shaun, which DeCusati then sought to verify by investigating the value of comparable items. TR V at 138:6-139:3, 143:1-144:22, 148:24-151:3. Similarly, DeCusati relied on Alexandra's description of Renate's evening gowns, as well as the flatware, china, and linens in the St. Pierre condominium. As DeCusati pointedly noted, Craig, as the executor of the estate, did not provide any accounting of the condominium's contents. TR VI at 3:21-9:3. DeCusati confirmed that he received descriptions of, *inter alia*, expensive evening gowns, a large humidor, three large televisions, patio furniture, two firearms, and two signed Miro lithographs. TR VI at 13:8-16:14. As to the firearms at the St. Pierre, DeCusati explained that he did not include their value in estimating the minimum loss to the Plaintiffs, but that he included them in the range of loss he assessed. TR VI at 16:4-17:5.

When pressed by Craig on how he could make an accurate value determination as to the content of the St. Pierre condominium, DeCusati explained that ordinarily, his primary source would be a complete accounting by the executor:

"So, absent that in this case, I interviewed individuals who would be owners or potential beneficiaries. I asked them for details of what existed. I was provided reasonable detail. They provided, I believe, some support for that number. And I used the most conservative amount total in deriving the range. So I think that's, in my opinion, the best evidence I could have in this case." TR VI at 21:10-18.

Although DeCusati conceded that he was not provided sufficient detail to make a determination of precise values, he used what he had available. TR VI at 22:1-6. For his evaluation of Laurie's watches, DeCusati provided a range of values based on the information provided to him by Shaun and Alexandra as to the exact make and model. DeCusati verified their value estimates independently and then used a conservative estimate to arrive at a range of values. TR VI at 24:5-28:4. As to Renate's jewelry, DeCusati noted that the Plaintiffs valued the jewelry at between $300,000 and $500,000, which included specifically identified and evaluated pieces from the inventory list provided to DeCusati and, at least in part, items verified by invoices and/or insurance appraisals. TR VI at 28:11-29:15. For the evaluation of other pieces, DeCusati relied on the description and estimates provided by Shaun and Alexandra, because he had no pictures, invoices, or other means of independent verification. TR V at 32:1-33:15. Likewise, with respect to the $80,000 assessed for shoes, DeCusati depended on a description and evaluation provided by Alexandra. TR VI at 42:11-43:8.

65

DeCusati assessed a value of $50,000 for Renate's Cadillac STS, which was about a year old and which, according to Shaun, cost about $85,000 new. No value was assessed for Laurie's Mercedes taken by Craig, because its value was unknown (apart from Craig's assertion to Darren that he had paid Laurie $35,000 for it). TR VI at 43:25-46:1.

In his assessment of the net loss suffered by the Plaintiffs (and to assess the legitimate income of the Defendants), DeCusati excluded the sales proceeds from the two Florida condominiums and the proceeds from Laurie's life insurance policy, the latter of which had yielded $208,000 for each brother. TR VI at 47:17-48:24. As Craig took great pains to establish in his cross-examination, DeCusati did not know where the personal items from Laurie's and Renate's estate were at present, nor was he provided any "documentary evidence such as family photographs, personal photographs, anything that would validate their existence in the first place." TR VI at 51:3-52:8.

**F. Craig Hekking**

Because he had previously invoked his rights against self-incrimination under the Fifth Amendment, both specifically and generally, Craig was precluded from answering the majority of questions he had prepared for himself. TR VII at 19:7-31:11. Craig testified that, on December 24, 2010, he purchased a one-

66

carat princess cut diamond ring for Molly and a larger diamond ring with a three-and-a-half carat antique cut with a halo setting in white gold. TR VII at 26:1-16. According to Craig, he gave the larger ring to Molly for Christmas and the smaller one for her birthday during the family vacation in Vermont. TR VI 26:17-27:2. In support, Craig sought to submit a photograph[14] of the smaller ring which he purportedly took immediately after purchasing it. TR VII at 29:18-30:8. Upon cross-examination by Molly, Craig asserted that he had never involved Molly or had her sign or do anything in regards to his fiduciary responsibilities. TR VII at 33:15-19. Following this presentation, the Defendants rested. TR VII at 37:1-12.

## IV. Discussion

### A. Liability

#### 1. Craig Hekking

For reasons set forth in detail in this Court's June 11, 2015 Memorandum and Order (Dkt. No. 94), the Court deemed it appropriate and necessary to impose the most severe of sanctions and to reinstate the default against Craig. Therefore, the question of liability in Counts I-VI of the Complaint was

---

[14] The photograph was not provided in discovery, despite the Plaintiffs' explicit request for all documents concerning the Defendants' jewelry. Ex. 24 at 19; TR VII at 33:23-34:24. Accordingly, the Court denied its submission as a full exhibit.

resolved in favor of the Plaintiffs as to Craig. Accordingly, "'the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" Montblanc-Simplo GmbH v. Colibri Corp., 692 F.Supp.2d 245, 253 (E.D.N.Y.2010)(quoting Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir.1977) (citing Pope v. United States, 323 U.S. 1, 12, 65 S.Ct. 16, 89 L.Ed. 3 (1944)); see also City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 128 (2d Cir. 2011)("The entry of a default, while establishing liability, 'is not an admission of damages.'" (quoting Finkel v. Romanowicz, 577 F.3d 79, 83 n. 6 (2d Cir.2009)).

In addition, the claims raised by the Plaintiffs against Craig were amply supported by the testimony and evidence submitted at trial. It is abundantly clear that, from the moment Craig took over the positions of executor and personal representative entrusted to him by Laurie and Renate, he failed to inform his brothers about many of the assets he discovered, in order to keep those assets for himself. Even the division of some of the assets that were known to Shaun and Darren — like the two Florida condominiums — was manipulated by Craig. Although the purchase price was divided in approximately equal shares, Craig withheld any proceeds he obtained from settling the lawsuit on behalf of the Estate. Craig's representation that all contents

68

and furnishings were included in the St. Pierre sale was belied by the evidence. Instead, it was revealed that Craig, with the assistance of Molly, packed up the valuable contents of the St. Pierre condominium and had them shipped to his Newport residence. Other assets simply disappeared without a trace, such as Renate's considerable jewelry collection, Laurie's coin collection, two luxury cars — as Molly candidly admitted, Craig took Laurie's Mercedes from Florida —  and a large collection of high-priced wines. The evidence also established that Craig and Molly packed up the contents of the Erlenbach apartment and that a shipment to the United States was arranged.[15] The whereabouts  and eventual fate of the contents shipped  from Switzerland to the United states are unknown and unaccounted for. As described in some detail by both Shaun and Darren, Laurie's personal effects included a number of valuable watches, as well as an extensive coin collection, none of which have been accounted for by Craig. As noted by Darren, he observed Craig wearing one of Laurie's watches on at least one occasion.

In addition to cashing the settlement check from the

---

[15]

It is noted that Craig and Molly do not dispute that such a shipment occurred, they merely maintain in their joint pretrial memorandum that the shipping costs were only $6,000, not $16,000. However, the 01/01/09 - 12/31/13 Gutzwiller account statement for the Winter Group reflects a payment of $5,599 for packaging/moving/shipping efforts, Ex. 150 at 0005, and $10,527 for the transfer from Zurich to the United States, Ex. 150 at 0008.

litigation Craig brought on behalf of the Estate, Craig kept the proceeds from both country club membership redemptions, without ever advising his brothers of any of these funds. As documented by the statements of Craig and Molly's joint Huntingon account and the two Citizens accounts Craig opened in the name of the Estate, with the exception of $8,614 in condominium fees, none of those funds were used for estate administration. Instead, the funds were used entirely for Craig and Molly's personal benefit.

Notwithstanding Molly's steadfast denial at trial that she ever wore Renate's engagement ring and gold Cartier watch, the testimony by Alexandra, Darren, and Shaun indicates otherwise. All three observed Molly wearing those items on two separate occasions and one or more of them confronted Craig directly, in Molly's presence, about her wearing Renate's jewelry. The value of at least some of Renate's jewelry is well-documented by invoices, certificates of authenticity, and insurance appraisals. As Alexandra and Shaun described in some detail, Craig had taken on the task of selling the larger pieces, provided the two larger rings to them for assessment, and then promptly recovered both rings under the guise of being able to yield a better result. The whereabouts of those rings, with a total worth between $175,000 and $225,000, is also unknown.

As to the Winter Group funds, intended for the education of

Laurie's grandchildren, it was clearly established that, with the exception of a limited amount paid for the education of Shaun's sons, those funds were completely withdrawn by Craig and spent by Craig and Molly for their own purposes. At first, with the exception of making some initial payments for the education of Shaun's sons, the $1,147,174 Winter Group assets in the Gutzwiller account were used to fund Craig and Molly's lavish vacations; to continue rental payments on the Erlenbach apartment, which they visited repeatedly; to make several large cash withdrawals amounting to $222,577; and to deplete the account completely by making a final CHF 548,396 withdrawal. Prior to making the cash withdrawals, Craig had arranged to convert the income producing equity index fund in the Winter Group fund into straight cash assets, thus facilitating the process of depleting the funds. In addition, the Winter Group had $81,857 in a VP Bank account, the existence of which Craig kept hidden from his brothers. Those funds were depleted as well.

In sum, Craig deliberately, and with much cunning, violated the trust of all three generations of his family: (1) that of his hardworking father, who had built up considerable wealth over many years, and of his stepmother who had generously provided for her husband's children and grandchildren; (2) that of his brothers, who believed that Craig would fairly and equitably deal

with the considerable assets left to all three of them; and (3) most incredibly, that of the six minor children, including his own four, who stood to have their education secured by a well-funded trust of more than $1.2 million.

Throughout this process, Craig obfuscated the facts, presented his brothers with lies and excuses, and kept delaying the inevitable discovery of his misconduct. Even after Shaun and Darren began to discover the extent of Craig's betrayal and brought suit against him and Molly in this Court, Craig continued his strategy of hiding his misdeeds and delaying the course of justice, all the while he and Molly continued to deplete the remaining assets of the Estate.

Craig's liability in this matter, although legally established by the default reinstated against him, was factually supported and defined by the incontrovertible evidence against him. The Court found the testimony of Shaun, Darren, and Alexandra credible in its consistency and detail. Craig's cross-examination, which frequently appeared to be designed solely to antagonize the Plaintiffs and to play his brothers against one another, only served to establish how thoroughly he had attempted to hide the truth from his brothers and how extensive his fraud and conversion had been.

**2.   Molly Hekking**

**a. The Allegations**

The Plaintiffs have asserted claims of Conversion (Count V), Civil Theft (Count VI) and Aiding and Abetting (Count VII) against Molly. Specifically, the Complaint asserts that the Plaintiffs were the beneficial owners of the property contained in Laurie's and Renate's estates and it alleges that Molly knowingly and deliberately converted those assets, obtained them for her personal use, and deprived the Plaintiffs accordingly. Regarding the claim of aiding and abetting, the Plaintiffs assert that Molly knew of Craig's fraudulent conduct, his breach of fiduciary duty, and the concealment of estate assets, and that she knowingly and deliberately aided and abetted Craig in his conduct.

In order to prove an action for conversion, the Plaintiffs must show that they were "in possession of the personalty, or entitled to possession of the personalty, at the time of conversion." Narragansett Elec. Co. v. Carbone, 898 A.2d 87, 97 (R.I.2006)(emphasis added) (citing Montecalvo v. Mandarelli, 682 A.2d 918, 928 (R.I.1996)). The essence of conversion is "the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession." Fuscellaro v. Industrial National Corp.,

117 R.I. 558, 560, 368 A.2d 1227, 1230 (1977). Conversion "may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful." Morrisette v. United States, 342 U.S. 246, 272, 72 S.Ct. 240, 96 L.Ed.288 (1952)(noting that "[p]robably, every stealing is conversion, but certainly not every knowing conversion is a stealing").

As to aiding and abetting, the Plaintiffs must show that "the alleged aider and abettor share[d] in the criminal intent of the principal, and second, that there exist[ed] a community of unlawful purpose." Curtin v. Lataille, 527 A.2d 1130, 1132 (citing State v. Gazerro, 420 A.2d 816, 828 (R.I. 1980) and noting that applying Rhode Island's criminal test of aiding and abetting to a civil action is consistent with the test set forth in 4 Restatement (Second) Torts § 876(b)(1979)). Although "[p]resence at the scene alone will not support a conviction for aiding and abetting...it is a factor that must be considered in the determination of guilt." Curtin v. Lataille, 527 A.2d at 1132. Other factors include the association or relationship between the principal and the alleged aider and abettor and the knowledge that an unlawful act was to be committed. Id.

Because this is a civil case, the Plaintiffs bear the burden to prove their allegations by a preponderance of the evidence,

*i.e.,* they must convince the Court that the facts they have asserted are "more probably true than false." <u>Narragansett Elec. Co. v. Carbone</u>, 898 A.2d at 99-100.

### b. Molly's Version

As noted, this Court previously accepted the Magistrate Judge's recommendation not to reinstate the default against Molly. The Court has now had the opportunity to listen to Molly's testimony at trial and to consider her statements in light of the uncontroverted documentary evidence submitted by the Plaintiffs and against the testimony of Shaun, Darren, and Alexandra.

Given what the Court has learned about the background and lifestyle of Laurie and Renate, as well as that of Craig and Molly, very little of Molly's testimony rang true. It is undisputed that Laurie and Renate had considerable assets and that they enjoyed displaying their wealth and exhibiting a certain lifestyle. *Inter alia*, they owned two (apparently debt-free) condominiums in Naples, Florida, with a total value of $1.6 million; they lived in a $78,349 per year rent lakeside apartment in Switzerland, where they kept one of their three luxury cars. They belonged to two exclusive country clubs in Florida; they also loved to entertain in their lavishly appointed condominium. Renate owned valuable jewelry for a documented value of at least $264,100; even her "costume jewelry" yielded as much as $17,000

75

or $18,000 on the secondary market. Laurie had a corresponding collection of luxury watches, and he collected valuable coins as well as high-priced wines. In addition to enjoying their property, they also provided for Laurie's sons and grandchildren. Laurie maintained a $600,000 life insurance policy and he established a million-dollar trust for the education of his grandchildren.

Even in life, the elder Hekkings appear to have been generous. Shaun acknowledged that Laurie gave him money for tuition payments; Renate took Alexandra shopping and doted on the grandchildren; and even Molly recounted that Laurie had given her money for her older daughter. In sum, the value of Laurie's and Renate's condominiums, Renate's jewelry, their club memberships, cars, and their generally luxurious lifestyle was well established by the evidence and confirmed by the detailed and consistent testimony provided by Shaun, Darren, and Alexandra.

In stark contrast thereto, Molly's descriptions of the furnishings and personal belongings of the elder Hekkings were entirely dismissive and, at times, outright contemptuous. During her testimony, Molly paid close attention to the questions posed to her and she was able to answer certain questions with precise detail. Although she maintained that she was entirely ignorant of her family's finances, she was clearly knowledgeable when it

76

suited her. In sum, she was not the naive ingenue she has sought to portray throughout this litigation. At times carefully evasive and overly literal, Molly kept repeating that she simply did not see anything she considered "nice" in either of the two residences where she spent days helping Craig to pack up.

*Inter alia*, Molly would have this Court believe that Renate, a woman with jewelry valued in excess of $250,000, a luxury car, and two country club memberships, who lived in high-priced residences, traveled extensively, and stayed in Manhattan luxury hotels, would only have old shoes and some unremarkable golfing outfits. Molly claimed that Renate's clothing was put in large garbage bags and donated. TR VI at 99:12-16. As to Renate's furs, bags, shoes, and gowns, Molly declared she did not recall any designers and that, in general, she didn't see anything nice or anything she liked. Notwithstanding that declaration, she admitted that she did take three small Louis Vuitton bags to give to her girls.

Molly also acknowledged that she made numerous trips to Switzerland and Florida to help Craig pack up Laurie and Renate's belongings and personal property, although she did not recall seeing anything of value. This testimony is incredible as well, given the undisputable evidence that items were shipped back from Switzerland to the United States at a cost of $16,000, and that a

large load of furnishings was removed from the St. Pierre condominium and, after months of temporary storage incurring significant fees, delivered to Molly and Craig's home address for another $6,447 in total moving expenses. Ex. 26. Although Molly admitted that she was present when the movers came to the St. Pierre condominium, she maintains that she did not know items were moved to her house, a claim which is entirely implausible.

Molly acknowledged at her deposition that the Naples condominium held Eames chairs; however, at trial, she claimed not to know what they were. After previously acknowledging that there was at least one Miro at the St. Pierre condominium, at trial she described it as "looked like a kid was swiping...it wasn't a scene, if that's what you're asking." TR VI at 97:1-7. She also suggested, for the first time, that one of the Louis Vuitton bags was a fake.

Molly's insistence that she was completely in the dark about her family's personal finances and the source of the considerable funds suddenly appearing in several of her joint accounts after Laurie's death is unconvincing as well. By her own account, Molly graduated from college; prior to meeting Craig, she obtained a real estate license, started and ran two separate businesses; later, she started and ran a children's clothing business together with Craig; and, finally, she became a participant in

the "Argentiere Luxury" venture.

Prior to her marriage to Craig, Molly purchased a 4,500 square foot house in Newport; later, that house became the family residence with Molly as the sole title and mortgage holder. In connection with her home, Molly sought repeatedly to reconfigure her mortgage payment, ostensibly based on financial hardship; although, at that time, Craig had already quit his job and they were living on funds received as part of Craig's inheritance (and well beyond). Although Molly suggested that this was only a temporary and long-planned modification, her signed application shows otherwise and is also inconsistent with Molly's statements that she felt financially comfortable during that same time span.

Molly spent freely from the joint Citizen Circle Gold account and the Huntington account ($64,000 in six months), contending that she was unaware of the sources that kept funding her considerable expenditures. She also wrote a check from the Argentiere Luxury account for personal expenses, which she understood to be a business account. Ex. 115 at 478. Molly's insistence that she never asked Craig about the size of his inheritance and that she never questioned how they could afford paying the considerable mortgage on their home, flying business class to France, making extensive home renovations, buying a $56,000 Landrover, and joining an exclusive country club, while

both of them had been unemployed for years, is simply not credible. It is telling that in August 2013, at the same time Molly was seeking a need-based home loan modification, she also sought to join the Carnegie Abbey country club. Just in time to make the required $11,356 payment to her mortgage lender and the $6,475 membership payment to the country club, $50,000 in Winter Group funds were transferred to the joint Circle Gold account, which would have had insufficient funds otherwise. It defies belief that the sudden infusion of cash should have been entirely fortuitous and that Molly would have made such payments without first ascertaining that the requisite funds were available.

### c. Plaintiffs' Entitlement to the Estate

It is undisputed that Shaun and Darren were each entitled to a one third share of Laurie's estate and, as this Court has concluded, see infra, that each of Shaun's two children was entitled to one sixth of the educational fund. As the evidence demonstrated, apart from the life insurance benefits, the proceeds from the two condominiums, and a half share of the HASPA account, Darren received no further portion of the inheritance; Shaun also received half of CHF 70,000 he and Craig found in the Erlenbach apartment, half the sales proceeds of Renate's costume jewelry, and a one third share of the Mercedes sold in Switzerland. Shaun's sons received $94,070 from the educational

fund which, at Laurie's death, had a balance of $1,229,031. All other cash, furnishings, cars, jewelry, personal effects, proceeds from litigation on behalf of Laurie's estate, and payments for the club membership redemption have disappeared and are, for the most part, unaccounted for.

### d. Molly's Role in the Conversion

Based on the testimony and evidence in this case, the Plaintiffs have offered ample evidence to establish that Molly was often present when Craig appropriated items that rightfully belonged to the Estate. On at least two occasions, Molly herself was in possession of Renate's engagement ring and gold Cartier watch. On both occasions, Molly was also present when Craig was confronted about this fact by his brothers and when he assured them that he was making efforts to sell the valuables. In other words, Molly was clearly made aware that Craig was not entitled to keep these items or to dispose of them for his sole benefit. Molly also knew about the Winter Group in Switzerland and, although she insisted that she never reviewed the statements from the Citizens account into which those funds had flowed, she conceded that she had been present on many occasions when Craig had purchased "nice things" for her with funds from that account. TR VII at 7:17-8:18.

Molly's denial that Alexandra made urgent appeals to her

regarding tuition payments for her younger son is not believable. Molly herself admitted that Alexandra repeatedly called her to ask for a return call from Craig and that Molly promised to do so. According to Molly,

> "she called after that with like a 911. I thought something was wrong with the kids. She did it another time, and then I stopped speaking with her because getting 911 calls and people having children is just not something that's cool." TR III at 75:18-24.

Upon the Court's inquiry about the "911," Molly explained that it was "[l]ike a 911 text, like emergency." TR III at 75:25-76:1. In other words, Molly was well aware of the urgency Alexandra was trying to convey to her, despite claiming complete ignorance on the matter. As Alexandra — whose testimony the Court found straightforward, consistent, and helpful in its descriptive details — recounted, Molly assured her that Garreau would take care of the tuition payments and noted that her own daughters' private school tuition was taken care of.

Alexandra also confirmed that both Craig and Molly were confronted at two family gatherings about Molly's wearing of Renate's engagement ring and Cartier watch and that both of them replied that it was a special occasion and that a buyer had not been found just yet. Finally, Alexandra related that Molly volunteered information about her frequent trips to Europe and that, when asked by Alexandra how they could afford that, Molly

advised her that the new jewelry business was doing so well, so busy, that they had to hire a sitter. As Molly herself admitted, however, the jewelry business never resulted in any earnings at all.

In sum, Molly's testimony, which was entirely self-serving and implausible, contradicted not only the testimony of Shaun, Darren, and Alexandra, it also conflicted with the unrefuted facts and, at times, with Molly's own prior statements. Given the undisputable evidence in this case, as supported with testimony by the other witnesses, the Court is of the opinion that the Plaintiffs have furnished sufficient proof to support their claims of civil theft and conversion, as well as that of aiding and abetting. Molly knew that Craig was withholding estate property that should have been rightfully shared with his brothers and she knowingly and deliberately assisted him in doing so and in delaying the discovery of the extent of that conversion.

### B.    Damages

Ascertaining the extent of the damages resulting from Craig's raiding of the Estate with which he was entrusted by Laurie and Renate is fraught with some difficulty because not only were the assets wrongfully taken by the Defendants, they were then transferred, disposed of, or depleted. For the most

part, there appears to have been no organized record keeping by Craig; nothing useful was provided by the Defendants in discovery; and the Plaintiffs had to obtain any available records from third parties. Craig, as the person with access to all records and accounts and any effects left by Laurie and Renate, was in the perfect position to control all the assets and then cover up his tracks. Even after litigation against him and Molly had commenced, Craig managed to delay the process by refusing to provide documentation in discovery, all while continuing to deplete the family inheritance. The Plaintiffs, at great expense, managed to launch an investigation both in Europe and stateside and to obtain considerable, if incomplete, information from third parties. Nevertheless, it is likely that the value and whereabouts of some of the assets will remain unknown.

Given that this is a civil proceeding, the Court is permitted to draw a negative inference from Craig's invocation of his Fifth Amendment right. Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); In re Carp, 340 F.3d 15, 23 (1st Cir. 2003)("[I]n a civil proceeding, the drawing of a negative inference is a permissible, but not an ineluctable, concomitant of a party's invocation of the Fifth Amendment.")(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 678 (1st Cir.1996)). Although this is generally a matter of

discretion by the trial court, <u>see</u> <u>In re Carp</u>, 340 F.3d at 23-24, the First Circuit has instructed that the trial court should "strive to accommodate a party's Fifth Amendment interests," while at the same time, ensure that "the opposing party is not unduly disadvantaged." <u>Serafino v. Hasbro, Inc.</u>, 82 F.3d 515, 518 (1st Cir.1996). In other words, the Court must conduct a balancing test to ensure that the Fifth Amendment right is safeguarded, while preventing an undue disadvantage against the opposing party. <u>Serafino v. Hasbro, Inc.</u>, 82 F.3d at 518 (noting that "in the civil context, [where] the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding.").

In this case, where it has not only been established that Craig, with the assistance of Molly, diverted a large portion of his father's and stepmother's Estate for his and Molly's benefit, but also that he actively engaged in structuring the depletion of accounts and hiding documentation and records that would have disclosed the extent of his misappropriation, the Court is of the opinion that it is necessary and appropriate to draw a negative inference against Craig on the basis of his Fifth Amendment invocation. Without Craig's cooperation, the Plaintiffs were at a serious disadvantage, and they had to incur significant expense,

85

to retrieve at least some of the information to which Craig had unfettered access and which he determinedly refused to divulge.

To be sure, the Plaintiffs' expert was placed at a considerable disadvantage in this case, as he was attempting to determine the value of an estate where the individual responsible for providing accurate records had removed most of the considerable holdings for himself while, at the same time, doing his utmost to hide the assets' whereabouts. Craig's depletion of Laurie's and Renate's estate has been established by the reinstatement of the default against him, as well as by the evidence presented by the Plaintiffs. Nevertheless, the Court must base its determination of damages incurred by the Plaintiffs on the evidence they were able to obtain, to the extent that such evidence provided sufficient and reliable proof for the Plaintiffs' claims. For some of the categories of damages asserted by the Plaintiffs, the proof of the existence and depletion of various assets was contained in financial records and other documentation. Other categories, however, although the Plaintiffs may well be right in suspecting that Craig and/or Molly obtained assets that rightfully belonged to all three brothers, could only be inferred by pointing out certain financial discrepancies that could not be readily explained. To strike a balance that does not result in an outright injustice to

86

either of the parties, the Court has limited its determination of the Plaintiffs' damages to those categories that were clearly supported by the testimony and evidence offered at trial.

### 1. The Winter Group

The Court notes that, at the April 30, 2015 hearing on Craig's and Molly's motions to dismiss for failure to join indispensable parties (*i.e.*, include their own children as plaintiffs against their parents), the Plaintiffs conceded that—should any of the Winter Group funds be recovered—they should be distributed to all six children on an equal basis. Although the Plaintiffs maintain in their post-trial memorandum that the Cego Foundation by-laws "are clear that the distribution of the Cego Foundation's education funds were to be apportioned 50% - 50% between the children of Craig and Shaun," Def.'s Mem. (Dkt. No. 163), a thorough review of that document does not support their contention.[16] The document, as a whole, clearly indicates that the fund was established for the training and education of the "Nachkommen" [descendants], further defined as the children of Craig and Shaun, the "Nachfahren" [successors]. Notwithstanding the translator's subsequent use of the term

---

[16]

The Plaintiffs assert in their post-trial memorandum that "the original document [was] translated into English without objection." However, the Defendants have always strenuously objected to the suggested 50/50 allocation; moreover, the Plaintiffs did waive their own interpretation in open Court. Ex. 78, 79.

"successors," the terms in the original document provide that it is the "Nachkommen" [descendants, or children] who are to be treated equally, not Craig and Shaun. In other words, all six children, for whose sole benefit the fund was established, were to receive equal shares of the Cego Foundation funds.

To be clear, limiting the Plaintiffs' damages from the depletion of the million-dollar-plus Winter Group assets to one third does not indicate that Craig was entitled to withdraw and/or spend two thirds of that fund for any purpose other than paying for the education of his children. Rather, the sole intended beneficiaries of that fund were Craig's four and Shaun's two children, for whom the considerable fund would have secured an education. In other words, each of Craig's children is entitled to one sixth of the fund established by their grandfather, minus any tuition or other educational expenses that were spent from that fund on the respective child.

At the time of Laurie's death, the combined Winter Group funds, on deposit in two separate accounts at the Gutzwiller Bank and the VP Bank, amounted to $1,229,031. As explained above, Shaun's children were entitled to one third of this amount, or $409,677. Shaun received $94,070 from those funds, after which his sons would have been due another $315,607. However, as was established by the evidence, the entire remainder of the Winter

88

Group funds, earmarked for the education of the six grandchildren, was spent or withdrawn by Craig for his and Molly's personal benefit and enjoyment.

The Plaintiffs suggest that, in addition to the actual loss of those educational funds, they have also suffered an economic loss of any gains, had the funds remained invested. While that may well be true, it does not appear to take into consideration that, at least in Shaun's case, he needed to withdraw large sums of the fund on an annual basis to pay for the tuition of both of his sons. At more than $50,000 annual tuition for Shaun and Alexandra's younger son, the Plaintiffs' share of the Winter Group funds would have been exhausted in about five years,[17] rendering a long-term economic loss analysis more than speculative. Undoubtedly, the more egregious injury inflicted on the Plaintiffs is the potential loss of a much needed educational opportunity for the younger son, of which Craig, the child's godfather, was well aware. Because the exact losses incurred through the misappropriation of the Winter Group cannot be determined with greater accuracy, the Court finds that Shaun, on behalf of his two minor children, is entitled to $315,607.

---

[17]

It is noted that this calculation does not take into account the exact distribution of the funds to Shaun's children who, according to the terms of the Cego Foundation, were to be treated equally.

### 2.   Club Membership Redemption

Craig redeemed the two Florida country club memberships for a total of $125,065. He used the funds to open two separate bank accounts, which he subsequently depleted and closed. Of those funds, $8,614 were spent on condominium fees. Accordingly, the Court finds that both Shaun and Darren are each owed $38,817 (($125,065 - $8,614) ÷ 3).

### 3.   Condominium Litigation

On behalf of Laurie's estate, Craig brought a case in connection with the sale of the St. Pierre condominium. Following a settlement, $62,500 was paid to Craig and Molly's joint account. The Court finds that Shaun and Darren are each owed $20,833 ($62,500 ÷ 3).[18]

### 4.   Renate's Jewelry

The documented value of Renate's fine jewelry, as supported by invoices, insurance assessments, and other appraisals, totaled $246,100. In addition, Renate owned a number of other valuable pieces, including the gold Cartier watch, which are listed on the inventory sheet found at the St. Pierre condominium, but for

---

[18]

The Court notes that Craig asked for, and received from Shaun, $7,000 for related legal fees. As Craig never submitted any accounting for fees related to that litigation or, in fact, for any legitimate costs he may have incurred in attempting to administer the estate, the Court will not make a separate determination regarding that transaction.

which no further documentation was available. Based on detailed descriptions provided by the Plaintiffs, which he then sought to verify, DeCusati estimated the total value of Renate's jewelry collection at $300,000. Given the high value of the pieces for which a value could be established with some certainty, the Court considers that to be a reasonable estimate. As DeCusati pointed out in his testimony, he was at a considerable disadvantage to provide an assessment for items that were known to exist but had been deliberately removed, along with any documentation that might have established their precise value. Craig had every opportunity to provide an accurate accounting of the property that belonged to the Estate. Accordingly, the Court finds that Darren is owed $106,000 and Shaun is owed $97,000 (having already received a half share of the $18,000 from the sale of Renate's "costume jewelry").

### 5.   Contents of the St. Pierre Condominium

The Court finds that Craig's representation that the St. Pierre Condominium was sold with all its contents is completely untruthful. Instead, the evidence showed that, after Craig and Molly packed up the contents and removed or disposed of any personal items as they saw fit, a large amount of furnishings was moved to a storage facility, from which a considerable list of items was eventually shipped to Craig and Molly's residence in

Newport. As documented in the various invoices by the William C. Huff moving company, it took five men nine hours to pack, prep, inventory and load the contents of the St. Pierre condominium, and it took them six hours to unload it. Ex. 26-0014. The "Warehouse Valuation" shows that Craig acquired $50,000 in insurance coverage for the stored furnishings. Ex. 26-0015, 0018. The storage of the items required four separate vaults. Ex. 26-0016. The relocating of most of the furnishings to Craig and Molly's Newport residence, specified on a two-page inventory list, Ex. 26-0021-0022,[19] required two men to load, drive, and deliver, resulting in moving expenses of $2,000. Ex. 26-0019-0020. As noted, *supra*, Craig confirmed with his signature that he had received the shipment at his home address and that the items included, *inter alia*, two plasma and two small televisions, two leather chairs with ottomans, six other chairs, numerous tables, patio furniture, and a large number of boxes.

Because none of these items are accounted for and a precise

---

[19]

Subsequent account records from William C. Huff reveal that some items were apparently left in storage, for which Craig simply discontinued to pay the monthly storage fee. Ex. 26-31. Eventually, after some resistance, Craig allowed access to Shaun and Darren, who, after payment of the late fees, discovered that nothing of value had been left at the unit.

assessment was made impossible by Craig's obstructive actions,[20] DeCusati, assisted by the descriptions provided to him by Shaun and Alexandra, and supported by his research into the value of comparable items, assessed the St. Pierre condominium contents at $200,000-$300,000. A baseline valuation was set by Craig himself, who obtained insurance for $50,000. Given the description of some of the items, and considering the value assessed on some of the items as well as the value of the condominium itself, the Court finds that the contents are reasonably evaluated at $200,000. Accordingly, Darren and Shaun are both awarded $66,666 each.

Regarding the contents of the larger safe in the St. Pierre condominium, both Shaun and Darren described in some detail that, in addition to a handgun, Laurie kept several bundles of cash, each bound with a $10,000 wrapper. Both agreed that Laurie liked to impress others with his belongings and that such a showing would be in character. Although Craig acknowledged to Shaun (and Darren was told by Laurie) that Craig had been given the combination to the safe, he purportedly was unable to open it during a visit he and Shaun paid to the St. Pierre in July 2010.

---

[20]

Molly's carefully worded response that none of the St. Pierre condominium contents were inside her 4,500 square foot house (which also includes a barn that she never enters) sheds no light on their actual whereabouts. However, her contention that she was unaware that a truckload of furniture was delivered to the residence where she lived can only be described as a deliberate falsehood.

As is apparent from Shaun's testimony, he left Craig alone during those attempts, on which occasion Shaun discovered a green folder with an inventory of Renate's jewelry. After an unsuccessful search for a locksmith who would open the safe on a Sunday, Craig offered to stay and "get it taken care of." TR I at 57:16-23. On the following day, Craig advised Shaun that he had obtained the services of a locksmith early that morning, and that the safe had been completely empty. TR I at 57:24-58:8.

Here, there is the consistent and detailed testimony of Darren and Shaun regarding the bundles of cash in the safe against Craig's statement to Shaun that the safe was empty. When viewed against the assertion that Craig, who had been given all authority and detailed information by Laurie to access the entire Estate, including the combination to the safe, could now (while Shaun was in another room) not open the safe, and in absence of any evidence to support Craig's story (e.g. a bill for the locksmith, or a statement by the same), Craig's version can only be considered another falsehood. Moreover, it has been established that Laurie kept as much as CHF 70,000 (at the time, approximately $62,000) in cash in an unsecured envelope at the Erlenbach apartment, lending more credence to the observation that Laurie kept at least an equivalent cash reserve at his Florida residence. Accordingly, the Court finds that it is more

94

likely than not that the safe in Florida contained $62,000 in cash. Together, each of the brothers was entitled to a $41,333 share of the combined cash reserves. As Craig and Shaun already divided the Erlenbach cash between them, Darren is awarded $41,333 ($124,000 ÷ 3), whereas Shaun is awarded $10,333 ($41,333-$31,000).

## 6. The Vehicles

It is undisputed that Laurie owned a Mercedes in Switzerland. According to Shaun, he received $10,000 as his one-third share of that car. Because Darren did not receive his portion related to the car, he is awarded $10,000. As to the Mercedes Laurie owned in Florida, it is undisputed that Craig took the car and that it has been at his residence ever since. When questioned about the car by Darren, Craig explained that he had bought the car from Laurie for $35,000 prior to Laurie's death. As late as 2013, Craig was still driving the Mercedes with Florida "LH" vanity plates and there has been no evidence of a sale from Laurie to Craig. Taken the purported sales price stated by Craig himself as a reasonable value assessment, and in the absence of any support of Craig's representation that he paid for the car, Darren and Shaun are each awarded $11,666. As to Renate's then one year old Cadillac STS luxury sedan, which remains unaccounted for and which, according to Shaun, cost

95

$85,000 when new, the Court finds that DeCusati's appraisal of $50,000 is a reasonable estimate of its value in 2010. Accordingly, Darren and Shaun are awarded $16,666 each for that car as well.

### 7.   Renate's Personal Effects

Based on the detailed descriptions by Alexandra and Shaun, DeCusati assessed the value of Renate's furs, designer bags, shoes, gowns, and other clothing at $250,000. Given that there is no information available regarding the age or condition of those items, it is extremely difficult to assess the value of Renate's possessions with some degree of accuracy. To be sure, this is entirely due to the thoroughness of Craig and Molly, who removed those effects without a trace and without any accounting as to what happened to them. As Renate's jewelry collection was assessed by this Court at $300,000, it would not be unreasonable to conclude that her entire wardrobe, shoes, bags, and luggage included, was worth the $250,000 value assigned to it by DeCusati. Accordingly, the Court finds that those items were worth $250,000 and that Darren and Shaun are awarded $83,333 each. To the extent this results in an overvaluation, Craig had ample opportunity and, in fact, a fiduciary duty, to account for the actual value of those items. However, it is likely that a more conservative estimate would result in an injustice to the

Plaintiffs, who were entirely deprived of the opportunity to learn of the true extent of their inheritance.

### 8. Laurie's Watch Collection

Both Darren and Shaun described several of Laurie's watches, including a Hamilton of lesser value, a Patek Philip, a Rolex Oyster, a stainless steel Rolex Daytona, and solid gold Rolex Daytona. As to the last, Laurie gifted it to Shaun for his sons during a hospital visit. As to the stainless steel Rolex Daytona, Darren noted that Craig was wearing it as he dropped by Darren's residence in Laurie's Mercedes. DeCusati estimated the value of the watches, which also disappeared and for which no accounting was ever provided, at $100,000. The Court accepts DeCusati's opinion. Accordingly, Darren and Shaun are awarded $33,333 each.

### 9. Contents of the Erlenbach Apartment

As the evidence established, Craig and Molly packed up the contents of the Erlenbach apartment over several visits. Those contents were then shipped to the United States around October 2011 at a cost of $16,000; their whereabouts are unknown and unaccounted for. DeCusati estimated the value of the Erlenbach contents at $150,000; this estimate included Laurie's coin collection, which Darren and Shaun described as being held in seven or eight folders, and which Craig agreed to ship back to the United States, as well as the large collection of valuable

wines. Of all the various categories of Laurie's and Renate's belongings, this is one of the more difficult ones to assess. The Erlenbach apartment, although smaller and apparently furnished less opulently than the St. Pierre condominium, was located on Lake Zurich and rented for CHF 6,090 (at a varying exchange rate, anywhere between $5,900 and $6,700) per month. Notwithstanding Molly's dismissive testimony, and considering that the apartment's contents were apparently worth being packed up over several visits and then shipped to the United States, the Court is more inclined to believe Shaun's description of a well-appointed residence with artwork and designer furniture. The Court believes that $90,000 is a reasonable estimate for the Erlenbach apartment contents. In light of the undisputed fact that those contents existed and that they were removed and sent stateside at considerable expense, and in view of Craig's persistent perjury and Molly's untruthful testimony, to demand more proof of the exact value of the contents would result in an injustice to the Plaintiffs. Accordingly, Darren and Craig are awarded $24,666 each (($90,000 - $16,000)÷ 3).

### 10. **Laurie's and Renate's Bank Accounts**

According to DeCusati's testimony, he was able to establish that Laurie's ZKB account held CHF 45,719 ($39,352) on deposit as of April 30, 2010. TR V at 36:20-38:11. Although Plaintiffs have

repeatedly, and for months, requested that the Defendants produce bank statements from ZKB and any other Swiss bank accounts, no such information was provided until after DeCusati had already issued his report. DeCusati did not consider any unauthenticated documents provided by Craig and Molly just before trial. TR V at 38:12-39:11. Shaun and Darren maintain that they did not receive any benefit from the ZKB account and, in the absence of any reliable evidence to the contrary, the Court finds that Shaun and Darren were each entitled to a third share of those funds. However, as it was established that they already received 100% of the remaining funds held in the HASPA account[21], no further award will be made as to the ZKB account.  As to any funds held in the UBP account, no evidence to support the Plaintiffs' claims was submitted and DeCusati acknowledged that he relied primarily on "sworn testimony through private investigators" to arrive at his estimate of approximately $200,000 in combined total funds in the ZKB and UBP accounts. The Court considers that  assessment to be too unreliable and uncertain to arrive at a finding with any confidence.  Accordingly, no further awards are made to the

---

[21]
    The Court notes that the HASPA funds may have been reduced by fees related to Craig's efforts to gain unfettered access to the account, as well as by losses in equity based funds. However, without a more reliable analysis to calculate the exact diminishment in value, the Court finds that allocating the HASPA funds to the Plaintiffs in their entirety gives some measure of compensation for their loss.

Plaintiffs related to the UBP account.

DeCusati explained, in some detail, that he reviewed the Defendants' financial history prior to Laurie's and Renate's deaths in order to determine whether Craig and/or Molly subsequently received funds from unknown sources that could not be explained by Craig's rightful share of his inheritance. Based on his conclusion that $358,684 flowed into Craig and Molly's joint accounts from unaccounted for sources, DeCusati calculated $239,122 in damages to the Plaintiffs. TR V at 17:13-20. He added $129,348 in damages for $194,023 Craig and Molly spent from Laurie's and Renate's account, or from their estate accounts. TR V at 18:11-23. In other words, DeCusati assumed that any funds that flowed into Craig and Molly's accounts (or that were spent from those accounts) in excess of the approximately $700,000 Craig received as his share of the condominium sales proceeds and the life insurance benefits, must have originated from the Estate. As DeCusati further explained, however, that sum included items such as the settlement proceeds from Cohen & Grigsby and the two Citizens accounts funded by the redemption of the two Florida country club memberships, which have already been considered by the Court in its damages calculation. Accordingly, the Court is not in a position to determine the extent to which the $358,684 from unaccounted sources and the $194,023 from other

accounts include sums already included in the general damages calculation.

### 11. Loss of Investment Opportunity

As with the loss of the Winter Group funds, DeCusati conducted an analysis of the financial position the Plaintiffs would have been in, had they received their rightful shares of the entire inheritance promptly, and had they invested the funds resulting from a liquidation of all estate assets. DeCusati makes a number of assumptions to arrive at his conclusions, which include, *inter alia*, that the Plaintiffs would have liquidated all assets and would have invested the proceeds, subsequently reinvesting any gains from their investment returns. For the same reasons already explained in connection with the possible investment of Winter Group funds, see Subsection A. herein, the Court deems that analysis too speculative and too reliant on unsupported assumptions to make a reasonable determination as to what additional damages may have resulted from Craig and Molly's conversion of those Estate assets.

### 12.  Litigation Expenses

As part of their damages, the Plaintiffs seek $983,853 in attorney's fees and costs; nearly three quarters of this amount was spent on pursuing the litigation. The Plaintiffs assert that they incurred significant costs hiring investigators, in this

country and abroad, to locate assets and financial records related to the Estate; they also spent money on translations and on the services of financial experts.

At the conclusion of the trial, the Court advised the Plaintiffs that, ordinarily, costs are taxed against the losing party, but are not included in the damages calculation. TR VII at 39:10-17. The Court then specifically requested that the Plaintiffs advise the Court which statute or case law would support the award of counsel fees (or the cost of investigators and/or counsel in Europe) as a measure of damages. TR VII at 39:17-40:7.

Notwithstanding the Court's direction, the Plaintiffs do not specifically discuss litigation costs as damages in their post-trial memorandum (Dkt. No. 163). Instead, the Plaintiffs support their request for costs and attorneys' fees by relying on Florida Statute Section 733.609, pursuant to which such costs may be awarded in cases of fiduciary breach, as well as on two related Florida cases. The Plaintiffs also point out that Laurie's and Renate's wills provide for Florida choice of law[22] and were

---

[22]

    That assertion appears to be mistaken. Neither Renate's nor Laurie's will contains a choice of law provision (Dkt. No. 69-1 at 13-20, 40-44.

probated in Florida.[23] Section 733.609 provides, in pertinent part:

> A personal representative's fiduciary duty is the same as the fiduciary duty of a trustee of an express trust, and a personal representative is liable to interested persons for damage or loss resulting from the breach of this duty. In all actions for breach of fiduciary duty or challenging the exercise of or failure to exercise a personal representative's powers, the court shall award taxable costs as in chancery actions, including attorney's fees. § 733.609(1), Fla. Stat.

Count I of the Complaint asserts a breach of fiduciary duty as personal representative under Fla. Stat. § 733.609 as to Craig; Count II asserts a breach of fiduciary duty as trustee under Fla. Stat. §§ 736.0706 *et al* as to Craig.[24] Because the Court has reinstated the default against Craig, Craig's liability as to those two counts has been established. In addition, the extent of Craig's breach of fiduciary duty relative to Laurie's and Renate's estates probated in Florida was further established by the evidence and testimony presented at trial.

Accordingly, the Plaintiffs have prevailed on those claims

---

[23] The Florida probate proceedings for both Renate's and Laurie's estates were terminated on April 9, 2014 and April 10, 2014, respectively, because the cases had been inactive since August 31, 2012 (Dkt. No. 69-1).

[24] It is noted that this claim relates to the Renate E. Hekking Revocable Trust; however, neither party presented any documentary evidence or testimony as to the provisions of the Trust. According to the Complaint, Craig never informed his brothers that the Trust even existed. Complaint at ¶ 134.

and, under Section 733.609 of the Florida Statutes, they are entitled to an award of costs and attorney's fees in connection with the Florida probate proceedings. In re Estate of Simon, 549 So. 2d 210 (Fla. 3d DCA 1989), *rev. denied*, 560 So.2d 788 (Fla. 1990)(allowing attorney's fees where beneficiaries prevailed on claim against personal representative for breach of fiduciary duty).

Craig, as the fiduciary of Renate's and Laurie's estates, included in the petitions for Florida probate the two Naples condominiums (which have long since been sold and the proceeds of which have been equitably divided) and tangible personal property of only $10,000 each. As was established at trial, however, the assets in Florida were far more valuable and included club memberships, furnishings, personal effects, and cash. None of those assets were ever disclosed by Craig to the Florida probate court, and all of them were eventually converted by Craig without providing any accounting to his brothers or providing them a share of the proceeds.

The Court is mindful of the fact that Craig — who was at all times in possession of the necessary information, records, and documentation that he should have rightfully shared with the Plaintiffs — conducted himself in a completely obstructionist manner, which was designed to preclude the Plaintiffs from

104

learning the extent of his conversion, to delay this litigation, and to continue the depletion of Estate assets. As a result, the Plaintiffs' costs of litigation, including attorneys' fees, were considerably increased. However, there has been no assertion that the assets of the Cego Foundation or the Estate assets located in Switzerland or Germany were part of the Florida probate proceedings and, therefore, subject to the imposition of costs pursuant to Section 733.609.

To the extent the Plaintiffs are able to specify which of the costs and attorneys' fees they incurred in this litigation resulted from Craig's breach of fiduciary duty in the Florida probate proceedings, the Court will consider making an award pursuant to Section 733.609.

### 13. Punitive damages

In their Complaint, the Plaintiffs seek an award of punitive damages; in their post-trial memorandum, they rely on Rhode Island law to support that request. Complaint at 34 (Dkt. No.1), Pltfs.' Post-trial Mem. at 35 (Dkt. No. 163). As the Supreme Court of Rhode Island has noted, "[p]unitive damages are awarded, not to compensate a plaintiff for his or her injuries, but rather to 'punish the offender and to deter future misconduct.'" Carrozza v. Voccola, 90 A.3d 142, 166 (R.I. 2014)(citing Greater Providence Deposit Corp. v. Jenison, 485 A.2d 1242, 1244

(R.I.1984)). The Court has consistently held  that "'punitive damages are proper only in situations in which the defendant's actions are so willful, reckless, or wicked that they amount to criminality.'" <u>Carrozza v. Voccola</u>, 90 A.3d at 166 (quoting <u>Sherman v. McDermott</u>, 114 R.I. 107, 109, 329 A.2d 195, 196-97 (1974)). The party seeking punitive damages must establish "'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" <u>Palmisano v. Toth</u>, 624 A.2d 314, 318 (R.I.1993)(quoting <u>Sherman v. McDermott</u>, 329 A.2d at 196)); <u>Morin v. Aetna Cas. and Sur. Co.</u>, 478 A.2d 964, 967.

The Rhode Island Supreme Court has also noted that, although a defendant's ability to pay may well play a role in the estimation of the amount of damages to award, "a punitive award is not *per se* void because such evidence is not present." <u>Castellucci v. Battista</u>, 847 A.2d 243, 248 (R.I. 2004). It is well established that plaintiffs must show that the actions of defendants merit punitive damages; however, Rhode Island law "does not require a further demonstration of the depth of the reservoir from which resources could be drawn to satisfy a punitive damage award." <u>Carrozza v. Voccola</u>, 90 A.3d at 168.

As set forth in some detail in this Decision and Order, the

conduct of both Defendants before and after commencement of this litigation has all the elements required for the imposition of punitive damages. Based on the financial history of the Defendants, their lack of gainful employment during the last half-decade, and their extravagant spending habits, the Court holds some doubt that they will be able to pay even the ordered compensatory damages and costs of litigation. However, under Rhode Island law, the ability to pay is not a precondition for the imposition of punitive damages. In this case, which encompassed the betrayal of family trust; the conversion of assets earmarked for the education of six minor children, including the Defendant's own; as well as the Defendants' reprehensible, perjurious, and contemptuous conduct throughout these proceedings, the Court finds that the imposition of punitive damages is appropriate. Because there has never been a complete accounting for the considerable assets of Laurie's and Renate's estates, it is conceivable that some assets have not yet been spent by the Defendants. Accordingly, the Court finds that punitive damages of $300,000 are an appropriate measure to send a clear message and to prevent further misconduct.

### Conclusion

For the reasons set forth herein, the Court makes the following findings:

107

I.   Molly is liable on Counts V-VII for conversion, civil theft, and aiding and abetting;

II.  The Court holds the Defendants jointly and severally liable for compensatory damages in the total amount of $1,172,233, to be divided among the Plaintiffs as follows:

1. Shaun, on behalf of his sons C.H. and B.H, is awarded compensatory damages of $315,607, to be divided between C.H. and B.H. in accordance with the provisions of the Cego Foundation by-laws.

2. Shaun, on his own behalf, is awarded compensatory damages of $403,313.

3. Darren is awarded compensatory damages of 453,313.

III. The Court imposes punitive damages on the Defendants, jointly and severally, in the amount of $300,000, to be divided equally between Darren and Shaun.

IV.  The Plaintiffs are directed to submit, within fourteen (14) days of this Decision and Order, a detailed accounting of the costs, including attorneys' fees, which they incurred in this litigation as the result of Craig's breach of fiduciary duty in the Florida probate proceedings. The Defendants shall have fourteen (14) days thereafter to file a response.

SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
Senior United States District Judge
June 1, 2016