UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DARREN MALLOY HEKKING, and | : | |
| SHAUN EGAN HEKKING, on behalf of | : | |
| himself and on behalf of C.H. and B.H., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 14-295JJM |
| | : | |
| CRAIG ANTONY HEKKING and | : | |
| MOLLY DURANT HEKKING, | : | |
| Defendants. | : | |

**REPORT AND RECOMMENDATION REGARDING MOTION TO VACATE
JUDGMENT AND FOR CONTEMPT AND SANCTIONS
AND
MEMORANDUM AND ORDER REGARDING MOTION TO VACATE ORDERS
PERTAINING TO ATTACHMENT**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

>   Oh, what a tangled web we weave
>   When first we practice to deceive!
>
>   <u>Marmion: A Tale of Flodden Fields</u>, by Sir Walter Scott (1808).

The latest skirmish in this longstanding dispute[1] over a family inheritance is the Motion

to Find Plaintiff's Liable for Fraud on the Court and Application of Sanctions for Plaintiff's

---

[1] In addressing the latest Motion, the Court assumes the reader's passing familiarity with what has gone before. Prior decisions, all bearing the same caption, include:

>   Memorandum and Order, ECF No. 28 (Sept. 17, 2014) (granting motion to remove default but finding Craig guilty of perjury and imposing monetary sanctions);
>
>   Report and Recommendation, ECF No. 50 (Nov. 25, 2014) (based on Craig's willful violation of five court orders and perjury, recommending contempt and reimposition of default) (2014 WL 9887272);
>
>   Report and Recommendation, ECF No. 85 (Mar. 17, 2015) (with caution to Molly, contempt for intentional violation of court orders by Molly not recommended);
>
>   Memorandum and Order, ECF No. 94 (June 11, 2015) (adopting recommendation that Craig's default be reinstated and ordering that Craig be removed as executor and trustee) (2015 WL 3650062);

Misconduct (the "Motion") filed by Defendants Craig Hekking and his wife, Molly Hekking,[2] on July 5, 2017. ECF No. 232. A year earlier, on July 11, 2016, judgment in favor of Plaintiffs Darren Malloy Hekking and Shaun Egan Hekking entered in the amount of $2,169,052 against Craig and Molly following a bench trial before United States District Judge Mary Lisi. Acting *pro se*, Craig and Molly now seek to vacate that judgment. In addition, they seek to unravel the post-judgment collection efforts of Darren and Shaun, including to vacate an *ex parte* order of attachment that entered on January 4, 2017 (ECF No. 181), which authorized the seizure of property from Defendants' Newport home. Defendants ask the Court to order the return of the seized property, to impose sanctions, fees and costs on Darren and Shaun and to find Shaun guilty of contempt.

As Defendants are *pro se*, and therefore entitled to the Court's interpretive lenience,[3] the Court has identified Fed. R. Civ. P. 60(b)(3) and 60(d)(3) as the appropriate legal standards for analysis of the Motion. For the reasons explained below, I deny the Motion to the extent that it seeks to vacate my January 4, 2017, order of seizure and the orders entered during and following the post-attachment evidentiary hearing of February 15, 2017; with respect to the balance of the relief sought, I recommend that the Motion be denied.[4]

---

Decision and Order, ECF No. 170 (June 1, 2016) (following bench trial, Molly found liable for conversion, civil theft and aiding and abetting; Molly and Craig held jointly and severally liable for $1,472,233 before interest and costs, and punitive damages) (2016 WL 3093448); and

Memorandum and Order (ECF No. 223) (Feb. 22, 2017) (following post-attachment hearing, determination that certain seized items either were not subject to attachment or should be returned based on a statutory exemption pursuant to R.I. Gen. Laws § 9-26-4).

[2] Because the parties all share the same last name, they will be referred to by first name.

[3] Haines v. Kerner, 404 U.S. 519, 520 (1972) (allegations of *pro se* litigant held to less stringent standard than formal pleadings drafted by lawyers).

[4] Pursuant to 28 U.S.C. § 636(b)(1)(B) and (e)(6) and DRI LR Cv 72, a motion for contempt, to vacate a judgment or for sanctions with dispositive impact should be referred to a Magistrate Judge for report and recommendation. Bowens v. Atl. Maintenance Corp., 546 F. Supp. 2d, 55 (E.D.N.Y. 2008); Alpern v. Lieb, 38 F.3d 933 (7th Cir.

## I. BACKGROUND AND TRAVEL

### A. Pretrial and Trial Findings

The Hekking clan's conflict has occupied this Court for several years. In brief, Defendant Craig and Plaintiffs Darren and Shaun are the three adult sons of Laurie Hekking. On June 1, 2010, Renate Hekking, Laurie's wife (and the step-mother of Craig, Darren and Shaun), died, leaving her estate to Laurie, who followed her to the grave eight days later. The estate was to be divided equally amongst the three brothers, with Craig serving as executor and trustee of a foundation to provide for Laurie's grandchildren's education. Four years later, Darren and Shaun, acting on his own behalf and for his minor children, sued Craig and his wife, Molly, accusing them of concealing and misappropriating estate and trust assets that rightfully belonged to, or were intended to benefit, all three brothers, as well as Craig and Shaun's minor children.

Activity during the pretrial phase of the case was extensive and acrimonious. Based on Defendants' failure to respond to the Complaint, default entered, ECF No. 18, which they sought to have set aside, arguing that they had not been served. Following an evidentiary hearing, Judge Lisi set aside the default based on the absence of prejudice to Plaintiffs, but also concluded that "Craig H.'s testimony regarding service of process was a complete fabrication"; both his testimony at the evidentiary hearing and his affidavits were found to constitute "blatant perjurious conduct." ECF No. 28 at 14-15, 18. Because of the expense caused by the perjury, monetary sanctions were imposed. ECF No. 28 at 18. Next, Craig and Molly failed to respond to discovery and Craig refused to provide any information based on the Fifth Amendment. That,

---

1994); United States v. Perry, CR 95-75-04S, 2012 WL 2771100 (D.R.I. May 16, 2012). By contrast, pursuant to 28 U.S.C. § 636((b)(1)(A), post-judgment collection issues are not dispositive and may be determined by a Magistrate Judge. In re Estate of Marcus Human Rights Litigation, 910 F. Supp. 1470, 1472 (D. Hi. 1995). Both a recommendation and a determination by a Magistrate Judge may be appealed to the District Judge; the difference is the standard of review, which is *de novo* on issues committed to the Magistrate Judge for recommendation. Elmendorf Grafica, Inc. v. D.S.America (East), Inc., 48 F.3d 46, 49-50 (1st Cir. 1995).

coupled with evidence uncovered through third party subpoenas establishing that Defendants had continued to withdraw and spend money in blatant contravention of the Court's orders, triggered this writer's recommendation that the default be reinstated against Craig. 2014 WL 9887272, at *13. This recommendation was adopted based on "Craig's . . . deliberate and repeated violations of Court orders . . . while continuing to dissipate the assets of the Estate and spending money on non-essential items." 2016 WL 3093448, at *4. The Court enjoined Craig from continuing to act as executor or trustee.

On the eve of the bench trial, making arguments that are strikingly similar to those made in the present Motion, Defendants filed a Motion for Sanctions of Dismissal with Prejudice and Award of Attorney's Fees and Costs against Plaintiff's and their Counsel for Fraud on the Court. ECF No. 144. In it, they alleged they had been the victims of "false claims and vexatious litigation stemming from a family dispute," arguing, for example, that a valuable ring that Molly was seen wearing was really a gift from Craig and not stolen from Renate's estate after her death. Id. at 2, 9. The Court rejected these arguments in reliance on the findings and rulings made during the seven-day bench trial in October 2015. 2016 WL 3093448, at *4. Following the bench trial, the Court issued the Decision and Order ("Trial Decision"), finding in favor of Darren and Shaun and entering judgment against Craig and Molly for compensatory and punitive damages in the total amount of $1,472,233. Id. at *37.

In the Trial Decision, the Court specifically evaluated the credibility of each witness. Those who testified for Plaintiffs, including Shaun, Alexandra (Shaun's wife of twenty years), and Darren, were found to be credible. Id. at *25. Their testimony painted an eye-popping picture of Laurie and Renate's possessions, including Swiss bank accounts, luxury cars, valuable paintings, a safe filled with hundred-dollar bills, an ocelot fur coat, jewelry (such as a 7.8 carat

4

yellow diamond ring), an extensive wine collection (stocked with vintages costing as much as $2,000 to $3,000 per bottle), designer clothing, shoes and handbags, Baccarat crystal and Tiffany silver. Id. at *7-9. These witnesses also described Laurie and Renate as loving, generous and committed grandparents. Id. at *5, 27.

In contrast, the scathing findings regarding Craig and Molly include:

- They stole funds set aside for the education of the grandchildren (including Shaun's disabled son), a total of over $1.1 million, using it, for example, for lavish vacations in the Swiss Alps and elsewhere in Europe. Id. at *25.

- Craig lied to his brothers, telling them that the two Florida condominiums were sold "as is," when in actuality Craig and Molly had stolen all valuable items, including artwork, jewelry, silver and antiques, which were shipped to their house in Newport. Id. at *24.

- During the same month that Molly entered into a need-based loan modification plan to avoid the foreclosure of their Newport home, she and Craig joined the Carnegie Abbey Country Club, with the deposit funded by money stolen from the grandchildren's education trust. Id. at *28.

- After Laurie died, Craig quit his job and they had no income, yet he and Molly spent thousands of dollars on private school tuition and luxury cosmetic procedures and treatments. Id. at *16, 18.

Regarding Craig, the Court concluded that he obfuscated and lied, while depleting the estate:

> Craig deliberately, and with much cunning, violated the trust of all three generations of his family: (1) that of his hardworking father, who had built up considerable wealth over many years, and his stepmother who had generously provided for her husband's children and grandchildren; (2) that of his brothers, who believed that Craig would fairly and equitably deal with the considerable assets left to all three of them; and (3) most incredibly, that of the six minor children, including his own four, who stood to have their education secured by a well-funded trust of more than $1.2 million.

Id. at *25. Regarding Molly's truthfulness, the Court found her testimony that she knew nothing about the family finances "simply not credible," particularly her claim that she never wondered how the spending spree she and Craig launched after Laurie and Renate died was being paid for, even though she and Craig were both unemployed. Id. at *28. Judge Lisi specifically found that

5

Molly "was not the naïve ingénue she has sought to portray throughout this litigation." Id. at *27. Regarding Molly's culpability, the Court concluded that:

> Molly's testimony, which was entirely self-serving and implausible, contradicted not only the testimony of Shaun, Darren, and Alexandra, it also conflicted with the unrefuted facts and, at times, with Molly's own prior statements. . . . Molly knew that Craig was withholding estate property that should have been rightfully shared with his brothers and she knowingly and deliberately assisted him in doing so and in delaying the discovery of the extent of that conversion.

Id. at *29.

To calculate the value of missing estate assets, the Court relied on Shaun and Darren's detailed recollections of their parents' property, and on testimony from Plaintiffs' expert, who then evaluated the described property based on comparisons with similar items. Id. at *21-22. The Court accepted this less-then-precise proof in light of Craig's failure to provide an accounting for the estate assets, all of which had disappeared without a trace, despite his affirmative duty as executor of Laurie's and Renate's estates to produce such an accounting. Id. at *22, 24. With the finding that "the Court is more inclined to believe Shaun's description" of the missing items, valuation was resolved in favor of Plaintiffs: "in view of Craig's persistent perjury and Molly's untruthful testimony, to demand more proof of the exact value of the contents would result in an injustice to the Plaintiffs." Id. at *33.

In addition to compensatory damages, the Court awarded Darren and Shaun punitive damages of $300,000: "[i]n this case, which encompassed the betrayal of family trust; the conversion of assets earmarked for the education of six minor children, including the Defendants' own; as well as the Defendants' reprehensible, perjurious, and contemptuous conduct throughout these proceedings, the Court finds the imposition of punitive damages is appropriate." Id. at *36. With interest and costs, the judgment totals $2,169,052.

    B.    **Post-Judgment Collection Efforts**

6

As of this writing, Craig and Molly have made no payments towards the judgment. In December 2016, acting pursuant to Fed. R. Civ. P. 69 and R.I. Gen. Laws § 9-25-7, Darren and Shaun filed, and, on January 4, 2017, the Court granted, an *ex parte* motion for issuance of writs of attachment.[5] On that day, United States Marshals, accompanied by Plaintiffs' counsel, entered Craig and Molly's residence, and seized and relinquished to a court-appointed custodian 125 lots of items, plus three vehicles. ECF No. 211. The post-attachment hearing began immediately thereafter, on January 13, and was continued at the request of Defendants. The evidentiary hearing for Craig and Molly to challenge the attachments and assert all of the statutory exemptions, to which they might be entitled pursuant to R.I. Gen. Laws § 9-26-4, was held on February 15, 2017. Based on the evidence presented at the February 15, 2017, hearing, this Court rendered decision on certain assets from the bench, as reflected in the transcript of the hearing,[6] and issued a Memorandum and Order on February 22, 2017, which resolved the remaining issues. ECF No. 223.

The Motion has placed in issue the Court's February 15, 2017, disposition of Molly's entitlement to retain jewelry up to the total value of $2000 pursuant to the jewelry exemption in R.I. Gen. Laws § 9-26-4(14), which allows a judgment debtor to retain jewelry cumulatively worth less than $2000. Accordingly, a deeper explication of the facts pertinent to the jewelry exemption is in order. During the evidentiary hearing, Molly testified that the seizure had left her with nothing but the earrings and pearl necklace she wore to the hearing, as to which she testified, "I actually don't even think the necklace is real, so I can't even give it a value," and a brown necklace with plastic

---

[5] Post-judgment, *ex parte* attachment is permissible pursuant to Fed. R. Civ. P. 69 and R.I. Gen. Laws § 9-25-7 as long as the writ advises the judgment debtor of the right to object or to assert exemptions and provides notice of a prompt post-attachment opportunity to be heard, all of which was done here. See Dionne v. Bouley, 757 F.2d 1344, 1354 (1st Cir. 1985).

[6] References to the February 15, 2017, hearing transcript are cited as "Tr. at __." The transcript is docketed as ECF No. 239. The exhibits marked during the hearing are referred to as "Plaintiffs'/Defendants' Ex. __."

flowers, which she said was costume jewelry.[7] Tr. at 52. She testified that she no longer had even a wedding band. Tr. at 53-54. She further testified that a diamond-studded Raymond Weil watch with a leather band, which had been seized and inventoried as Lot 83, was hers, "a gift from Craig back in 2003 or 2004." Tr. at 53, 58 (hereinafter, the "Raymond Weil Watch"). Based on an eBay download found and printed by Craig (Defendants' Ex. B), Molly testified that she believed that her Raymond Weil Watch was worth only $108.84. Tr. at 52-53. Molly distinguished her watch from the one depicted in the eBay posting only in that the strap was different, testifying, "Craig printed this from eBay . . . same brand of watch, but mine had a black leather band, not – I don't even know if this is gold or silver, but mine was a leather band." Tr. at 53. Based on this testimony, which the Court found to be lacking in credibility,[8] she asked the Court to find that the jewelry she still possessed was worth "$100, maybe," which is substantially less than the $2000 jewelry exemption. Therefore, she asked that the Raymond Weil Watch, which she claimed was hers and worth little more than $100, should be returned to her. Tr. at 53.

On cross examination, Plaintiffs elicited the admission, based on Defendants' filing just before trial (ECF No. 125), that Molly had then had a 14K yellow gold ring with a one carat solitaire diamond. She admitted this, but claimed that she no longer had that ring because it had been sold, though she could not recall when. Tr. at 55-56. Molly also admitted to having had a 14K white gold ring with a European cut 3.5 carat diamond. Tr. at 57. Somewhat bizarrely, she testified that she left

---

[7] As established in her trial testimony and in her testimony during the contempt hearing before me, Molly is an educated woman who ran her own business, was a partner in a luxury jewelry import company called Argentière Luxury, purchased and wore jewelry of significant value, and claimed to have such a sophisticated knowledge of the value of luxury items as to be able to classify Renate's possessions as comprising almost nothing of authentic designer quality and nothing "nice." 2016 WL 3063448, at *26-28; ECF No. 85 at 5-8. With this background, and based on my observation of her demeanor, I found her testimony on February 15, 2017, that she did not know the value of the jewelry she chose to wear to Court, including whether the pearl necklace she was wearing was fake or real and that these were the only pieces of jewelry she still possessed, to be utterly incredible.

[8] For example, the watch depicted in Defendants' Ex. B is labelled as a "diamond watch," but it has a completely different band. In addition, it is impossible to ascertain whether it has the same configuration of rows studded with diamonds that appear on the Raymond Weil Watch shown in Plaintiffs' Ex. 1. The Court dismissed as incredible Molly's testimony that the latter is worth only $100.

8

this valuable ring in her Land Rover, from which it was stolen in 2013. Tr. at 59-61. She admitted that no insurance claim was ever made in connection with the theft and she did not produce a police report, though she claimed one had been made after the robbery. Tr. 56-58. None of Molly's testimony about what happened to these valuable diamond rings was found to be credible.

To rebut Molly's claim that the Raymond Weil Watch was hers and that she has owned it since "2003 or 2004," Plaintiffs called Shaun who testified that he recalled seeing the Raymond Weil Watch worn by Renate before her death in June 2010. Tr. at 65. Craig's cross examination of his brother focused on whether the Raymond Weil Watch had been listed as an estate asset during the trial, which Shaun could not recall. Tr. at 65-70. Shaun's testimony is consistent with the bench trial findings that Molly participated in the theft of Renate's luxury jewelry items, including a Cartier watch, and was seen wearing items that had belonged to Renate after her death. 2016 WL 3063448, at *28-31 (references to Molly seen wearing Renate's engagement ring and Cartier watch).

Based on this evidence, the Court ruled from the bench on Molly's jewelry exemption. Tr. 70. Focusing on the "evaluation of the credibility of the witnesses and the testimony," the Court found that Molly had failed to sustain her burden of proving that her retained jewelry and the Raymond Weil Watch together were worth less than $2000 (the amount of jewelry that a judgment debtor may retain as exempt from execution under Rhode Island law). Id. With these findings, there was no need for the Court to determine whether the Raymond Weil Watch had really been Molly's or whether it was an asset of the estate stolen by Molly. Accordingly, the Court did not weigh Shaun's testimony that the Raymond Weil Watch had belonged to Renate and therefore should not be returned. Rather, based on Molly's failure to present competent evidence that she possessed so little valuable jewelry and that the Raymond Weil Watch was of such *de minimis* value that her jewelry cumulatively fell within the R.I. Gen. Laws § 9-26-4(14) exemption, Molly's request that it be returned was denied. Id.

### C. The Motion

With all challenges to the attachment resolved, in May 2017, Plaintiffs sought instructions from the Court on how to proceed to sell the attached property. ECF No. 231. In order to provide Defendants with ample time to respond to Plaintiffs' motion for instructions, the Court set down the motion for instructions for hearing on July 6, 2017. Craig and Molly waited until the late afternoon of the day before the hearing. Filed at almost 4:00 p.m. on July 5, 2017, the Motion is largely focused on the Raymond Weil Watch. It seeks not only to recover possession of the Watch, but also to stop the sale, vacate the attachment, reclaim all seized property, and vacate the entire judgment. ECF No. 232. In reliance on Fed. R. Civ. P. 60(c)(2), which provides that a motion for relief from judgment under Rule 60(b) "does not affect the judgment's finality or suspend its operation," as well as on the representation of Plaintiffs' counsel that the Raymond Weil Watch would be set to one side and not sold until the Motion is resolved,[9] the Court went forward with the scheduled hearing, resulting in the entry of a Memorandum and Order on Instructions Regarding Sale of Attached Property. ECF No. 241. Meanwhile, a briefing schedule for the Motion was set, following which it was taken under advisement; further hearing was deemed unnecessary.

First and primarily, the Motion focuses on Shaun's testimony at the February 15, 2017, hearing that he recalled seeing the Raymond Weil Watch on Renate's wrist before her death. Craig and Molly challenge the credibility of that testimony with an out-of-time proffer of new and unauthenticated evidence that was not even mentioned during the February 15, 2017, hearing. Specifically, attached to the Motion are eight photographs purportedly of Molly on

---

[9] Otherwise, Defendants did not ask the Court to stay the execution of the judgment or to delay the sale of the seized assets. Had they done so, such a request would have been denied based on the palpable lack of merit of the Motion as well as on the timing of the proffer, seemingly to sow confusion and cause delay.

New Year's Day in 2006 at Mohegan Sun, just before Christmas 2006 in Newport, and on New Year's Eve 2006 in London. ECF No. 232-1 at 4-19. In each, she is wearing a watch with a light colored strap. In addition, Defendants present copies of an email dated March 8, 2017, purporting to be from a friend of Craig employed by Overstock.com; attached is what Defendants contend is a copy of an almost twelve-year-old invoice (from December 20, 2005), reflecting the sale to Craig of a "Raymond Weil Women's Silver Strap Diamond Watch" for $899.99. ECF No. 232-1 at 1-3. Finally, Defendants have produced two photographs of what they claim is Molly's wrist wearing the Raymond Weil Watch (with a black leather strap), ostensibly taken in November 2010. ECF No. 232-1 at 20-23. Defendants argue that these photographs prove that Shaun lied when he testified that he remembered seeing Renate wearing the Watch prior to her death in June 2010. Plaintiffs object to the authenticity of all of them, as well as to timing of the proffer.

The other focus of the Motion is on trial evidence presented by Plaintiffs. Seeking to relitigate matters resolved in the Trial Decision, Craig and Molly ask the Court to focus on the testimony of Plaintiffs' trial expert, who corrected his estimate of the size of a wine cooler (from twenty feet to ten feet) in one of the Swiss apartments of Renate and Laurie. The Motion also vaguely (without any reference to where this testimony may be found in the transcript) accuses Shaun of lying at trial because he gave what Craig and Molly claim was inconsistent testimony about the sale of Renate's rings.[10]

Based on this proffer, Defendants argue that Shaun's testimony at the February 15, 2017, hearing and at the bench trial amounts to a pervasive fraud on the Court and that "the 'wine cooler example' demonstrates how far and wide the plaintiffs have ventured with their

---

[10] Defendants' pretrial motion for sanctions based on fraud on the Court made essentially the same argument. ECF No. 144 at 9. It was soundly rejected in the Trial Decision. 2016 WL 3063448, at *4.

11

fabrications, which have been taken, to-date, at face value by the Court." ECF No. 232 at 3.
Craig and Molly conclude:

> Shaun Hekking has clearly and convincingly, and knowingly set in motion an unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate this matter by improperly influencing the trier as well as unfairly hampering the presentation of the opposing party's claim or defense.

ECF No. 232 at 8. As relief, Defendants ask the Court to vacate both the original judgment and the order of attachment, reclaim their property, impose sanctions and costs against Plaintiffs and find Shaun guilty of contempt.

## II. ANALYSIS

### A. Fed. R. Civ. P. 60(b)(3) – fraud, misrepresentation or misconduct

A motion under Fed. R. Civ. P. 60(b) to set aside a final judgment or order for fraud, misrepresentation or misconduct must be made no more than a year after entry of the challenged judgment or order. Fed. R. Civ. P. 60(c)(1). Relief under Fed. R. Civ. P. 60(b) is "extraordinary in nature" and must "be granted sparingly." Giroux v. Fed. Nat. Mortg. Ass'n, 810 F.3d 103, 106 (1st Cir. 2016); Fontanillas-Lopez v. Morel Bauza Cartagena, 136 F. Supp. 3d 152, 155 (D.P.R. 2015) ("court's discretion must be exercised with considerable circumspection"). To prevail on the motion, the moving party must demonstrate misconduct, such as fraud or misrepresentation, by clear and convincing evidence, and must show that the misconduct prevented the moving party from fully and fairly preparing or presenting his or her case. Roger Edwards, LLC, v. Fiddes & Son Ltd., 427 F.3d 129, 135 (1st Cir. 2005); MCI Telecomm. Corp. v. Matrix Comm. Corp., 171 F.R.D. 7, 9 (D. Mass. 1997), aff'd, 135 F.3d 27 (1st Cir. 1998).

On timing, Defendants' prayer for relief from the judgment and post-attachment orders squeaks under the wire in that judgment entered on July 11, 2016, and the Motion was filed on July 5, 2017. Otherwise, analyzed from the perspective of Fed. R. Civ. P. 60(b), Defendants fall

12

woefully short of sustaining their burden of demonstrating by clear and convincing evidence that Shaun's testimony – either during trial or at the February 15, 2017, hearing – amounted to fraud, misrepresentation or misconduct.

Beginning with Defendants' proffer of photographs and the copy of what purports to be an almost twelve-year-old invoice relating to the Raymond Weil Watch, there is no need for the Court to get to the bottom of the untimeliness of the proffer, whether these documents are authentic and what they really depict. Assuming, without deciding, that this proffer amounts to what Craig and Molly claim it represents, the photographs prove nothing that would affect the Court's ruling on the jewelry exemption nor do they cast any shadow on Shaun's testimony. For starters, the Court's February 15, 2017, ruling on the jewelry exemption focused on the threshold issue of whether Molly had sustained her burden of proving that she retained less than $2000 in jewelry; at the hearing, the Court made no finding regarding whether the seized Raymond Weil Watch has always belonged to Molly, or whether it belonged to Renate and was stolen by Molly. It is also worth noting that the watch that Craig now claims he purchased for Molly in 2005 and the watch that Molly appears to be wearing in 2006 all have a silver or light colored strap. By contrast, the Raymond Weil Watch supposedly worn by Molly in November 2010 has a black strap, consistent with Molly's testimony that "mine had a black leather band." Tr. at 53. Put differently, taken at face value, the new evidence is equally consistent with the inference that Molly began wearing Renate's Raymond Weil Watch with the black leather band in 2010 after Renate died. The fact that Renate's Raymond Weil Watch was not remembered during Shaun's "painstakingly detailed" trial testimony about Renate's jewelry does not prove that Shaun lied when he testified at the February 15, 2017, hearing that he remembered seeing Renate wearing it before her death.

Equally unavailing is Defendants' redux of their earlier attacks on Shaun's trial testimony, which they now underscore with the liberal use of hyperbolic adjectives ("insidious," "unpardonable," "fantastical"). With no citation to the trial transcript, Defendants hurl the conclusory accusation that Shaun lied when he first admitted under cross examination that he sold Renate's diamond rings, but later recanted. The Court's review of the trial transcript does not turn up any such testimony – rather, the trial transcript reflects that Shaun said that he took the rings to an appraiser in New York, then gave them to Craig who said he could sell them for more in Newport. Shaun never saw them again, except for seeing Molly wearing one of the rings on two occasions. ECF No. 157 at 104-11. The Motion's only allegation that is based on what actually happened during trial relates to the testimony of Plaintiffs' expert witness who admitted he was momentarily confused about what his notes reflected about the size of a wine cooler in the Swiss apartment. ECF No. 153 at 49, 140-41. Defendants seize on this minor (and corrected) discrepancy and label it as one of the "wild claims" that have "gone wholly unchecked throughout this matter." ECF No. 232 at 3.

None of this conceivably amounts to actionable fraud, misrepresentation or misconduct. Craig and Molly are really asking the Court for a do-over of the weighing of the trial evidence. In her lengthy and detailed decision, Judge Lisi expressly addressed the problems with Plaintiffs' proof of damages, including their need to rely on the memory of family members regarding what Laurie and Renate owned before their deaths, as well as the second hand nature of the valuation expert's testimony. 2016 WL 3093448, at *21-24. And, as noted above, Shaun's failure to remember the Raymond Weill Watch during trial proves nothing beyond the frailty of human memory, particularly where there is no suggestion that Shaun or any witness called by Plaintiffs

provided testimony ruling out the possibility that Renate owned the Raymond Weill Watch with a black leather strap.

To summarize, Defendants' proffer does not approach or even hint of fraud, never mind hit the "clear and convincing evidence" standard required to tip over the judgment pursuant to Fed. R. Civ. P. 60(b). Roger Edwards, LLC, 427 F.3d at 135. Nor does it undermine either the Court's seizure order of January 4, 2017, or the order of February 15, 2017, regarding the jewelry exemption. There is no need to go further. At bottom, the standard is clear and convincing evidence of fraud and Defendants have not come close. I find that Defendants' Motion based on Fed. R. Civ. P. 60(b)(3) to vacate the final judgment or any of the orders related to the writ of attachments should be denied.

### B. Rule 60(d)(3) – fraud on the court

An alternative path for Defendants is Fed. R. Civ. P. 60(d)(3), which states that the provisions of Fed. R. Civ. P. 60 as a whole should not be construed to limit the court's power to "set aside a judgment for fraud on the court." To succeed at overturning a judgment under Fed. R. Civ. P. 60(d)(3) requires a showing of fraudulent misconduct that is even more comprehensive or reprehensible than what is enough to demonstrate common law fraud or misconduct under Fed. R. Civ. P. 60(b). George P. Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 48 (1st Cir. 1995). Thus, "[t]his provision requires an unconscionable scheme or the most egregious conduct designed to corrupt the judicial process." Fontanillas-Lopez, 136 F.3d at 158 (internal quotations omitted). To hit this bar, perjury alone, even resulting from collusion between a litigant and a witness, is not sufficient to demonstrate fraud on the court, absent the involvement of an officer of the court. Reintjes, 71 F.3d at 49. Examples of what might constitute fraud on the court include bribery of a judge or some other tactic employed to exert

improper influence on the court. Roger Edwards, LLC, 427 F.3d at 133. As with Fed. R. Civ. P. 60(b), the evidence must be clear and convincing. Fontanillas-Lopez, 136 F.3d at 158.

There is no need to linger on this analysis. Even if the Court agreed, which I do not, that the Plaintiffs' expert and Shaun both perjured themselves, these misdeeds would not rise (or sink) to the level of fraud on the Court, during either the bench trial or during the post-attachment evidentiary hearing. Consequently, reexamined through the lens of Fed. R. Civ. P. 60(d)(3), Defendants' Motion to overturn the judgments and orders resulting from those proceedings should be denied.

### C.     Unclean Hands

Defendants invest significant energy on the equitable doctrine of unclean hands, arguing it may be invoked to dismiss claims or defenses of litigants who use underhanded means to advance their cause. Specifically, Craig and Molly characterize Shaun as having "very unclean hands" when he undertook to "deceive the court for his own remunerative benefit . . . ." Based on Shaun's supposed unclean hands, Craig and Molly ask the Court to impose sanctions on Plaintiffs, including to dismiss the case, to find that Shaun is guilty of contempt, and to award Defendants attorneys' fees[11] and costs.

Generally, a defense based upon "unclean hands" is used in the course of litigation and is directly related to the merits of the controversy. Travers v. Flight Servs., Inc., 808 F.3d 525, 538 (1st Cir. 2015); see Rederford v. U.S. Airways, Inc., 589 F.3d 30, 38 (1st Cir. 2009) ("Unclean hands is a doctrine requiring that parties seeking equitable relief be honest and fair with the court."). "The basic premise is that when a district court considers whether or not to award

---

[11] This aspect of the Motion makes no sense – Defendants have not been represented by counsel since August 2015, well before the bench trial, when both their attorneys withdrew from the case. ECF Nos. 97, 100; Text Orders of Aug. 17, 2015.

16

equitable relief, one factor it must consider is the extent to which the plaintiff has engaged in certain misconduct." Dr. Jose S. Belaval, Inc. v. Perez-Perdomo, 488 F.3d 11, 15 (1st Cir. 2007). The doctrine does not serve as a basis to overturn a judgment or orders pursuant to Fed. R. Civ. P. 60. Accordingly, Defendants' arguments based on unclean hands should be rejected as a matter of law.

While that resolves Defendants' unclean hands argument, the Court is compelled to go one step further and observe that the fraudulent – indeed criminal – conduct of Craig and Molly is well established in the Trial Decision; my findings that Defendants' testimony and post-hearing proffer in connection with the February 15, 2017, evidentiary hearing utterly lacked credibility are consistent with Judge Lisi's trial findings. By contrast, Judge Lisi found Shaun to be credible and I found no basis to question the veracity of his testimony during his brief appearance at the February 15, 2017, hearing. Thus, the unclean-hands doctrine is also inapt because Defendants have made no plausible showing that Plaintiffs have engaged in any misconduct. Rederford, 589 F.3d at 38 ("Here, there was no misconduct.").

Because Defendants have failed to present any evidence that Plaintiffs committed fraud, misconduct, misrepresentation or fraud on the Court or failed to comply with any order or directive of the Court, I do not recommend the assessment of any sanctions against them or a finding of contempt by Shaun; nor do I recommend that the Court award attorneys' fees or costs to Defendants.

## III. CONCLUSION

For the foregoing reasons, to the extent that the Motion seeks to overturn the judgment or impose a finding of contempt by Shaun or an award of sanctions, attorney's fees or costs, I recommend that Defendants' Motion to Find Plaintiff's Liable for Fraud on the Court and

Application of Sanctions for Plaintiff's Misconduct (ECF No. 232) be denied. Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

To the extent that the Motion seeks to vacate my January 4, 2017, order of seizure and the orders entered during and following the evidentiary hearing of February 15, 2017, it is denied. Accordingly, Plaintiffs are released from that part of the Court's order preventing the sale of the Raymond Weil Watch. Based on this order, Plaintiffs are now free to sell the Raymond Weil Watch in accordance with the Order on Instructions Regarding Sale of Attached Property. ECF No. 241.

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
September 27, 2017